**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

CODY BUTLER,

                    Plaintiff,

          -against-

ST. STANISLAUS KOSTKA CATHOLIC
ACADEMY and THE DIOCESE OF BROOKLYN,

                    Defendants.

---

DATE OF SERVICE:
NOVEMBER 19, 2020


19-CV-3574 (EK)(ST)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF
CIVIL PROCEDURE**

Richard J. Cea, Esq.
Wingate, Kearney & Cullen, LLP
45 Main Street, Ste. 1020
Brooklyn, New York 11201
(718) 852-5900
*Attorneys for Defendants St. Stanislaus Kostka
Catholic Academy and the Roman Catholic Diocese
of Brooklyn, New York*

*Of counsel*
Mark E. Chopko, Esq.
Marissa Parker, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

LEGAL ARGUMENT ............................................................................................................. 3

I.      SUMMARY JUDGMENT STANDARD. ................................................................. 3

II.     THIS ACTION IS BARRED BY RELIGIOUS FREEDOM DEFENSES.................... 4

   A.  The Ministerial Exception. ........................................................................................ 4

      1.  Framework of the Ministerial Exception. .................................................... 5

      2.  The Ministerial Exception Applies Here. ................................................... 11

        a.  Plaintiff's Role as An Academy Teacher is One of Ministry.................... 11

        b.  Adjudicating Plaintiff's Case Will Cause Excessive Entanglement. ........ 15

   B.  Statutory Exemptions. ............................................................................................. 16

      1.  Title VII. ..................................................................................................... 16

      2.  The NYSHRL and NYCHRL. .................................................................... 18

   C.  The New York State Constitution. ........................................................................... 19

III.    PLAINTIFF CANNOT PREVAIL ON THE MERITS. ........................................... 19

   A.  The McDonnell-Douglas Burden Shifting Framework..................................... 20

   B.  Plaintiff Cannot Establish A *Prima Facie* Case........................................................ 20

      1.  Discrimination. ........................................................................................... 20

      2.  Retaliation................................................................................................... 22

   C.  Defendants Have Offered A Legitimate, Non-Discriminatory Reason Which Plaintiff
      Cannot Show is Pretext. .......................................................................................... 24

IV.    THE DIOCESE WAS NEVER PLAINTIFF'S EMPLOYER WITHIN THE
       MEANING OF TITLE VII, THE NYSHRL, THE NYCHRL, OR THE NYLL. ......... 26

   A.  The Diocese is Not an Employer Within the Meaning of the Statutes. ..................... 26

      1.  Title VII. ..................................................................................................... 26

      2.  NYSHRL & NYCHRL................................................................................ 28

      3.  NYLL. ......................................................................................................... 30

   B.  The Diocese Cannot Be Held Liable Under Any Other Theories............................. 30

      1.  Plaintiff is Precluded From Claiming Any Other Theories of Employment............. 30

      2.  The Diocese Is Not A "Joint Employer." ................................................... 32

      3.  The Diocese Is Not A "Single Employer" with the Academy. ................... 33

CONCLUSION....................................................................................................................... 34

**TABLE OF AUTHORITIES**

**Cases**                                                                     **Page Number(s)**

*Anderson v. Delphi Auto. Sys. Corp.*,
   297 F. Supp. 2d 625 (W.D.N.Y. 2004), *aff'd*, 111 Fed. App'x 634 (2d Cir. 2004)................. 21

*Arculeo v. On-Site Sales & Mktg., L.L.C.*,
   425 F.3d 193 (2d Cir. 2005) ....................................................................... 30, 31, 32

*Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith
   Inc.*, 684 F.3d 413 (3d Cir. 2012)..................................................................... 15, 16

*Bennett v. Hofstra Univ.*,
   842 F. Supp. 2d 489 (E.D.N.Y. 2012).................................................................... 3

*Bilquin v. Roman Catholic Church*,
   No. 018588/99, 2000 N.Y. Misc. LEXIS 515 (Sup. Ct. Nassau Cnty. 2000)......................... 18

*Bynog v. Cipriani Group, Inc.*,
   1 N.Y.3d 193 (2003) .................................................................................. 30

*Catholic High Sch. Ass'n of Archdiocese of New York v. Culvert*,
   753 F.2d 1161 (2d Cir. 1985) ......................................................................... 7

*Cent. UTA of Monsey v. Vil. of Airmont*,
   No. 18-CV-11103 (VB), 2020 WL 377706 (S.D.N.Y. Jan. 22, 2020) ................................... 19

*Cowen v. Lily Dale Assembly*,
   44 A.D.2d 772 (App. Div. 4th Dep't 1974) ........................................................... 19

*Creddille v. MTA N.Y. City Transit Auth. & Core Envtl. Corp.*,
   11-CV-5444 (SLT)(RLM), 2014 WL 2917022 (E.D.N.Y. June 25, 2014) .............................. 27

*Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc.*,
   344 F. Supp. 2d 923 (D. Del. 2004), *aff'd*, 450 F.3d 130 (3d Cir. 2006).................................. 18

*Dixon v. Int'l Fed'n. of Accountants*,
   416 F. App'x 107 (2d. Cir. 2011)....................................................................... 22

*Dwyer v. Horne*,
   12-CV-1176 (NG) (VMS), 2017 WL 5197234 (E.D.N.Y. Nov. 8, 2017) ......................... 27, 31

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
   494 U.S. 872 (1990) ................................................................................ 10

*Escobar v. Tutor Perini Corp.*,
   2019 NY Slip Op 31020[U] (Sup Ct. NY Cnty. 2019) ...................................... 28, 31

*Fanelli v. New York*,
   200 F. Supp. 3d 363 (E.D.N.Y. 2016).......................................................... 20, 24

*Fenner v. News Corp.*,
   No. 09-CV-9832 (LGS), 2013 WL 6244156 (S.D.N.Y. Dec. 2, 2013) ....................... 32, 33, 34

*Fortress Bible Church v. Feiner*,
   734 F. Supp. 2d 409 (S.D.N.Y. 2010)........................................................... 19

*Fratello v. Archdiocese of New York*,
   863 F.3d 190 (2d Cir. 2017)..................................................................... 7

*Fratello v. Archdiocese of N.Y.*,
   175 F. Supp. 3d 152 (S.D.N.Y. 2016), *aff'd*, 863 F.3d 190 (2d Cir. 2017) ............... 16

*Gelin v. City of N.Y.*,
   No. 10-CV-5592 (CBA)(VVP), 2013 WL 2298979 (E.D.N.Y. May 24, 2013)............... 24

*Grady v. Affiliated Cent. Inc.*,
   130 F.3d 553 (2d Cir. 1997)..................................................................... 25

*Griffin v. Sirva, Inc.*,
   29 N.Y.3d 174 (2017) ............................................................................ 28, 29

*Gulino v. N.Y. State Educ. Dep't*,
   460 F.3d 361 (2d Cir. 2006)...................................................................... passim

*Hall v. Baptist Mem. Health Care Corp.*,
   215 F.3d 618 (6th Cir. 2000)..................................................................... 17

*Hiralall v. Sentosacare, LLC*,
   13-CV-4437 (GBD), 2016 WL 1126530 (S.D.N.Y. March 18, 2016) ...................... 27

*Hoag v. Fallsburg Cent. Sch. Dist.*,
   279 F. Supp. 3d 465 (S.D.N.Y. 2017)........................................................... 20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  565 U.S. 171 (2012) ............................................................................................ passim

*Hui-Wen Chang v. N.Y.C. Dep't of Educ.*,
  412 F. Supp. 3d 229 (E.D.N.Y. 2019) ............................................................ 20, 21

*Jones-Khan v. Westbury Bd. of Educ.*,
  13-CV-7144 (JS)(GRB), 2017 WL 1483522 (E.D.N.Y. Apr. 25, 2017) ...................... 3, 22, 23

*Jung v. Gina Group, LLC*,
  No. 19-CV-8624 (MKV), 2020 WL 3640048 (S.D.N.Y. July 6, 2020) .................................. 22

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
  334 U.S. 94 (1952) .................................................................................................. 5, 8

*Kelderhouse v. St. Cabrini Home*,
  259 A.D.2d 938 (3d Dep't 1999) .......................................................................... 25

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
  716 F.3d 10 (2d Cir. 2013) .................................................................................... 23

*Killinger v. Samford Univ.*,
  113 F.3d 196 (11th Cir. 1997) .............................................................................. 17

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ................................................................................................ 6

*Little v. Wuerl*,
  929 F.2d 944 (3d Cir. 1991) .................................................................................. 17

*Lu v. Chase Inv. Serves. Corp.*,
  412 F. App'x 413 (2d Cir. 2011) ........................................................................... 24

*MacSweeney v. ING Life Ins. & Annuity Co.*,
  No. 11-CV-971 (VB), 2011 WL 4839086 (S.D.N.Y. Oct. 12, 2011) ....................................... 28

*Matter of A. Uliano & Son. Ltd. v. N.Y. State Dep't of Labor*,
  97 A.D.3d 664 (App. Div. 2d Dep't 2012) ............................................................ 24

*McIntyre v. Longwood Cent. Sch. Dist.*,
  No. 07-CV-1337 (JFB)(ETB), 2008 WL 850263 (E.D.N.Y. March 27, 2008) ........................ 28

iv

*Milhalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
   715 F.3d 102 (2d Cir. 2013) .................................................................................. 21

*Mitchell v. Helms*,
   530 U.S. 793 (2000) ............................................................................................... 10

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) ................................................................................... 5, 6, 10, 19

*NLRB v. Solid Waste Servs.*,
   38 F.3d 93 (2d Cir. 1994) ....................................................................................... 32

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) .................................................................................... passim

*Penn v. New York Methodist Hosp.*,
   158 F. Supp. 3d 177 (S.D.N.Y. 2016), *aff'd*, 884 F.3d 416 (2d Cir. 2018) ............................ 5

*Samide v. Roman Catholic Diocese of Brooklyn*,
   194 Misc. 2d 561 (Sup. Ct. Qns. Cnty, 2003) ................................................. 29, 30

*Sarmiento v. Queens Coll.*,
   386 F. Supp. 2d 93 (E.D.N.Y. 2005), *aff'd*, 153 Fed. App'x 21 (2d Cir. 2005). ............... 21, 25

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ......................................................................................... 10, 15

*Sotomayer v. City of N.Y.*,
   862 F. Supp. 2d 226 (E.D.N.Y. 2012) ................................................. 20, 22, 23, 24

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993) ............................................................................................... 20

*Stinson v. City of N.Y.*,
   17-CV-3949 (KBF), 2018 WL 2727886 (S.D.N.Y. June 6, 2018) ..................... 31, 33

*Triola v. ASRC Mgt. Servs.(ASRC MS)*,
   No. 10-CV-560 (ERK)(LB), 2011 WL 6181731 (E.D.N.Y. Dec. 12, 2011) ............. 26, 32

*United States v. N.Y. State DMV*,
   82 F. Supp. 2d 42 (E.D.N.Y. 2000) ....................................................................... 34

*Velez v. SES Operating Corp.*,
   07-CV-10946 (DLC), 2009 WL 3817461 (S.D.N.Y. Nov. 12, 2009) ............................... 24, 25

*Watson v. Jones*,
   80 U.S. (13 Wall.) (1871) ........................................................................................... 10

*Workneh v. Pall Corp.*,
   897 F. Supp. 2d 121 (E.D.N.Y. 2012) ......................................................................... 21

*Zolondek v. Worldwide Flight Servs.*,
   02-CV-2030 (DLI)(LB), 2006 WL 4100886 (E.D.N.Y. Aug. 26, 2006), (Report and
   Recommendation), *adopted by*, 2007 WL 680778 (E.D.N.Y. Mar. 2, 2007) .......................... 22

**Statutes**

42 U.S.C. § 2000e(j) ................................................................................................. 17

42 U.S.C. § 2000e-1(a) ............................................................................................. 17

42 U.S.C. § 2000e-2(e)(2) ......................................................................................... 17

Fed. R. Civ. P. 56 ............................................................................................... 1, 3

N.Y. Exec. L. § 296 (11) ........................................................................................... 18

N.Y.C. Admin. Code § 8-107(7) .................................................................................. 23

N.Y.C. Adm. Code § 8-107(12) .................................................................................. 18

**Constitutional Provisions**

N.Y. Const. art. I, § 3 ............................................................................................. 19

**Other Authorities**

Catechism of the Catholic Church 8 (2d ed. 2016)....................................................... 11

Defendants St. Stanislaus Kostka Catholic Academy (the "Academy") and The Roman Catholic Diocese of Brooklyn, New York, s/h/a Diocese of Brooklyn ("Diocese," and together, "Defendants"), by their attorneys, respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 56.

## PRELIMINARY STATEMENT

In 2015, the Academy, a Roman Catholic elementary school, offered Plaintiff employment as a teacher.  (Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("SUF"), ¶ 78).  The Academy, and the Roman Catholic Church ("Church"), consider teachers "ministers" of the Catholic Faith (the "Faith") and essential to furthering the Catholic mission.  (SUF, ¶¶ 17-26).  Before the 2015-16 school year began, Plaintiff attended orientation where he was instructed, among other things, that all teachers must "[e]mbrac[e] the ministry of the Catholic school."  (SUF, ¶ 48).  After one day of orientation, Plaintiff e-mailed the principal of the Academy informing her that he is homosexual, plans on marrying his boyfriend "eventually," and feels "wounded and unwanted" after "being told all day that [he has] to live church doctrine . . . . " (SUF, ¶ 99).

The Academy determined, based on Plaintiff's e-mail, Plaintiff was in violation of the Faith by intending to marry his boyfriend and appearing to reject Catholic teachings.  (SUF, ¶ 119).  Given that all teachers must live in accord with Catholic Faith and morals (indeed, Plaintiff signed a contract where he expressly agreed to do so), the Academy rescinded Plaintiff's offer.  (SUF, ¶¶ 79-80, 107-119).  Plaintiff sued for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and a New York Labor Law ("NYLL") claim.

Summary judgment on all Plaintiff's claims is proper because the claims are all barred by Constitutional principles and statutory exemptions that protect religious freedom, namely:  (1) the

ministerial defense, based in the First Amendment of the United States Constitution; (2) statutory exemptions in Title VII, the NYSHRL, and the NYCHRL, which protect decisions made by religious organizations to further their religious purpose; and (3) the New York State Constitution.

Foremost, the ministerial exception forbids courts from adjudicating employment disputes between religious organizations and employees who carry out the organization's mission.  The Supreme Court recently held that the ministerial exception bars employment discrimination claims by lay teachers in religious schools, like Plaintiff, because the "religious education and formation of students is the very reason" for Catholic schools' existence and therefore "the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission."  *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). Here, the record is replete with evidence that Plaintiff's role as teacher was to convey the Faith. The Academy only hired "practicing Roman Catholic[s] committed to the mission of Catholic education," viewed all teachers as ministers who serve as "role models" of the Faith, expected all teachers to infuse Catholic values into lessons, mandated teachers to participate in a faith formation program, contractually declared that its teachers are "essential to the ministry of conveying the Faith," and held daily prayer sessions for all students and teachers.  (SUF, ¶¶ 27, 29, 34, 40, 52, 58-60, 64).  Given Plaintiff's role as a minister, judicial review of this action "would undermine the independence of religious institutions in a way that the First Amendment does not tolerate." *Our Lady of Guadalupe*, 140 S. Ct. at 2055.

Even if the religious defenses were not a complete bar, Plaintiff cannot succeed on the merits.  He cannot establish a *prima facie* case of discrimination because his violation of the Faith rendered him unqualified for the teaching position, and the record contains no inference of discrimination as it is devoid of homophobic bias.  (SUF ¶, 119).  Plaintiff did not engage in a

"protected activity" necessary to establish his retaliation claims, as he admitted that he e-mailed the principal for "clarification" of doctrine—not to complain of discrimination.  (SUF ¶, 101).  Even if Plaintiff could state these claims, Defendants have offered a legitimate, non-discriminatory reason grounded in Defendants' religion for rescinding his offer:  he violated Catholic Faith and morals.  (SUF ¶¶, 107-119).  The record contains no evidence that the reason was pretextual, or that "but-for" discrimination Plaintiff would have remained hired, the heightened standard he must meet for his retaliation claim to prevail.

Finally, the Diocese cannot be held liable as an employer, as it did not interview, hire, evaluate, supervise, provide feedback to, supply classroom materials to, pay, or control the schedule of Academy teachers.  (SUF, ¶¶ 76-79, 179-85, 189, 194-95).

## STATEMENT OF FACTS

For the sake of brevity, Defendants respectfully request that their Statement of Undisputed Facts Pursuant to Local Rule 56.1 be fully reinstated herein as the Statement of Facts.

## LEGAL ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 496 (E.D.N.Y. 2012) (citing FED. R. CIV. P. 56(c)).  "The movant bears the burden of establishing that there are no genuine issues of material fact." *Jones-Khan v. Westbury Bd. of Educ.*, 13-CV-7144 (JS)(GRB), 2017 WL 1483522, at *5 (E.D.N.Y. Apr. 25, 2017).  "Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating a genuine issue for trial." *Id.* (quotations omitted).

3

## II.     **THIS ACTION IS BARRED BY RELIGIOUS FREEDOM DEFENSES.**

### A.  The Ministerial Exception.

Over the past decade, the Supreme Court has made explicit that the First Amendment forbids inquiry into the employment decisions of religious organizations where the employee has a role in ministry.  *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2055; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012).  This pronouncement in *Hosanna-Tabor*, further sharpened in *Our Lady of Guadalupe*, is grounded in the First Amendment's protection of a religious organization's ability to order its governance and operations according to religious principles.  The Supreme Court recently framed the ministerial exception in terms equally applicable to the case at bar:

> The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore **the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission**. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Our Lady of Guadalupe*, 140 S. Ct. at 2055 (emphasis added).

The record here is replete with evidence that both correct beliefs and correct actions are expected of all Academy teachers, who are "essential to the ministry of conveying the Faith." (SUF, ¶ 34).  In pursuing this ministry, Plaintiff agreed to be a role model of the Catholic Faith to his students, to include the Church's teachings in his lessons and classroom, and to support and exemplify Catholic doctrine and morality through his public conduct.  (SUF, ¶ 34).  He recognized that he might not be able to qualify to teach at the Academy.  (SUF, ¶ 99).  The Academy's decision to rescind its offer of employment to Plaintiff is not susceptible to civil adjudication because of the mission-centric position he sought; rather, the decision falls within the ministerial exception. Plaintiff's protestations that another teacher may have not met all of Defendants' expectations, or

4

that the decision to rescind Plaintiff's offer "due to the violation of Catholic faith and morals" was pretextual only underscore that the Court must abstain from inquiry or else become impermissibly entangled in the religious principles and motives challenged by Plaintiff.  For all of these reasons, Defendants urge the Court to find that the ministerial exception applies to Plaintiff's claims and grant summary judgment in their favor.

1.   Framework of the Ministerial Exception.

The Religion Clauses of the First Amendment protect the rights of churches and other religious institutions to decide matters of faith and doctrine without government intrusion.  *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (quoting *Hosanna-Tabor*, 565 U.S. at 186, quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 334 U.S. 94, 116 (1952)) (internal quotations omitted).  The ministerial exception is a structural safeguard that prohibits judicial scrutiny into the selection of individuals by religious organizations to carry out its mission, aligning the protections promised by both the Free Exercise and Establishment Clauses.  "By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 188–89.  The religious nature of an entity's purpose and mission, and how the challenged employee's role relates to the mission, are the two drivers in applying the ministerial exception.  *See, e.g., Penn v. New York Methodist Hosp.*, 158 F. Supp. 3d 177, 182 (S.D.N.Y. 2016), *aff'd*, 884 F.3d 416 (2d Cir. 2018).

The mission of church-operated education, and the "critical and unique" role of teachers in delivering that mission, has been recognized by the Supreme Court for many decades.  *NLRB v.*

*Catholic Bishop of Chicago,* 440 U.S. 490, 501 (1979); *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971) ("Religious authority necessarily pervades the [parochial] school system."). In the seminal case of *Lemon v. Kurtzman*, concerning the constitutionality of state aid to the Roman Catholic elementary schools of Rhode Island, the Supreme Court explained some years ago that "instruction in faith and morals is part of the total educational process" of those schools and that "the parochial schools constituted 'an integral part of the religious mission of the Catholic Church.'" *Lemon v. Kurtzman*, 403 U.S. 602, 615–16 (1971). There, the Court rejected actual testimony by teachers about how they did not inject religion into their classes, observing that each "teacher is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith." *Id.* at 618.

More recently, the Supreme Court has twice examined the roles of teachers in religious organizations to find they were "ministers" for purposes of the exception, eschewing titles and checklists in favor of focusing on the role of and responsibilities placed on the employee in view of the organizational mission. *Our Lady of Guadalupe*, 140 S. Ct. at 2064, 2067-68; *Hosanna-Tabor*, 565 U.S. at 190. In its landmark unanimous adoption of the exception, the *Hosanna-Tabor* Court considered, among other things, plaintiff Perich's title, her training, her job duties, and her "role in conveying the Church's message and carrying out its mission." 565 U.S. at 192. Perich had been a kindergarten and fourth grade teacher at the K-8 Lutheran school, which offered "Christian-centered education." *Id.* at 177. She initially taught as a lay teacher, then became a "called" (religiously commissioned) teacher at the school's invitation. *Id.* at 178. Perich took extended medical leave and the school hired a lay teacher to replace her; when she sought to return, an employment dispute ensued over her ability to resume teaching. The school terminated her employment based upon her "insubordination and disruptive behavior," as well as the damage she

6

had done to her working relationship with the school by "threatening to take legal action." *Id.* at 179. Perich then sued under the ADA for retaliation.

In finding that Perich's claims were barred by the ministerial exception, the Supreme Court pointed to numerous facts concerning "the circumstances of her employment," including that (i) the school held Perich out as a "minister" by extending her a "call," which required Perich undertake a significant amount of religious training, and which she did; (ii) Perich regarded herself as part of the "teaching ministry;" (ii) her job duties required her to lead others toward Christian maturity and faithfully teach the "Word of God;" and (iv) Perich taught both secular and religious subjects, led students in daily prayer, attended weekly school-wide chapel services, and twice a year led chapel services. The Court emphasized it was not adopting a formulaic analysis; no title, amount of time spent on religious functions, or particular amount of religious training was dispositive to its determination. *Hosanna-Tabor*, 565 U.S. at 191-94.

Importantly, *Hosanna–Tabor* expressly rejected the suggestion that the ministerial exception's viability in an employment discrimination lawsuit hinges upon the motivation or effect of the religious institution's employment decision. 565 U.S. at 194-95; *accord Catholic High Sch. Ass'n of Archdiocese of New York v. Culvert*, 753 F.2d 1161, 1168 (2d Cir. 1985) ("the First Amendment prohibits the State Board from inquiring into an asserted religious motive [in discharging an employee] to determine whether it is pretextual."); *see also Fratello v. Archdiocese of New York*, 863 F.3d 190, 202–03 (2d Cir. 2017) (citing *Hosanna-Tabor* for the proposition that "those properly characterized as 'ministers' are flatly barred from bringing employment-discrimination claims against the religious groups that employ or formerly employed them."). As the Supreme Court explained, "[t]hat suggestion misses the point of the ministerial exception. The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is

made for a religious reason." *Hosanna-Tabor*, 565 U.S. at 194.  Rather, the exception "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Id.* at 195 (quoting *Kedroff*, 344 U.S. at 119).  Put differently, "[w]hen a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way." *Id.* at 196.  Thus, the ministerial exception prevents a court from evaluating the employment decisions of a religious organization regardless of whether the court would be required to delve into religious doctrine.

Recently, in *Our Lady of Guadalupe*, the Court emphasized that the nature of this inquiry must be tailored to the specific role at issue, recognizing that for religious school teachers, "[t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." 140 S. Ct. at 2055.  There, two Catholic elementary school teachers sued for employment discrimination.  As lay Catholic elementary school teachers, plaintiffs were the students' "primary teachers of religion," which included preparing students for participation in the Mass, for communion and confession.  *Id.* at 2057, 2060, 2067.  The Court inventoried the responsibilities placed on plaintiffs through their employment agreements and faculty handbooks, including "to develop and promote a Catholic School Faith Community," to "model and promote" Catholic "faith and morals" and "mode[l] the faith life," and to "integrat[e] Catholic thought and principles into secular subjects."  *Id.* at 2056-59 (quotations in original).  The teachers were expected to take religion courses at the school's request, attend faculty prayer services, pray with students, and participate in school liturgical activities.  *Id.* at 2057, 2059.  The teachers' performance was reviewed in a "Classroom

Observation Report" that considered whether Catholic values were "infused through all subject areas" and whether there were religious signs and display in the classroom. *Id.* at 2057, 2059. Each school claimed to terminate the plaintiffs for poor classroom performance: Plaintiff Morrissey-Berru for difficulty implementing a literacy program, and Plaintiff Biel for failing to observe the planned curriculum and keep an orderly classroom. *Id.* at 2058-59.

In finding that the schools' decisions to terminate each plaintiff fell within the ministerial exception and barred plaintiffs' discrimination claims, the Court recounted "why a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* at 2060. The ministerial exception protects a church's teaching authority by foreclosing employment discrimination claims brought against religious organizations by any "employee . . . who serves as a messenger or teacher of its faith." *Id.* at 2061, 2063 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J. concurrence)). In applying this standard, the Court noted the differences between the roles and experiences of Perich in *Hosanna-Tabor*, on one hand, and Morrissey-Berru and Biel, on the other, but found those differences immaterial to applying the ministerial exception. *See id.* at 2055, 2063-64 (discussing how neither Morrissey-Berru nor Biel held a title of minister and each had less religious training that Perich). "[I]mplicit in our decision in *Hosanna-Tabor* was a recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064. The record reflected this recognition in the employment agreements and faculty handbooks that "specified in no uncertain terms that [plaintiff teachers] were expected to help the schools carry out the mission" and they were "expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith." *Id.* at 2066.

9

Although the schools' stated basis for plaintiffs' employment termination in *Our Lady of Guadalupe* was not expressly religious, application of the ministerial exception helped avoid impermissible entanglement by the court in considering the plaintiff employee's challenge to the meaning of religious expectations. *See id.* at 2069 (declining to delve into "sensitive question of what it means to be a 'practicing' member of a faith"). Judicial inquiry into whether an employee's conduct does or does not meet the Church's expectations would eviscerate the purpose of the ministerial exception.[1] *See id.* This type of judicial abstention is well established. *See, e.g., Mitchell v. Helms,* 530 U.S. 793, 828 (2000) ("courts should refrain from trolling through a person's or institution's religious beliefs") (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 887 (1990) (collecting cases)); *Catholic Bishop of Chicago*, 440 U.S. at 502 ("The resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry leading to findings and conclusions*.") (emphasis added); *see also Hosanna-Tabor*, 565 U.S. at 194 ("An award of [monetary damages] would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination.").

This constitutional jurisprudence culminates in the central teaching of *Our Lady of Guadalupe*: "When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school

---

[1]   Similarly, civil courts may not inquire into contractual matters whose enforcement would require a searching and therefore impermissible inquiry into church doctrine. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976); *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871).

and the teacher threatens the school's independence in a way that the First Amendment does not allow." 140 S. Ct. at 2069. This teaching bars litigation of this case.

> 2. The Ministerial Exception Applies Here.

There is no dispute that the Diocese and Academy are religious organizations entitled to invoke the ministerial exception. (*Cf.* ECF Nos. 50, 52). The only question is whether Plaintiff's role as an Academy teacher is sufficiently integral to the Catholic school mission such that the First Amendment forbids the Court from determining who should fill that role. Defendants respectfully submit that Plaintiff's role meets the requirements for the ministerial exception.

> a. *Plaintiff's Role as An Academy Teacher is One of Ministry.*

The employee expectations and employment framework within which the Academy had proposed to hire Plaintiff as a 7th and 8th grade teacher are that of religious ministry. The mission of the Academy is to educate students in a "nurturing environment that emphasizes Catholic values, the beauty of diversity and a love of God, others and life-long learning." (SUF, ¶ 6). As the recent case of *Our Lady of Guadalupe* aptly recognizes, "[i]n the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" 140 S. Ct. at 2065 (quoting Catechism of the Catholic Church 8 (2d ed. 2016)). The Academy's Handbook, Employment Contract, New Teacher Orientation, and related correspondence all drive home the point that the Academy teachers are the people who carry out this day-to-day mission and ministry.

As in *Our Lady of Guadalupe*, this ministry principle is firmly embedded in the Academy's Handbook, the first section of which is titled "Guiding Principles for Catholic School Teachers," and states in relevant part:

> The TEACHER and the Academy is involved in the ministry of teaching and conveying the Roman Catholic Faith. The TEACHER is essential to the ministry of conveying the Faith. The Teacher is to teach and convey the Roman Catholic Faith by being a role model of the Catholic Faith to their students. The TEACHER is to support and exemplify by his/her public conduct Catholic Doctrine and

> Morality. The TEACHER is to include the Church's teachings within the content/subject matter of all subjects. The TEACHER is to incorporate objects of Catholic Faith into the learning environment and she/he will have religious articles displayed in the classroom at all times. The TEACHER shall not teach, advocate, encourage, or counsel beliefs or practices contrary to the Catholic Faith,

(SUF, ¶ 40). This introduction is followed by exhorting each teacher to, among other things, be a practicing Roman Catholic; embrace the evangelizing mission of the Church; live the reality of the Faith Community; demonstrate an acceptance of Gospel value and the Roman Catholic tradition; and be willing and able to teach and defend the dogmatic truths of the Church in areas of Faith and morals as it pertains to age-appropriate classroom curriculum. (SUF, ¶ 41).

The Handbook advises that all newly hired teachers must participate in a two-day New Teacher Orientation Program immediately before the school year begins and are required to complete the *Living and Leading by Faith* Catechist Faith Formation Program ("LLF") within four years of hiring. (SUF, ¶¶ 29-30, 45). It also warns that "[j]ust cause for discipline, suspension or termination of a teacher's employment" includes "[v]iolation of the tenets of Catholic morality or teaching contrary to Catholic doctrine." (SUF, ¶ 44).

The Academy expects all teachers to share in the responsibilities for students' Catholic formation by, among other things, influencing their spiritual, moral and cognitive development; encouraging them to make Catholic value judgments in their choices; and fostering in them an apostolic consciousness. (SUF, ¶ 42). This includes participating in school-wide morning prayer, leading prayer before lunch, and leading prayer at the end of the day (SUF, ¶¶ 64, 67). It also includes incorporating religion into all subjects. (SUF, ¶¶ 58-60 ("religion is expected to be incorporated into whatever subject the teachers teach, including prayer with the students in the classroom . . . in English language arts especially, there would be written assignments during the course of the year that would [] have a connection to religion")).

The Academy and Plaintiff both recognized and embraced the ministry of Catholic education as integral to the role of an Academy teacher from the outset. When soliciting candidates to apply for a teacher position at the Academy, the Academy's publicly listed job qualifications include being "a practicing Roman Catholic committed to the mission of Catholic education." (SUF, ¶ 27). Educated in Catholic schools and poised to serve as Catholic teacher, Plaintiff espoused his view of meeting this qualification in his application letter to the Academy for the 7th and 8th grade Social Studies and English Language Arts teaching position:

> It is important for me, as a way of enacting my faith, to teach in a Catholic setting. Only in Catholic Schools, is the education of the soul at the center of the curriculum, and as John Paul II said, "the cornerstone of this curriculum is Christ".

(SUF, ¶ 70). Plaintiff's own religious education at Catholic primary and secondary schools in New York, which he listed on his resume (SUF, ¶¶ 72-73), and completion of the Sacraments of Baptism, Reconciliation, Communion, and Confirmation (SUF, ¶ 74) were viewed as significant religious training. (SUF, ¶ 75).

The ministerial nature of serving as an Academy teacher was again reinforced in the employment contract dated August 28, 2015, presented by the Academy and executed by Plaintiff. It recites the same Guiding Principles for Catholic School Teachers paragraph above, including that an Academy teacher is "essential to the ministry of conveying the Faith." (SUF, ¶ 34). The contract incorporates the Handbook and reiterates many of the key expectations and requirements summarized above. (SUF, ¶¶ 34-35, 37).

While Plaintiff ultimately never taught at the Academy, he did attend some portion of the Academy's New Teacher Orientation, which was organized and run by the Diocese for all newly-hired teachers at schools throughout the Diocese (SUF, ¶¶ 45, 95). The letter directed to the attending teachers from the Superintendent enclosing the Orientation schedule set the stage:

13

> As a Catholic elementary school teacher, you are called to witness the faith and to teach as Jesus did. . . . [Y]ou as teacher, have the awesome responsibility of bringing the Gospel message to the students . . . As you prepare for this new ministry, take the time to reflect upon the important role you will play in forming the lives of the future members of the Catholic Church. . . .

> Key to your professional growth and development is having knowledge of what is expected of you as you begin your educational apostolate. . . . Through the Office of the Superintendent for Catholic School Support Services you will be provided with an initial and ongoing program of Professional Development [including] the New Teacher Orientation.

(SUF, ¶ 93). After morning prayer and mass on the second day of Orientation, the program featured presentations on "Mission and Ministry of Catholic Education" by the Superintendent, "Teacher as Catechist – Living and Leading by Faith" by the Director of the Office of Faith Formation, and an afternoon session on the LLF methodology. (SUF, ¶ 96). The third and final day of orientation included a one-hour discussion on "How Do We Bring Religion Into Everything We Teach?" (SUF, ¶ 96). Each of these programs drew upon the above-described principles, for example, fostering discussion with the teachers about their "strengths as a Catechist" (SUF, ¶ 50) and providing exemplar lessons and materials that infuse Catholic identity (SUF, ¶ 52), recognizing that "by our vocation and work in Catholic schools, **every** teacher is a **Religion** teacher." (SUF, ¶ 57) (emphasis in original).

After attending enough of the orientation to fully absorb these expectations, Plaintiff questioned whether he was fit to be a teacher at the Academy, emailing "I cannot tell if I would be accepted. I am homosexual and plan on marrying my boyfriend eventually, and after being told all day that I have to live church doctrine I feel wounded and unwanted. . . . Would I still be a welcome member of the St. Stan's community?" (SUF, ¶ 99). In response, and after internal discussion, the principal replied "Thank you for your email and your honesty. Unfortunately, we cannot enter into a contract for employment with you as a teacher in this Catholic institution due

14

to the violation of the Catholic faith and morals of our school."  (SUF, ¶ 119).

The Academy's decision to rescind Plaintiff's offer of employment squarely fits into the ministerial exception because of the inherently mission-based nature of the role of Academy teachers in educating children in this Catholic elementary school.  As in *Our Lady of Guadalupe*, had Plaintiff taught at the Academy, he would have been expected to abide by the terms of the Academy's Handbook and employment contract, engaged in and led prayer with his students, prepared lessons infused with Catholic values, and guided his students "by word and deed, toward the goal of living their lives in accordance with the faith."  140 S. Ct. 2066.  Thus, the role of Academy teacher for 7th and 8th grade social studies and English language arts is that of a minister.

b. *Adjudicating Plaintiff's Case Will Cause Excessive Entanglement.*

In his pre-motion letter briefing, Plaintiff suggested that his proposed teaching role was not ministerial—and therefore not susceptible to the exception—because Academy teacher Ms. Puglionisi, who taught for one year in the role Plaintiff had sought, may have not met all of Defendants' above-listed expectations and was not disciplined.  (ECF Nos. 50 at 2, 52 at 2.)  He also contended that Defendants' decision to rescind Plaintiff's offer "due to the violation of Catholic faith and morals" was pretextual only, and therefore the exception should not apply. These arguments both misconstrue the purpose and utility of the ministerial exception, and neither provide a basis to avoid application of the exception.

First, the Academy's evaluation of whether and how Ms. Puglionisi included the Church's teachings in her classroom lessons and exemplified them in public conduct is precisely the type of inquiry this Court must avoid.  Review of a religious organization's compliance with its own rules and regulations in arriving at a decision "would undermine the general rule that religious controversies are not the proper subject of civil court inquiry." *Milivojevich*, 426 U.S. at 713; *Accord Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic*

15

*Faith Inc.*, 684 F.3d 413, 420 (3d Cir. 2012) (declining to consider arguments about termination of membership within church on First Amendment grounds).  It is not the job of civil courts to review how religious organizations evaluate their ministers.  *See Our Lady of Guadalupe*, 140 S. Ct. at 2068 ("The schools in question here thought that [plaintiffs] had a sufficient understanding of Catholicism to teach their students, and judges have no warrant to second-guess that judgment or to impose their own credentialing requirements.").

Second, Plaintiff's suit challenges the Academy's decision not to select Plaintiff to be one of its teachers, which the Academy stated was based upon "violation of the Catholic faith and morals of our school" (SUF, ¶ 119), but which Plaintiff contends was discriminatory.  *Hosanna–Tabor* foreclosed this argument; the motivation or effect of the religious institution's employment decision is not relevant to whether the institution has the autonomy to select its ministers. 565 U.S. at 194-95.  This rule was followed in *Our Lady of Guadalupe*, where both teachers were terminated on seemingly secular grounds of poor classroom performance, which the teachers challenged as discriminatory.  140 S. Ct. at 2058-59.  The Supreme Court did not test the veracity of the school's reasons for termination, it focused on the schools' "explanation of the role of such employees in the life of the religion in question," the teachers' qualifications and training, and the day-to-day responsibilities and obligations placed on the teachers by the school, and concluded that the teachers performed "vital religious duties." *Id.* at 2066.  The same reasoning follows here. [2]

### B.  Statutory Exemptions.

#### 1.  Title VII.

---

[2] The Court should further decline to exercise supplemental jurisdiction over Plaintiff's state and city claims, as "traditional values of judicial economy, convenience, fairness and comity weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial."  *See Fratello v. Archdiocese of N.Y.*, 175 F. Supp. 3d 152, 168 (S.D.N.Y. 2016), *aff'd*, 863 F.3d 190 (2d Cir. 2017) (quotations omitted) (declining to exercise supplemental jurisdiction over NYSHRL and breach of contract claims where federal discrimination and retaliation claims were barred by the ministerial exception).

Religious exemptions in Title VII further bar Plaintiff's federal claims.  Section 2001e-1 of Title VII states that the protections of Title VII do not apply to:

> a religious corporation [or] educational institution . . . with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation [or] educational institution . . . of its activities.

42 U.S.C. § 2000e-1(a).  In the education context, Section 2001e-2(a) states that:

> it shall not be an unlawful employment practice for a school . . . or other educational institution or institution of learning to hire and employ employees of a particular religion if such school . . . or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion . . . or if the curriculum of such school . . . or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

What constitutes a "particular religion" has been interpreted to not only include where a religious institution exercises a preference in hiring candidates of its own religion, but also where a religious employer makes a "decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer."  *Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 200 (11th Cir. 1997) (finding the exemptions barred a discrimination claim where a religious university removed a professor whose religious beliefs differed from that of the dean); *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) ("We conclude that the permission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts.").  This is supported by the statutory text, which defines "religion" as "all aspects of religious observance and practice, as well as belief . . . ."  42 U.S.C. § 2000e(j).

The Academy's decision falls within these exemptions.  The Academy found that Plaintiff's statement of intent to marry his boyfriend did not "coincide with [its] Catholic morals

and values" as "same sex marriage is not recognized by the Church."   (SUF, ¶¶ 107, 109).  Thus, the Academy determined that Plaintiff's beliefs and actions did not coincide with that of its own. Neither Plaintiff nor the Court can challenge the Academy's religious judgment in that regard.  *See Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc.*, 344 F. Supp. 2d 923, 935 (D. Del. 2004), *aff'd*, 450 F.3d 130 (3d Cir. 2006) (applying Title VII exemption to bar gender claim by Catholic school teacher who, although identified as Catholic, advocated for abortion, reasoning that "[i]t is not the place of this or any other court to say what system of beliefs constitutes 'true' Catholicism or makes for a 'good' Catholic.  Ours is a system which, wonderfully, forbids any intrusion of the sort.").

### 2.  The NYSHRL and NYCHRL.

Plaintiff's state and city law claims are also precluded by statutory exemptions.  Section 296(11) of the NYSHRL states that it shall not be construed to bar a religious organization, including one "operated for . . . educational purposes," from "taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." N.Y. Exec. L. § 296 (11).   Similarly, Section 8-107(12) of the NYCHRL reads that nothing prevents a religious institution, including one operated for "educational purposes," from "making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained."  N.Y.C. Adm. Code § 8-107(12) (emphasis added).  By their plain language, these exemptions apply not only to religious creed suits, but also where a religious entity makes an employment decision to promote its religion.  *See Bilquin v. Roman Catholic Church*, No. 018588/99, 2000 N.Y. Misc. LEXIS 515, at *2 (Sup. Ct. Nassau Cnty. 2000).[3]

Here, the Academy rescinded Plaintiff's offer to promote Catholic principles for which it

---

[3] As this case is not available on the Westlaw database, a courtesy copy is attached as Exhibit 32 to the November 19, 2020 Declaration of Richard J. Cea and Accompanying Exhibits.

is maintained, as both the Academy and Diocese understood the contents of Plaintiff's e-mail as a violation of the Faith.  (SUF, ¶¶ 107-119).  The record is overwhelmingly clear that living in accord with the Faith was essential for Academy teachers, who further the religious mission of the Academy.  (SUF, ¶¶ 17-26); *see Catholic Bishop of Chicago*, 440 U.S. at 501 ("[W]e have recognized the critical and unique role of the teacher in fulling the mission of a church-operated school.").  Whether Plaintiff violated Catholic values is a determination exclusively within Defendants' religious judgment.  *See Cowen v. Lily Dale Assembly*, 44 A.D.2d 772, 773 (App. Div. 4th Dep't 1974) ("It is not for this court nor any other secular institution to regulate the manner in which respondent exercises its ecclesiastical judgment.").

### C.  The New York State Constitution.

This action is further barred by the free exercise clause of the New York Constitution. Article I, Section 3 guarantees that:  "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind . . . ."  N.Y. CONST. art. I, § 3.  In interpreting the state free exercise clause, courts have treated it "coextensive" with its federal counterpart.  *See Cent. UTA of Monsey v. Vil. of Airmont*, No. 18-CV-11103 (VB), 2020 WL 377706, at *25 (S.D.N.Y. Jan. 22, 2020).  A finding that federal free exercise rights are violated "necessarily finds" a violation of the state Constitution.  *See Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 518 (S.D.N.Y. 2010).  Here, the Academy's free exercise rights are violated if the Court decides whether the Academy improperly rescinded Plaintiff's employment offer for a role integral to religious mission.

### III.    PLAINTIFF CANNOT PREVAIL ON THE MERITS.

Assuming solely for the purposes of argument that the above religious defenses did not apply, all seven of Plaintiff's causes of action fail as a matter of law.

**A.  The McDonnell-Douglas Burden Shifting Framework.**

Where, as here, a plaintiff has no direct evidence of discrimination, his claims are governed by *McDonnell Douglas Corp. v. Green*.  *See Fanelli v. N.Y.*, 200 F. Supp. 3d 363, 370, 375 (E.D.N.Y. 2016).  This analysis is applied to "federal, state, and city employment discrimination claims . . . ." *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 252 (E.D.N.Y. 2012).  Under this framework, a plaintiff must first establish a *prima facie* case.  *See Fanelli*, 200 F. Supp. 3d at 370, 375.  If, and only if, a plaintiff can do so, the burden shifts back to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse act.  *Id.* at 371 (citations omitted).  This burden is one of production, not persuasion, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), and is "not a particularly steep hurdle" as "[f]ederal courts do not have a roving commission to review business judgments . . . . " *Fanelli*, 200 F. Supp. 3d at 371 (quotations omitted).  Then, "the burden shifts back to the [employee] to demonstrate pretext." *Id.* at 375-76 (quotations omitted).  "[A] plaintiff must present more than allegations that are conclusory and unsupported by evidence of any weight." *Id.* at 371 (quotations omitted).  And, at the pretext stage for retaliation, Plaintiff "must establish that his [] protected activity was a but-for cause of the alleged adverse act . . . ." *Id.* at 375.

**B.  Plaintiff Cannot Establish A *Prima Facie* Case.**

    1.  Discrimination.

A *prima facie* case of discrimination under Title VII and NYSHRL[4] requires that Plaintiff: "(1) belonged to a protected class, (2) was qualified for the position []he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent." *Hui-Wen Chang v. N.Y.C. Dep't of Educ.*, 412 F. Supp. 3d 229, 245

---

[4] Claims under Title VII and the NYSHRL are evaluated under the same framework.  *See Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 475 (S.D.N.Y. 2017).

(E.D.N.Y. 2019) (quotations omitted).  Under City law, Plaintiff must demonstrate "that []he has been treated less well than other employees" because of his sexual orientation.  *Milhalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).  Defendants can avoid liability "if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences."  *Id.* at 111.

Plaintiff's Title VII and NYSHRL discrimination claims fail because he was not qualified for the position.  "Being 'qualified' refers to the criteria the employer has specified for the positions, and a plaintiff's subjective belief he is qualified will not suffice."  *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012) (quotations omitted).  Here, the Academy required its teachers to be practicing Roman Catholics who lived in accord with the Faith, and Defendants determined Plaintiff did not meet this criterion.  (SUF ¶¶, 22, 27, 34-35, 40-43, 109, 119).  Plaintiff also recognized he may not be qualified to teach at the Academy.  (SUF, ¶ 99).  Adjudicating the Academy's religious judgment about a candidate's religious qualification would create impermissible entanglement.  *See Our Lady of Guadalupe*, 140 S. Ct. at 2068.  And, in any event, Defendants' judgment is awarded deference as a matter of law.  *See Sarmiento v. Queens Coll.*, 386 F. Supp. 2d 93, 97-98 (E.D.N.Y. 2005), *aff'd*, 153 Fed. App'x 21 (2d Cir. 2005). ("Whether an individual is 'qualified' for a job must be assessed in relation to the criteria the employer has specified for the position, not criteria that seem reasonable to the litigant . . . or to this Court.").[5]

Nor can Plaintiff show an inference of discrimination.  He does not allege that any homophobic remarks were made to him or anyone else.  At most, he alleges that a speaker at

---

[5] Plaintiff's assertion that Defendants "admitted" Plaintiff was eligible for the position distorts the record. (*See* ECF No. 50 at 1).  During discovery, Defendants were asked if, hypothetically, Plaintiff would have been eligible if he planned to marry his boyfriend once homosexual marriage was approved by the Church.  This hypothetical is not what Plaintiff said to the Academy in 2015 nor what Defendants understood him to mean at that time, and thus is irrelevant.  *See Anderson v. Delphi Auto. Sys. Corp.*, 297 F. Supp. 2d 625, 628 (W.D.N.Y. 2004), *aff'd*, 111 Fed. App'x 634 (2d Cir. 2004) ("The decision to terminate must be judged at that time, not in hindsight.").

orientation made a comment about a "double life" and had a "strident" and "inveigh" tone.  (SUF, ¶ 104).  He recalls nothing else.  (SUF, ¶ 105).  But the single neutral statement of "double life" and subjective interpretation of tone are insufficient to show discriminatory animus, especially where nothing was allegedly said by a decision-maker.  *See Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d. Cir. 2011) (holding that "stray comments" by a non-decisionmaker "do not create an inference of discrimination"); *Zolondek v. Worldwide Flight Servs.*, 02-CV-2030 (DLI)(LB), 2006 WL 4100886, at *8 (E.D.N.Y. Aug. 26, 2006), (Report and Recommendation), *adopted by*, 2007 WL 680778 (E.D.N.Y. Mar. 2, 2007) ("It is well-settled that a plaintiff's speculations, generalities and gut feelings, however genuine, when unsupported by specific facts, do not allow for an inference of discrimination.").

Nor can Plaintiff establish a discrimination claim under the NYCHRL.  To show that he was treated "less well," Plaintiff must present a comparator who is "similarly situated [] in all material respects."  *See Jung v. Gina Group, LLC,* No. 19-CV-8624 (MKV), 2020 WL 3640048, at *4 (S.D.N.Y. July 6, 2020).  But there is no evidence that Plaintiff was treated less well than an employee who similarly violated the Catholic Faith.  And, even if Plaintiff could show that he was treated less well, the complained of conduct, which consists of the single statement by a non-decisionmaker, is nothing more than a petty slight.

    2.  <u>Retaliation.</u>

To state a federal and state *prima facie* case of retaliation, Plaintiff must demonstrate:  "(1) []he engaged in [a] protected activity; (2) the employer was aware of this activity; (3) the employer suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity."  *Jones-Khan*, 2017 WL 1483522, at *10.  "The essential elements of a retaliation claim under the NYCHRL are the same . . . ."  *Sotomayor*,

862 F. Supp. 2d at 262.  However, under the NYCHRL, "the employer's actions need not be 'materially adverse' to the plaintiff, but merely 'reasonably likely to deter a person from engaging in protected activity.'"  *Id.* (quoting N.Y.C. Admin. Code § 8-107(7)).

Plaintiff cannot show a "protected activity."  A complaint may constitute a protected activity so long as the employee had a "good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quotations and citations omitted).  Here, Plaintiff's E-mail does not meet this standard for several reasons.  First, he testified that the purpose of the E-mail was for "clarification" as to "understanding of doctrine," not opposition to alleged discrimination.  *See* (SUF, ¶ 101).  Second, Plaintiff could not have reasonably believed that the statement of the speaker at orientation violated Title VII where Plaintiff does not allege that the speaker made any comments regarding sexual orientation.  (SUF, ¶¶ 102-105); *see Kelly*, 716 F.3d at 15 ("A plaintiff's belief [that conduct is made unlawful by Title VII] is not reasonable simply because he [] complains of something that appears to be discrimination in some form.").  Third, it was unreasonable for Plaintiff to believe he was complaining of discrimination as he signed the employment contract which stated that he must exemplify the Faith, and understood that marriage in the Church was solely between a man and woman.  (SUF, ¶¶ 34, 79-80, 108).

Nor can he meet the second element.  "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII."  *Jones-Khan*, 2017 WL 1483522, at *11.  Here, Plaintiff's E-mail addressed his concern regarding complying with Church doctrine.  In fact, he specifically wrote that he "put the decision in [the Academy's] hands now rather than at some point down the line."  (SUF, ¶ 100).

Plaintiff's NYCHRL claim fails as he cannot meet these elements. *See Sotomayor*, 862 F. Supp. 2d at 262. Further, he cannot show that the decision was *because* of his sexual orientation, as the record lacks invidious comments regarding sexual orientation or other facts supporting retaliatory motive. *See Gelin v. City of N.Y.*, No. 10-CV-5592 (CBA)(VVP), 2013 WL 2298979, at *13 (E.D.N.Y. May 24, 2013) ("[S]ummary judgment is appropriate if the plaintiff fails to prove that the conduct is caused at least in part by...retaliatory motives.") (quotations omitted).

## C. Defendants Have Offered A Legitimate, Non-Discriminatory Reason Which Plaintiff Cannot Show is Pretext.

Even if Plaintiff could show a *prima facie* case (which he cannot), the Academy has offered a legitimate, non-discriminatory reason for rescinding his offer: Plaintiff violated Catholic Faith and morals.[6] This reason is precisely what the Academy told Plaintiff in 2015, and was repeatedly confirmed by Defendants in depositions. (SUF, ¶¶ 107-119). Thus, the burden shifts back to Plaintiff to show pretext, including under the heightened "but-for" standard applicable to his retaliation claims. *See Fanelli*, 200 F. Supp. 3d at 375. Plaintiff's primary argument appears that Plaintiff meant that he only planned to enter into a same-sex marriage once sanctioned by the Church. (ECF No. 50 at 1). This fails for several reasons.

As an initial matter, what Plaintiff meant—but never said to Defendants—is wholly irrelevant to the pretext analysis. It is well-settled that, in evaluating pretext, what matters is what the employer believed, even if its decision was made based on incorrect information. *See, e.g.*, *Lu v. Chase Inv. Serves. Corp.*, 412 F. App'x 413, 417 (2d Cir. 2011); *Velez v. SES Operating Corp.*,

---

[6] Plaintiff also alleges a NYLL claim in connection with time spent at orientation and setting up his classroom. However, Plaintiff was entitled to professional development credits for his time at orientation, and the evidence suggest that Plaintiff set up his classroom after the Academy sent the letter rescinding his offer. (SUF, ¶¶ 46, 123). In any event, these facts undermine any willfulness, which requires "proof that the employer knew, or should have known, that it was violating the prevailing wage laws." *Matter of A. Uliano & Son. Ltd. v. N.Y. State Dep't of Labor*, 97 A.D.3d 664, 667 (App. Div. 2d Dep't 2012). Finally, the Court should decline to exercise supplemental jurisdiction over this claim as Plaintiff brings no federal wage related cause of action.

07-CV-10946 (DLC), 2009 WL 3817461, at *12 (S.D.N.Y. Nov. 12, 2009); *Kelderhouse v. St. Cabrini Home*, 259 A.D.2d 938, 939 (3d Dep't 1999).  Here, Defendants believed in 2015 that Plaintiff's intent to marry his boyfriend violated Catholic Faith and morals, and thus he could not work as a teacher at the Academy.  (SUF, ¶¶ 107-119).  In fact, the record reflects that Plaintiff understood this to be the reason as he informed his boyfriend that he was "terminated" for informing the school that he planned to marry his boyfriend, which he admits is not sanctioned by the Church.  (SUF, ¶¶ 108, 126).  Moreover, to argue that the Academy's stated religious purpose is pretextual only invites entanglement that the First Amendment forbids.

This argument by Plaintiff also ignores his own words, where he cast into doubt his ability to follow Church doctrine, telling the Academy that "after being told all day that I have to live church doctrine I feel wounded and unwanted."  (SUF, ¶ 99).  This apparent rejection of Church teachings was further unacceptable behavior for a Catholic school teacher.  (SUF, ¶¶ 111-116).

A November 2015 email sent by the principal is insufficient to show pretext.  At that time, the principal wrote to the Diocese regarding Plaintiff and stated it was about "the gay young man that I had hired in August before I knew he was gay."  (SUF, ¶ 127).  She testified, however, *on three separate occasions*, that she only mentioned Plaintiff was gay to "refresh" the Diocese's memory and that "[i]t didn't make a difference" that she offered employment to Plaintiff before she knew he was gay.  (SUF, ¶¶ 128-29).  Viewed in context, a reasonable jury cannot conclude that this e-mail supports discrimination.  And, perhaps inartful, this "single misstatement in a letter . . . is insufficient to establish a viable claim of pretext."  *Sarmiento*, 386 F. Supp. 2d at 105.

Finally, the overall circumstances "strongly suggest that invidious discrimination was unlikely," including that the same individual offered and rescinded Plaintiff's offer within an extremely short time.  *See Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

## IV.    THE DIOCESE WAS NEVER PLAINTIFF'S EMPLOYER WITHIN THE MEANING OF TITLE VII, THE NYSHRL, THE NYCHRL, OR THE NYLL.[7]

### A. The Diocese is Not an Employer Within the Meaning of the Statutes.

Plaintiff's claims against the Diocese further fail as it was never Plaintiff's employer. Establishing that the Diocese is an employer is "a primary element of Title VII claims." *See Triola v. ASRC Mgt. Servs.(ASRC MS)*, No. 10-CV-560 (ERK)(LB), 2011 WL 6181731, at *6 (E.D.N.Y. Dec. 12, 2011) (quotations omitted).  Plaintiff cannot establish that the Diocese was an employer within the meaning of Title VII, the NYSHRL, the NYCHRL, or the NYLL.

#### 1. Title VII.

Courts look to principles of common-law agency to determine who is an employer under Title VII.  *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006).  In the Second Circuit, "a prerequisite to considering whether an individual is [an employee] under common-law agency principles is that the individual have been [*sic*] *hired* in the first instance." *Id.* at 372 (emphasis in original) (quotations omitted).  To determine whether a person is "hired," this Circuit looks "primarily to whether [a plaintiff] has received direct or indirect renumeration from the alleged employer." *Id.* (quotations omitted).  If the prerequisite is met, the inquiry turns to whether there is a "traditional master-servant relationship," which "focuses largely on the extent to which the alleged master has 'control' over the day-to-day activities of the alleged 'servant." *Id.* at 379. This level of control must be "direct, obvious, and concrete, not merely indirect or abstract." *Id.*

At the outset, Plaintiff cannot meet the necessary prerequisite as it is undisputed that he was neither hired nor paid by the Diocese.  Plaintiff has admitted that the Academy "offered him a position" and "made [the] offer."  (Amended Complaint, ECF No. 22 at ¶ 15). This is further

---

[7] On October 27, 2020, the Court granted Defendants' request for an additional ten pages to brief the issue that the Diocese was never Plaintiff's employer.  *See* Electronic Order dated October 27, 2020.

supported by Plaintiff's application letter addressed to the principal, Plaintiff and the principal both stating that he was hired by the Academy, and Plaintiff signing an employment contract with the Academy. (SUF, ¶¶ 69, 78-79). Further, it is undisputed that the Academy, and not the Diocese, sets its teacher's salaries and pays them from its own bank account. (SUF, ¶¶ 172, 189). Thus, as the Diocese "did not hire plaintiff in the first instance or pay any portion of the plaintiff's wages" it is not Plaintiff's employer, and "no further analysis is required." *Dwyer v. Horne*, 12-CV-1176 (NG) (VMS), 2017 WL 5197234, at *4 (E.D.N.Y. Nov. 8, 2017) (quotations omitted); *see also Hirallal v. Sentosacare, LLC*, 13-CV-4437 (GBD), 2016 WL 1126530, at *6 (S.D.N.Y. March 18, 2016) ("Generally, an employer-employee relationship exists for Title VII purposes when a plaintiff appears on the employer's payroll . . . ."); *Creddille v. MTA N.Y. City Transit Auth. & Core Envtl. Corp.*, 11-CV-5444 (SLT)(RLM), 2014 WL 2917022, at *4 (E.D.N.Y. June 25, 2014) ("Here, it is undisputed that Creddille was not compensated by the Transit Authority. Thus, Creddille was not a Transit Authority employee.").

Even if this prerequisite was met, a reasonable jury cannot conclude that the Diocese would have controlled the "day-to-day activities" of Plaintiff. *Gulino*, 460 F.3d at 379. The Academy, and not the Diocese, interviewed, hired, entered into contracts with, observed, provided feedback to, set the schedule of, decided the rate of pay of, provided classroom materials for, and paid its teachers. (SUF, ¶¶ 33, 76-79, 172, 179-85, 189, 194-95). The Diocese does not review Academy teacher lesson plans or teacher observations, or have the authority to direct the Academy to conduct a teacher observation. (SUF, ¶¶ 178-183). At most, the Diocese provided guidance on curriculum and hiring requirements. The Second Circuit has never found a "master servant" relationship to exist where an entity in the educational context may have "control[led] basic curriculum and credentialing requirements" of another but did not "exercise the workaday supervision necessary

to an employment relationship." *Gulino*, 460 F.3d at 379. Such is the case here.

## 2. NYSHRL & NYCHRL.

The Diocese was also never an employer pursuant to the NYSHRL or NYCHRL. Under this analysis, courts consider: "1) whether the proposed employer had the power of the selection and engagement of the employee; 2) whether the proposed employer made the payment of salary or wages to the employee; 3) whether the proposed employer had the power of dismissal over the employee; and 4) whether the proposed employer had the power to control the employee's conduct." *McIntyre v. Longwood Cent. Sch. Dist.*, No. 07-CV-1337 (JFB)(ETB), 2008 WL 850263, at *12 (E.D.N.Y. March 27, 2008); *see Escobar v. Tutor Perini Corp.*, 2019 NY Slip Op 31020[U], at *12 (Sup Ct. NY Cnty. 2019) (applying factors to NYCHRL claim). "The fourth factor is most important." *MacSweeney v. ING Life Ins. & Annuity Co.*, No. 11-CV-971 (VB), 2011 WL 4839086, at *6 (S.D.N.Y. Oct. 12, 2011).

Most fatally, Plaintiff cannot meet the fourth, and most important, factor. The New York Court of Appeals has deemed this factor the "essential element," likening it to the master-servant test adopted by *Gulino*. Specifically, the Court of Appeals has held that: "As with the *Reid* test (endorsed in *Darden* and *Gulino*), [t]he really essential element of the relationship is the right of control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017) (quotations omitted). Thus, for the reasons set forth above, the Diocese cannot constitute an employer under either the state or city discrimination laws.

None of the other factors are met. As stated previously, the Diocese did not interview or hire Plaintiff, and it would not have paid him or set his salary. (SUF, ¶¶ 76-78, 172, 189). Regarding the rescinding of Plaintiff's offer, the principal explained that she forwarded Plaintiff's

e-mail to Dr. Thomas Chadzutko at the Diocese for "advice" and the Diocese found the content of Plaintiff's e-mail as a violation of the Faith. (SUF, ¶¶ 106-107, 118). That the Academy would consider this "advice" binding is logical, given that the Diocese is the "ecclesiastical," or Catholic, governing body and thus the authority on Church doctrine, and the Academy is a Catholic school.

Although Plaintiff suggests that *Samide v. Roman Catholic Diocese of Brooklyn* establishes that the Diocese is an employer, *Samide* is factually and legally distinct. (*See* ECF No. 52 at 3). In *Samide*, a New York state court found that the plaintiff successfully *pleaded* that the Diocese was an employer under the NYSHRL. 194 Misc. 2d 561, 568 (Sup. Ct. Qns. Cnty, 2003). *Samide,* however, was decided on a motion to dismiss and analyzed the relationship between the Diocese and "St. Elizabeth Parish and School" seventeen years ago. *Id.* In this case, no parish is involved, the Academy is a separately incorporated education corporation, and several factors differ.

Notably, the evidence in this case through discovery—which *Samide* did not have as it was decided on a motion to dismiss—renders the reasoning in *Samide* moot. First, the *Samide* court looked to the Diocese's Certification of Incorporation which indicated that it has "ecclesiastical jurisdiction" over Catholic churches and societies. *Id.* Here, however, no church is a party. Moreover, although the Diocese may exercise "ecclesiastical," or religious, jurisdiction, the Academy is separately incorporated as an education corporation and is civilly governed by its own Board of Directors. (SUF, ¶¶ 1-3, 143-44). This distinction crucial, as the core inquiry is who controls the day-to-day work of the employee, which in this case is the Academy. *See Griffin*, 29 N.Y.3d at 186. Second, the *Samide* court looked to the "unrefuted allegation" that the Diocese operates Catholic schools through "its Office of Superintendent of Schools." *Samide*, 194 Misc. 2d at 568. But here no such unrefuted allegation has been made. And, although the Office of the Superintendent ("OSS") provides services, it does so through a voluntary and fee-based

Participation Agreement and only "as needed and requested by" the Academy.  (SUF, ¶¶ 152-54, 159-160).  Third, the *Samide* court found plaintiff's employment was subject to a handbook distributed by the Diocese.  *Samide*, 194 Misc. 2d at 568.  But here, although the OSS provides the "legal and procedural" content of the Handbook, the Academy can change content in the Handbook as it wishes.  (SUF, ¶¶ 186-87).  And, the principal and the Board of Directors of the Academy are responsible for ensuring that teachers comply with the Handbook.  (SUF, ¶ 188).  This, coupled with other evidence the *Samide* court may not have had when evaluating a motion to dismiss, including that the Diocese does not hire, evaluate, observe, pay, or discipline Academy employees, supports that *Samide* is not analogous.

       3.  <u>NYLL.</u>

The Diocese also cannot constitute an employer under the NYLL.  The "critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003).  Factors include whether the employee: "(1) worked at his own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule." *Id.*  Here, the Diocese did not exercise control over the work done by the teachers at the Academy, as it did not interview, evaluate, supervise, provide feedback to, supply classroom materials to, pay, or decide the schedule of Academy teachers.  (SUF, ¶¶ 76-79, 179-85, 189, 194-95).

**B.  The Diocese Cannot Be Held Liable Under Any Other Theories.**

       1.  <u>Plaintiff is Precluded From Claiming Any Other Theories of Employment.</u>

In the context of Title VII, when a defendant entity is not a plaintiff's direct employer, there are two primary theories of liability:  (1) the single integrated enterprise theory, where two

entities are "part of a larger 'single-employer' entity," and (2) joint employment, where two entities are separate but handle certain aspects jointly. *See Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 197-98 (2d Cir. 2005); *see also Dwyer*, 2017 WL 5197234, at *4. Plaintiff, however, cannot avail himself of either theory here for several reasons.

Plaintiff has not provided any notice to Defendants or the Court as to which theory, if either, he may pursue. This is despite that Plaintiff must "give[] fair notice to defendants of his theory." *Stinson v. City of N.Y.*, 17-CV-3949 (KBF), 2018 WL 2727886, at *9 (S.D.N.Y. June 6, 2018); *see also Escobar*, 2019 NY Slip Op 31020[U], at *13 (finding that entity was not an employer under the NYCHRL where plaintiffs did not allege that the purported employer "was a joint employer"). Nothing in Plaintiff's Amended Complaint or otherwise indicates which theory he may seek to pursue. *See* Am. Compl. Such failure by Plaintiff is both prejudicial to Defendants and wasteful of judicial resources.

At most, Plaintiff claims in his pre-motion conference briefing that the Diocese is an "'employer' under any of the relevant analysis." (ECF No. 52 at 3).[8] Not only is this statement too vague to constitute notice of a theory, it is also a legal impossibility. In the Second Circuit, an entity cannot be both a joint and single employer, as "[i]n a 'joint employer relationship, in contrast, there is no single integrated enterprise. A conclusion that employers are 'joint' assumes that they are separate legal entities . . . ." *Arculeo*, 425 F.3d at 198. Plaintiff's assertion that the Diocese can be held liable under "any" relevant analysis is simply impossible, and underscores that Plaintiff is taking a shot in the dark to hold the Diocese liable.

---

[8] Plaintiff cites to *Gulino* to support that the "Second Circuit uses several tests to determine whether an entity is an employer under Title VII." (ECF No. 52 at 3). Although *Gulino* mentioned the "interference" and "instrumentality" test, it rejected the application of both. As for the "interference test," *Gulino* declined to apply it, noting that its application by the lower court "contravenes the plain language of Title VII . . . ." *Gulino*, 460 F.3d at 374. *Gulino* further dismissed the "instrumentality" theory, which "merely states that agents of employers can be held liable under Title VII." *Id.* at 378. Plaintiff, however, has never claimed that the Diocese is an agent of the Academy.

Further, it is well settled that "[t]he law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances . . . ." *Fenner v. News Corp.*, No. 09-CV-9832 (LGS), 2013 WL 6244156, at *9 (S.D.N.Y. Dec. 2, 2013) (quotations omitted). Given that Plaintiff failed to provide any theory of liability, the Court should decline to exercise this "extraordinary circumstance."  Nonetheless, for the sake of completeness, Defendants address the two theories below.

### 2.   The Diocese Is Not A "Joint Employer."

Under the joint employment doctrine, "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer . . . ." *Arculeo*, 425 F.3d at 198.  Relevant factors may include "shared responsibilities such as commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Triola*, 2011 WL 6181731, at *7 (quotations omitted).  "A joint employer relationship may be found to exist where there is sufficient evidence that the respondent had immediate control over the other company's employees." *NLRB v. Solid Waste Servs.*, 38 F.3d 93, 94 (2d Cir. 1994).

Here, the Diocese did not have "immediate control" over Academy teachers as it did not interview, hire, discipline, evaluate, observe, provide feedback to, pay, set the salary of, approve time off for, or provide classroom materials to Academy teachers.  (SUF, ¶¶ 76-79, 172, 179-85, 189, 194-95).  Nor did the Diocese maintain copies of observations or employment contracts. (SUF, ¶¶ 163, 182).  In fact, the Diocese did not even know which version of the employment contract was offered to Plaintiff.  (SUF, ¶ 162).  And, the Academy represented to its employees in no uncertain terms that it, and not the Diocese, was the employer.  (SUF, ¶ 168).

No other factors support a finding of a joint employment relationship as there is no showing of the requisite immediate control.  Although the Diocese sponsors pension and health benefits offered to the Academy, the record also shows that the Academy provides its employees with benefits, such as Workers' Compensation insurance, New York State Unemployment Insurance, and Social Security benefits matched by the Academy.  (SUF, ¶¶ 174-75).

### 3.   The Diocese Is Not A "Single Employer" with the Academy.

In determining "whether a parent and subsidiary compromise a single employer subject to joint liability for employment-related act, the court considers evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  *Fenner*, 2013 WL 6244156, at *9.

As an initial matter, this theory is not applicable here.  The Second Circuit has "confined" the single employer analysis "to two corporate contexts:  first, where the plaintiff is an employee of a wholly-owned corporate subsidiary; and second, where the plaintiff's employment is subcontracted by one employer to another, formally distinct, entity."  *Gulino*, 460 F.3d at 378. Neither context is applicable here.  Moreover, where the four factors above "are not adequately alleged in the pleadings, courts have ruled that the plaintiffs may not pursue the single integrated employer theory."  *Stinson*, 2018 WL 2727886, at *9.  This is precisely the case, as Plaintiff pleaded none of the four elements.  *See* Am. Compl.

Even if the doctrine applied, the elements are not met.  A reasonable jury could not conclude that there is an interrelation of operations, as the Academy manages its own marketing and recruiting, has its own accountant, bank account and bookkeeper, provides its own classroom materials, collects its own tuition, and issues paychecks to its employees from its own bank account.  (SUF, ¶¶ 189-193, 195); *see Fenner*, 2013 WL 6244156, at *9 (stating interrelation of

operations focuses on whether two entities share "employees, services, records, and equipment, and whether the parent was involved directly in the subsidiary's daily business decisions relating to production, distribution, marketing, advertising and finances . . . .").

Nor can Plaintiff show centralized control over labor relations.  The Academy, and not the Diocese, was responsible for interviewing, hiring, evaluating, supervising, and paying its employees.  (SUF, ¶¶ 76-78, 166, 182-85, 189); *see Fenner*, 2013 WL 6244156, at *9.  Although the Diocese provided some services to the Academy, these were offered pursuant to the Participation Agreement.  This voluntary agreement further undermines any finding of a single employer as "[t]he test ultimately depends, however, on whether all the circumstances of the case tend to show the absence of an arm's length relationship between two entities." *United States v. N.Y. State DMV*, 82 F. Supp. 2d 42, 53 (E.D.N.Y. 2000) (quotations omitted).  And, that the Diocese administered policies adopted by the Academy, including hiring criteria, and sponsored pension and health benefits are all insufficient to show centralized control over labor relations. *See id* at 54. (finding that providing "minimum standards" for hiring "does not amount to centralized control of labor relations."); *Fenner*, 2013 WL 6244156, at *10 (finding that "adopt[ing] policies promulgated by [the parent]" and maintaining "the same benefits" as insufficient to show control of labor relations).

Further, there is no common ownership or management.  Both entities are separately incorporated and neither is owned by the other.  (SUF, ¶¶ 1-3, 141-42).  In terms of management, the day-to-day of the Academy is governed by its own independent Board of Directors.  (SUF, ¶¶ 143-144).

## CONCLUSION

For the reasons set forth above, Defendants respectfully submit that summary judgment be

granted with prejudice as to all Plaintiff's claims.  To the extent the Court does not dismiss all of

Plaintiff's claims, the Diocese further submits that it be dismissed as an improper party.

Dated: November 19, 2020
Brooklyn, New York

WINGATE, KEARNEY & CULLEN LLP
By: _____ *s/ Richard J. Cea, Esq.* _____
Richard J. Cea, Esq.
45 Main Street, Ste. 1020
Brooklyn, New York 11201
*Attorneys for Defendants*

*Of counsel*
Mark E. Chopko, Esq.
Marissa Parker, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018