**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CODY BUTLER,

Plaintiff,

v.

ST. STANISLAUS KOSTKA CATHOLIC
ACADEMY, and THE DIOCESE OF
BROOKLYN,

Defendants.

No. 19-cv-3574

SERVED ON DECEMBER 21, 2020

*Oral Argument Requested*

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION FOR SUMMARY JUDGEMENT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 1

LEGAL STANDARD ...................................................................................... 4

ARGUMENT ................................................................................................... 5

    I.     Neither the Constitutional nor Statutory Exceptions Apply. ........................... 6

        A.    The Ministerial Exception 1) Permits Non-Ministerial
               Employees' Discrimination Cases To Proceed Even When
               a Religious Employer Asserts a Religious Reason for its
               Actions; and 2) Requires Religious Employers to Prove
               That a Putative Ministerial Employee Would Have
               Performed Religious Duties. ................................................... 7

             1.    Mr. Butler is Not a "Minister." ................................ 7

                    a.    Defendants Rely on Their Own "Say So"
                         Evidence, Which Is Inadequate as a Matter
                           of Law and Does Not Rebut Evidence from
                           the Teacher Who Did the Job Showing that
                           Mr. Butler Would Not Have Been a
                           Minister. ......................................................... 7

                    b.    Defendants' Evidence is Inadmissible and
                            Fails to Establish the Absence of a Genuine
                            Dispute. ........................................................ 12

             2.    As a Non-Ministerial Employee, Mr. Butler May
                    Bring His Discrimination Claims. ........................... 15

                    a.    The Ministerial Exception Permits Non-
                            Ministerial Employees Like Mr. Butler to
                           Bring Discrimination Claims Against
                           Employers that Assert Religious Reasons
                           for a Termination. ...................................... 15

                    b.    Defendants' Pretext Argument Misapplies
                            the Law Because a Court Can Adjudicate
                            Non-Ministerial Employees' Claims Even
                            if the Employer Asserts a Religious Reason
                           for its Actions. ........................................... 18

i

B.     The Statutory Exceptions Do Not Apply as a Matter of Law. ................................................................................ 19

II.    Material Disputes Remain Regarding Defendants' Motive for Terminating Mr. Butler's Employment. ......................................... 21

    A.     Mrs. C's Termination Letter and Subsequent Email Satisfy Mr. Butler's Initial Showing for His Discrimination Claim Under Either a Mixed-Motive or Burden-Shifting Analysis. ................................................ 21

         1.    Mrs. C's Termination Letter and Subsequent Email are Direct Evidence of Discrimination Under a Mixed-Motive Analysis. .......................................... 21

         2.    Mr. Butler Satisfies His Prima Facie Showing Under the Burden-Shifting Analysis, Because Sex was the "But For" Cause of His Termination. ...................... 23

    B.     There is a Dispute in the Record Over Whether Defendants Retaliated Against Mr. Butler for His Protected Activity. .............................................................. 28

III.   The Diocese is a Proper Defendant Because it is Enmeshed in St. Stans' Operations and Management, and Made the Decision to Terminate Mr. Butler. ............................................................ 30

    A.     The Diocese is an Employer Under the "Joint Employer" and Common Law Agency Tests. ..................................... 31

    B.     The Diocese Is Liable Because It Performed St. Stans' HR Function. ............................................................ 33

    C.     The Diocese and St. Stans Formed a Single Integrated Enterprise. .......................................................... 33

CONCLUSION .......................................................... 34

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*Ames v. Cartier, Inc.*,
   193 F. Supp. 2d 762 (S.D.N.Y. 2002)...................................................................22

*Anderson v. Delphi Auto. Sys. Corp.*,
   297 F. Supp. 2d 625 (W.D.N.Y.), *aff'd*, 111 F. App'x 634 (2d Cir. 2004) ............................27

*Apolinar v. Glob. Deli & Grocery, Inc.*,
   No. 12 Civ. 3446, 2013 WL 5408122 (E.D.N.Y. Sept. 25, 2013)..........................30

*Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ of the
   Apostolic Faith Inc.*,
   684 F.3d 413 (3d Cir. 2012)........................................................................11

*Bank of China, New York Branch v. NBM LLC*,
   359 F.3d 171 (2d Cir. 2004).........................................................................13

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008).........................................................................31

*Berube v. Great Atl. & Pac. Tea Co.*,
   No. 06 Civ. 197, 2010 WL 3021522 (D. Conn. July 29, 2010).............................28

*Bostock v. Clayton Cty., Georgia*,
   140 S. Ct. 1731 (2020)..................................................................... *passim*

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000)..................................................................................30

*Bridgeway Corp. v. Citibank*,
   201 F.3d 134 (2d Cir. 2000).........................................................................13

*Carter v. Rosenberg & Estis, P.C.*,
   No. 95 Civ. 10439, 1998 WL 150491 (S.D.N.Y. Mar. 31, 1998) ..........................29

*Catholic High Sch. Ass'n of Archdiocese of New York v. Culvert*,
   753 F.2d 1161 (2d Cir. 1985)..........................................................................8

*Chambers v. TRM Copy Ctrs. Corp.*,
   43 F.3d 29 (2d Cir. 1994).............................................................................24

*Chime v. Peak Sec. Plus, Inc.*,
   137 F. Supp. 3d 183 (E.D.N.Y. 2015) ...........................................................30

*Coffey v. Dobbs Int'l Servs., Inc.*,
   170 F.3d 323 (2d Cir. 1999).........................................................................29

*Colbert v. FSA Store, Inc.*,
    No. 19 Civ. 9828, 2020 WL 1989404 (S.D.N.Y. Apr. 27, 2020) ...........................................30

*CompassCare v. Cuomo*,
    465 F. Supp. 3d 122 (N.D.N.Y. 2020) ..................................................................................16

*Cook v. Arrowsmith Shelburne, Inc.*,
    69 F.3d 1235 (2d Cir. 1995) ...................................................................................................33

*Crawford v. Metro. Gov't of Nashville & Davidson Cty*,
    555 U.S. 271 (2009) ................................................................................................................29

*Curay-Cramer v. Ursuline Acad. of Wilmington*,
    344 F. Supp. 2d 923 (D. Del. 2004), *aff'd on other grounds*, 450 F.3d 130 (3d
    Cir. 2006) ................................................................................................................................20

*Danford v. City of Syracuse*,
    No. 09 Civ. 0307, 2012 WL 4006240 (N.D.N.Y. Sept. 12, 2012) ...................................13, 14

*Davis v. City of New York*,
    959 F. Supp. 2d 427 (S.D.N.Y. 2013) ....................................................................................13

*DeMarco v. Holy Cross High Sch.*,
    4 F.3d 166 (2d Cir. 1993) ..................................................................................................5, 18

*E.E.O.C. v. Ethan Allen, Inc.*,
    44 F.3d 116 (2d Cir. 1994) .....................................................................................................25

*Fowler v. Scores Holding Co.*,
    677 F. Supp. 2d 673 (S.D.N.Y. 2009) ...............................................................................32, 33

*Fratello v. Archdiocese of New York*,
    863 F.3d 190 (2d Cir. 2017) .............................................................................................. *passim*

*Fullwood v. Sodexo, Inc.*,
    No. 16 Civ. 6527, 2018 WL 3439866 (W.D.N.Y. July 17, 2018) ..........................................30

*Gargano v. Diocese of Rockville Ctr.*,
    888 F. Supp. 1274 (E.D.N.Y. 1995), *aff'd*, 80 F.3d 87 (2d Cir. 1996) ..............................31, 32

*Geary v. Visitation of Blessed Virgin Mary Par. Sch.*,
    7 F.3d 324 (3d Cir. 1993) .......................................................................................................19

*Giannullo v. City of New York*,
    322 F.3d 139 (2d Cir. 2003) ...................................................................................................13

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016) ...................................................................................................30

*Gregory v. Daly,*
  243 F.3d 687 (2d Cir. 2001)...........................................................................................23, 24

*Gulino v. New York State Educ. Dep't,*
  460 F.3d 361 (2d Cir. 2006)........................................................................................31, 32, 33

*Hall v. Baptist Mem'l Health Care Corp.,*
  215 F.3d 618 (6th Cir. 2000) ...................................................................................................20

*Hart v. Rick's Cabaret Int'l, Inc.,*
  967 F. Supp. 2d 901 (S.D.N.Y. 2013).....................................................................................33

*Herx v. Diocese of Ft. Wayne-S. Bend Inc.,*
  48 F. Supp. 3d 1168 (N.D. Ind. 2014) ............................................................................. *passim*

*Holtz v. Rockefeller & Co.,*
  258 F.3d 62 (2d Cir. 2001).................................................................................................22, 24

*Hongyan Lu v. Chase Inv. Servs. Corp.,*
  412 F. App'x 413 (2d Cir. 2011) .............................................................................................27

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012)......................................................................................8, 11, 16, 17

*ITC Ltd. v. Punchgini, Inc.,*
  482 F.3d 135 (2d Cir. 2007)....................................................................................................13

*Jing Zhang v. Jenzabar, Inc.,*
  No. 12 Civ. 2988, 2015 WL 1475793 (E.D.N.Y. Mar. 30, 2015) ..........................................20

*Kelderhouse v. St. Cabrini Home,*
  259 A.D.2d 938 (3d Dep't 1999) .............................................................................................27

*Killinger v. Samford Univ.,*
  113 F.3d 196 (11th Cir. 1997) .................................................................................................20

*Krasner v. Episcopal Diocese of Long Island,*
  431 F. Supp. 2d 320 (E.D.N.Y. 2006) .....................................................................................31

*Lation v. Fetner Properties, Inc.,*
  No. 17 Civ. 3276, 2017 WL 6550691 (S.D.N.Y. Dec. 22, 2017)...........................................33

*Lightfoot v. Union Carbide Corp.,*
  110 F.3d 898 (2d Cir. 1997).....................................................................................................22

*Little v. Wuerl,*
  929 F.2d 944 (3d Cir. 1991).....................................................................................................20

*Mandell v. County of Suffolk,*
  316 F.3d 368 (2d Cir. 2003).......................................................................................................5

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)............................................................................................23

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013).........................................................................21, 28

*National Labor Relations Board v. Roman Catholic Diocese of Brooklyn*,
535 F.2d 1387 (2d Cir. 1976)..............................................................................31

*O'Brien v. Wisniewski*,
No. 10 Civ. 120, 2012 WL 1118076 (D. Conn. Apr. 3, 2012) ............................12

*Osorio v. Mathews Prime Meats, Inc.*,
101 F. Supp. 3d 255 (E.D.N.Y. 2015) ................................................................15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ................................................................................ *passim*

*Pathan v. Conn.*,
19 F. Supp. 3d 400 (D. Conn. 2014) ...................................................................33

*Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*,
180 F.3d 468 (2d Cir. 1999)................................................................................32

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989)............................................................................................21

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997)............................................................................21, 22

*Ravenell v. Avis Budget Grp., Inc.*,
No. 08 Civ. 2113, 2014 WL 1330914 (E.D.N.Y. Mar. 31, 2014) ........................14

*Redhead v. Conference of Seventh-Day Adventists*,
440 F. Supp. 2d 211 (E.D.N.Y. 2006) ...................................................................9

*Redhead v. Conference of Seventh-Day Adventists*,
566 F. Supp. 2d 125 (E.D.N.Y. 2008) .......................................................... *passim*

*Richardson v. Nw. Christian Univ.*,
242 F. Supp. 3d 1132 (D. Or. 2017) .....................................................................9

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
743 F.3d 11 (2d Cir. 2014)....................................................................................4

*Roman Catholic Diocese of Brooklyn*,
221 NLRB 831 (1975), *granted enforcement by N.L.R.B. v. Roman Catholic
Diocese of Brooklyn*, 535 F.2d 1387 (2d Cir. 1976)...............................................31

*Ruiz v. Cty. of Rockland,*
    609 F.3d 486 (2d Cir. 2010)............................................................................23

*Rweyemamu v. Cote,*
    520 F.3d 198 (2nd Cir. 2008)..................................................................16, 19

*Scheiber v. St. John's Univ.,*
    84 N.Y.2d 120 (N.Y. 1994) ....................................................................20

*Serbian E. Diocese of the United States of Am. & Canada v. Milivojevich,*
    426 U.S. 696 (1976)..........................................................................11

*Singh v. Bay Crane Servs., Inc.,*
    No. 11 Civ. 720, 2013 WL 5655931 (E.D.N.Y. Oct. 11, 2013) ............................13

*Sista v. CDC Ixis North America, Inc.,*
    445 F.3d 161 (2d Cir. 2006)................................................................29

*Slattery v. Swiss Reinsurance Am. Corp.,*
    248 F.3d 87 (2d. Cir. 2001)................................................................23

*Spirt v. Teachers Ins. and Annuity Ass'n,*
    691 F.2d 1054 (2d Cir. 1982)..............................................................33

*St. Jean v. Orient-Express Hotels Inc.,*
    963 F. Supp. 2d 301 (S.D.N.Y. 2013)....................................................32

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
    No. 19 Civ. 03153, 2020 WL 6434979 (S.D. Ind. Oct. 21, 2020)...............17, 22, 24

*State Div. of Human Rts. v. GTE Corp.,*
    109 A.D.2d 1082 (1st Dep't 1985) ......................................................33

*Stetson v. NYNEX Serv. Co.,*
    995 F.2d 355 (2d Cir. 1993)................................................................28

*Texas Dep't of Cmty. Affairs v. Burdine,*
    450 U.S. 248 (1981)..........................................................................23

*Ticali v. Roman Catholic Diocese of Brooklyn,*
    41 F. Supp. 2d 249 (E.D.N.Y.), *aff'd*, 201 F.3d 432 (2d Cir. 1999)......................19

*Tyler v. Bethlehem Steel Corp.,*
    958 F.2d 1176 (2d Cir. 1992)..................................................21, 22, 23, 25

*United States v. Rem,*
    38 F.3d 634 (2d Cir. 1994)..................................................................4

*Velez v. SES Operating Corp.,*
    No. 07 Civ. 10946, 2009 WL 3817461 (S.D.N.Y. Nov. 12, 2009) ........................27

*Victor G. Reiling Assocs. v. Fisher-Price, Inc.*,
    406 F. Supp. 2d 171 (D. Conn. 2005) .......................................................................13

*York v. Ass'n of Bar of City of New York*,
    286 F.3d 122 (2d Cir. 2002) .......................................................................................32

*Zann Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013) ...............................................................................25, 29

**Statutes**

42 U.S.C. §§ 2000e-1(a) ....................................................................................................19

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................................4

## PRELIMINARY STATEMENT

The threshold issue in this case is whether the job for which Cody Butler was hired was that of a minister.  The availability of the ministerial exception depends upon whether this particular teacher, in this particular job, was or would have been a minister.  The evidence in the record regarding the job Mr. Butler would have held (he was fired before the first day of school) comes primarily from the teacher who was hired to replace him.  That teacher testified in detail that she did nothing that had anything to do with religion.  She was never corrected for this by the school; and the school, fully aware, gave her positive performance reviews.  The evidence that Defendants offer to counter the record Plaintiff developed regarding this particular job consists primarily of their own self-serving and boilerplate documents applicable (they say) to the whole school.  This is not enough to show that Mr. Butler would have been a minister.

As a non-ministerial employee Mr. Butler can challenge his termination as discriminatory, and he does so here, claiming that his termination was illegal sex discrimination and retaliation under Title VII and applicable state and city law.  He has direct evidence substantiating his claim – Defendants terminated his employment in a letter responding to an email he sent the day before in which he said he was gay.  Defendants cite other reasons for their decision, but their letter and other record evidence creates a factual dispute as to whether Mr. Butler's sexual orientation was at least one but-for cause of Defendants' decision: "[i]t doesn't matter if other factors besides the plaintiff's sex contributed to the decision." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020).  Defendants' motion for summary judgment must therefore be denied.

## STATEMENT OF FACTS

Cody Butler is a native of Queens, New York, where he attended local Catholic grammar and high schools.  *See* Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. Resp.

Defs. 56.1"),[1] ¶¶ 72, 73, 251.  He earned his degree in Classics from Hunter College in 2015.  *Id.* ¶ 252.  That summer, Mr. Butler applied for school teaching positions through the Diocese of Brooklyn's ("the Diocese") employment portal.  *Id.* ¶¶ 68, 285.  The Diocese forwarded a list of teacher candidates, including Mr. Butler, to Mrs. C, the principal of St. Stanislaus Kostka Catholic Academy ("St. Stans"[2]) – a school within the Diocese.  *Id.* ¶ 253.  Mrs. C invited him for an interview.  *Id.* ¶¶ 76-77.  She did not interview any of the other candidates on the list from the Diocese, and offered Mr. Butler the job shortly after.  *Id.* ¶¶ 78, 254.  On August 28, 2015, Mr. Butler met with Mrs. C again, this time to formally accept a position teaching seventh and eighth grade English Language Arts and Social Studies for the 2015-16 school year.  *Id.* ¶¶ 79, 255.  She informed him that he would not teach religion because his students would go to a separate classroom for that instruction.  *Id.* ¶ 255.  (She similarly advised the teacher hired to replace him. *Id.* ¶¶ 203-05.)  Mr. Butler had just graduated from college and landed his first real job.  He was "starting out in life," and "[e]verything seemed to be going just really well."  *Id.* ¶ 256.

By the time Defendants hired Mr. Butler, the first day of the Diocese's mandatory New Teacher Orientation had already occurred.  *Id.* ¶ 257.  Mr. Butler attended the program's second day on or about September 1, 2015.  *Id*. ¶ 258.[3]  One of the orientation's presenters inveighed against "leading a double life," which Mr. Butler understood to be a disparaging reference to homosexuals.  *Id.* ¶¶ 104, 260-61.  Mr. Butler was in a committed relationship with his partner,

---

[1] Citations to exhibits previously cited in either Plaintiff's of Defendants' opening briefs are to the November 19, 2020 Declaration of Kathleen Peratis, the November 19, 2020 Declaration of Richard Cea ("Cea Decl."), or both.  Citations exhibits cited in this opposition for the first time are to the December 21 Declaration of Kathleen Peratis.

[2] Plaintiff uses the form "St. Stans" rather than "St. Stan's" because we believe the latter, which we have used heretofore, is erroneous.

[3] Mr. Butler does not recall, and nothing in the record establishes, whether a third day of orientation was held or if Mr. Butler attended it.  *Id.* ¶ 259.

but he was also a devout Catholic so he was celibate and eschewed civil marriage, hopeful for the day, which seemed not impossibly far off,[4] when the church would authorize same sex marriages.  *Id.* ¶¶ 262-64.  Still, the presenter's tone worried Mr. Butler, so the next day he sent Mrs. C an email stating "I am homosexual and plan on marrying my boyfriend eventually, and after being told all day that I have to live church doctrine I feel wounded and unwanted[,]" and sought assurance that he would be welcome at St. Stans.[5]  *Id.* ¶ 99.

When Mrs. C received Mr. Butler's email, she forwarded it to Dr. Thomas Chadzutko, the Superintendent of Catholic Schools, Office of Catholic School Support Services for the Diocese of Brooklyn.  *Id.* ¶ 106.[6]  Mrs. C and Dr. Chadzutko spoke on the phone the next day. *Id.* ¶ 117.  Their recollections of several aspects of the call differ, and each Defendant claims that the other was the ultimate decisionmaker, *id.* ¶¶ 267-69, but they agree on the outcome.  In a September 3, 2015 letter thanking Mr. Butler for his "email and [his] honesty," Mrs. C terminated his employment, "due to the violation of the Catholic faith and morals of our school." *Id.* ¶¶ 119, 270.

The letter never reached Mr. Butler, *id.* ¶ 120, so he continued preparing for the school year.  He attended an in-person, mandated child sex abuse prevention training, he set up his

---

[4] *See* Pl. Mem., 2 n.2 (collecting news of Pope Francis's support of gay Catholics in 2013).

[5] Defendants argue Mr. Butler's statement that "after being told all day that I have to live church doctrine I feel wounded and unwanted" amounted to an "apparent rejection of Church teachings."  Defs. Mem, 25. This is the first time Defendants have relied on this language to justify the termination – their many previous explanations for their actions do not refer to it.  *See* Pl. Resp. Defs. 56.1 ¶ 277 (New York City Human Rights Commission Position Statement), ¶¶ 34-43; Answer to Amended Complaint, ECF No. 23; Ex. F (Defendants' Response to Plaintiff's First Set of Interrogatories), 4.  Neither of their corporate witnesses cited it as a reason for terminating Mr. Butler's employment. *See* Exs. H & 1 (St. Stans' 30(b)(6) Tr. 68:17-23); Ex. HH (Diocese 30(b)(6) Tr. 238:3-5), nor did they ask Plaintiff what he meant by it during discovery.

[6] The Diocese managed St. Stans' HR function, many aspects of the school's operations, and effectively controlled its Board of Directors.  *Id.* ¶¶ 266, 282-355.

3

classroom, and his proud father bought him a new computer. *Id.* ¶¶ 121-23, 272.  When Mr. Butler arrived for what he thought would be his first day of work at St. Stans, Mrs. C called him into her office and gave him a copy of the letter. *Id.* ¶¶ 124-25.  He was crying as he left her office and walked through the parking lot where he encountered another teacher who he told he "just got a letter saying that [he had been] fired because [he was] gay." *Id.* ¶¶ 273-74.  The teacher told him "she was sorry, she couldn't believe that and it was terrible." *Id.* ¶ 274.  Being fired was particularly distressing for Mr. Butler, because he had "always [gone] to the Church for comfort, for solace when things happened in [his] life," and after being fired he "felt like that was ripped away from [him.]" *Id.* ¶ 275.

Two months later, Mrs. C forwarded correspondence to Dr. Chadzutko, and "to refresh his memory" explained that it was "regarding the gay young man that I had hired in August before I knew he was gay." *Id.* ¶¶ 127-28.

## LEGAL STANDARD

Summary judgment shall be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).  Instead, courts must "constru[e] all the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences in that party's favor[.]" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014).  In general, when ruling on a motion for summary judgment in an employment discrimination case, where intent is at issue, the court affirms "judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of

discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (internal quotation marks and citation omitted).

## ARGUMENT

None of the affirmative defenses Defendants assert in their motion are available because 1) they have not met their burden to show that the ministerial exception applies, and 2) the statutory exceptions are not implicated here as a matter of law.  Absent these defenses, a non-ministerial employee like Mr. Butler can challenge his termination as discriminatory.  The employer may assert a non-discriminatory reason, including a religious one, for the adverse job action, and the factfinder must decide whether the discriminatory or non-discriminatory reason is more credible.  *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170-71 (2d Cir. 1993); *Redhead v. Conference of Seventh-Day Adventists*, 566 F. Supp. 2d 125, 131, 137 (E.D.N.Y. 2008).  Mrs. C's correspondence terminating Mr. Butler's employment because of his email, and then referring to him as "the gay young man" she hired "before [she] knew he was gay," satisfies Plaintiff's initial showing under either a mixed motive or burden-shifting analysis for Title VII claims.

Furthermore, there is strong evidence of pretext.  In the course of the investigation of this matter by the New York City Human Rights Commission ("NYCHRC"), Defendants asserted the following: "[i]f … [Plaintiff] was living a celibate life his sexual orientation would be meaningless absent more actions on his part[,]" "[t]hough Mr. Butler can civilly marry another man . . . his choice . . . is a clear and obvious violation of Church teachings[,]" and "Mr. Butler was hired . . . by the school principal, without knowledge of his sexual orientation or intent to enter into a same sex marriage."  Pl. Resp. Defs. 56.1 ¶ 277.  These explanations show that Defendants jumped to incorrect, stereotyped, and discriminatory conclusions about Mr. Butler.  As these reasons were increasingly undercut by the developing evidence, Defendants'

explanations shifted, and on some points, simply unraveled (Defendants contradicted each other over who the ultimate decisionmaker was). *Id.* ¶¶ 276-81. Thus, a jury could find that Defendants' latest explanations are pretextual. Viewing the record in the light most favorable to the non-movant, there is, at the very least, a dispute over Defendants' denial that they terminated Mr. Butler's employment in part because of his sexual orientation. *See Bostock*, 140 S. Ct. at 1741 ("An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision."). Defendants have not met their summary judgment burden.

## I.  Neither the Constitutional nor Statutory Exceptions Apply.

As discussed in Plaintiff's November 19, 2020 Motion for Partial Summary Judgment ("Pl. Mem."), Defendants are not entitled to either the ministerial exception or to statutory exceptions for religious organizations. *See* Pl. Mem., 7-17. The record shows that under the fact-specific analysis adopted by the Supreme Court and the Second Circuit Mr. Butler would not have been a minister. The Second Circuit has distinguished between "[the] constitutionally derived ministerial exception" and Title VII's statutory exceptions. *See Fratello v. Archdiocese of New York*, 863 F.3d 190, 200 n.21 (2d Cir. 2017). The latter, the Second Circuit has said, only provides a defense to claims of discrimination on the basis of religion; it does not provide a defense to claims of other kinds of discrimination (in that case, and here, sex discrimination). *See id*. Here, Mr. Butler does not assert a religious discrimination claim; therefore, the statutory exceptions do not apply. Defendants' arguments to the contrary misapprehend and ignore controlling Supreme Court and Second Circuit authority.

**A.    The Ministerial Exception 1) Permits Non-Ministerial Employees' Discrimination Cases To Proceed Even When a Religious Employer Asserts a Religious Reason for its Actions; and 2) Requires Religious Employers to Prove That a Putative Ministerial Employee Would Have Performed Religious Duties.**

Defendants argue that the ministerial exception, which protects religious organizations' first amendment rights, applies here, and that the New York State Constitution's guarantees are "coextensive" with its federal counterpart. *See* Defendants' November 19, 2020 Memorandum of Law in Support of Their Motion for Summary Judgment, ("Defs. Mem."), 19. For the reasons discussed below and previously, Pl. Mem., 9-15, retaining Mr. Butler in a non-ministerial position would not violate Defendants' rights under either the Federal or State constitution.

**1.    Mr. Butler is Not a "Minister."**

Defendants' argument boils down to the claim that Mr. Butler would have been a minister based upon their assumptions, expectations and boilerplate – their own "say so." This approach has been rejected by the Supreme Court (twice). Even if it were viable substantively Defendants support their argument with inadmissible evidence.

**a.    Defendants Rely on Their Own "Say So" Evidence, Which Is Inadequate as a Matter of Law and Does Not Rebut Evidence from the Teacher Who Did the Job Showing that Mr. Butler Would Not Have Been a Minister.**

All the record evidence related to what actually happened in the classes that Mr. Butler would have taught shows that he would not have been a minister. *See* Pl. Mem., 9-13; Pl. Resp. Defs. 56.1 ¶¶ 196-250. To avoid this reality, Defendants frame the ministerial exception as turning on the "religious nature of an entity's purpose and mission, and how the challenged employee's role relates to the mission," and urge the Court to focus on the "responsibilities placed on the employee in view of the organizational mission." Defs. Mem., 5, 6. A court may consider these factors, but they are not determinative and do not rebut the contrary evidence from the teacher who actually did the job. Defendants ask the court to ignore the Supreme Court's

direction in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020)

("*OLG*"), that "[w]hat matters, at bottom, is what an employee does[;]" and to ignore that the

Court's determination was based on factual findings about what those employees did.

Defendants effectively ask the Court to adopt Justice Thomas's twice-rejected position,

which is that courts should defer completely "to religious organizations' good-faith claims that a

certain employee's position is 'ministerial.'" *Id.* at 2064, 69-70; *Hosanna-Tabor Evangelical*

*Lutheran Chur & Sch. v. EEOC*, 565 U.S. 171, 196-98 (2012).  In his concurrence in *OLG*,

Justice Thomas argued that statements in the relevant handbooks and contracts alone should have

sustained the schools' claims that the teachers held ministerial roles, *OLG*, 140 S. Ct. at 2071,

which was a more detailed rendition of his concurrence in *Hosanna-Tabor*, 565 U.S. at 196-98.

Although two Supreme Court majorities have declined to make that the majority opinion,

evidence of the Defendants' own "say so" is all that Defendants offer here.

Ignoring the majority opinion in *OLG*, Defendants rely primarily on the handbook and

employment contract to demonstrate that Defendants "viewed all teachers as ministers who serve

as 'role models' of the Faith."[7]  *See* Defs. Mem., 4, 11-15.  But courts do not defer entirely to the

school's views or the documents that set forth its views.  *See Catholic High Sch. Ass'n of*

*Archdiocese of New York v. Culvert*, 753 F.2d 1161, 1167-68 (2d Cir. 1985) ("That faculty

members are expected to serve as exemplars of practicing Christians does not serve to make the

terms and conditions of their employment matters of church administration and thus purely of

ecclesiastical concern."); *Fratello*, 863 F.3d at 193 n.2 (contents of handbook "establish[ed] very

little by themselves"); *id.* at 207 (an employer could not "insulate itself" from liability simply by

---

[7] In fact, Mrs. C testified that she viewed all employees as ministers and role models of the faith, *see* Pl. Resp. Defs. 56.1, ¶ 25, which undermines the Supreme Court's view that the ministerial exception applies only to "certain key employees."  *OLG*, 140 S. Ct. at 2055.

changing an employee's title); *Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168,

1176-77 (N.D. Ind. 2014) (school's expectation did not outweigh record evidence regarding

teacher's actual job duties).

The other evidence Defendants rely on does not address what the teacher who performed

the job (Amanda Puglionisi) actually did; or how Defendants actually evaluated her, her

predecessor (Adrian Casiano), or their successors.  Instead Defendants point to more "say so"

evidence – a job description in a 2017 online application for a teacher position; a July 2015

"Welcome Letter" to new teachers (sent before either Mr. Butler or Ms. Puglionisi were hired for

the job);[8] a draft agenda and other materials purportedly related to the 2015 new teacher

orientation that Mr. Butler did not recall seeing and which Ms. Puglionisi did not attend; and

testimony from St. Stans' corporate representative regarding the school's "expectation" that

teachers participate in school-wide prayer, lead prayer in the classroom, and incorporate religion

into all subjects.[9]  None of that "say so" evidence demonstrates anything more about what

happened in the classroom than the handbook or contracts do,[10] especially in light of Ms.

Puglionisi's contrary testimony and Defendants' praise for the job she did.  *See* Pl. Resp. Defs.

56.1 ¶¶ 241, 245; *see also Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d

211, 215-16, 221 (E.D.N.Y. 2006), *adhered to on reconsideration*, 566 F. Supp. 2d 125

---

[8] Defendants state that the welcome letter enclosed the orientation agenda, but neither the exhibits produced with their brief, nor the document produced in discovery, included an agenda.

[9] *See* Defs. Mem., 13-14 (citing Defs. 56.1 ¶¶ 27, 45, 50, 52, 64, 67, 93, 95, 96); *id.* at 10 (citing Defs. 56.1 ¶¶ 58-60, 64, 67).

[10] Defendants also cite Plaintiff's cover letter, Defs. Mem., 13 (citing Defs. 56.1 ¶ 70), but it also does not show what his religious duties would have been at St. Stans'.  In *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132 (D. Or. 2017), the plaintiff stated in her application that she would be "proud to be employed by a faculty that honors Christian principles and values" and submitted a "personal faith statement as part of her application."  *Id.* at 1139.  These statements showed that the plaintiff "held herself out as a *Christian*," but not "a *minister*," and the court held she was not a minister because she did not provide religious instruction or perform religious duties.  *Id.* at 1146 (emphasis in original).

(E.D.N.Y. 2008) (statements in employment application and contract did not preempt evidence of actual duties).  Defendants' evidence fails to show that Mr. Butler would have been a minister.

Similar "say so" evidence was in the record in the *OLG* cases, but those Defendants also presented "abundant record evidence" showing that both teachers actually engaged in religious instruction using school-provided religious materials and textbooks, and were evaluated by their employers on whether, and how well, they taught religion.  140 S. Ct. at 2059, 2066.  Here, Plaintiff is the one presenting "abundant record evidence" as to what the teacher actually did, and it shows that the actual job included none of the functions or duties that, according to the *OLG* Court, can render a teacher a minister: no teaching of religious curriculum or materials, (*compare OLG*, 140 S. Ct. at 2056-57, 2058-59 *with* Pl. Resp. Defs. 56.1 ¶¶ 201, 204-06, 213-17); no inclusion of religious substance, (*compare OLG*, 140 S. Ct. at 2056-57, 2058-59 *with* Pl. Resp. Defs. 56.1 ¶¶ 196, 229, 233-37); no responsibility for leading devotional activities (*compare OLG*, 140 S. Ct. at 2057, 2059 *with* Pl. Resp. Defs. 56.1 ¶¶ 196-98; 207-12.)  Other evidence is consistent with Ms. Puglionisi's – Mrs. C testified that Ms. Puglionisi's predecessor's lessons also tracked the state curriculum and could not recall any particular religious assignment he gave, and none of the sample lesson plans produced from the 2019-20 school year reference religion.  *See* Pl. Resp. Defs. 56.1 ¶¶ 230-31, 238.  Both schools in *OLG* used a "Classroom Observation Report" form that asked the observer to evaluate "whether Catholic values were 'infused through all subject areas.'"  *OLG*, 140 S. Ct. at 2057-59.  Neither the annual assessment form that the Diocese provided to St. Stans, nor the formal classroom observation form the school uses, ask the evaluator about religion; and Mrs. C did not include any mention of religion in any of the annual assessment or formal observation reports she completed.  *See* Pl. Resp. Defs. 56.1 ¶¶ 219-23; 240-41; 243-44.  These differences are fatal to Defendants' motion and substantiate Plaintiff's claim that Mr. Butler would not have been a minister.

Pursuing their argument that this court must not examine what actually happened at the school, Defendants make the astonishing statement that "the Academy's evaluation of whether and how Ms. Puglionisi included the Church's teachings in her classroom lessons and exemplified them in public conduct is precisely the type of inquiry this Court must avoid." Defs' Mem., 15. But this is precisely the inquiry that Supreme Court mandates. Whether a teacher included the church's teachings in classroom lessons and was evaluated on religious criteria, and how the teacher was held out to the public, are precisely the types of facts that the Supreme Court and Second Circuit[11] relied upon to determine whether the teachers in the cases before them were ministers. The Supreme Court found it significant that the congregation that hired and fired the teacher in *Hosanna-Tabor* formally assessed her religious leadership, 565 U.S. at 191; and in *OLG* the Court relied on the teacher evaluation forms that assessed the quality of the plaintiff's religious instruction, 140 S. Ct. at, 2057, 2059. Similarly, the Court found significant that both the school and the teacher in *Hosanna-Tabor* "held [the plaintiff] out as a minister." *Compare* 565 U.S. at 191, *with* Pl. Mem., 7.[12] Defendants eschew this required fact-intensive approach.[13]

---

[11] *Fratello*, 863 F.3d at 209 (discussing religious functions performed and Diocese's evaluation of those religious functions).

[12] While the Court in *OLG* found that factor was less salient in the cases it was considering, it certainly did not suggest that courts should "avoid" it. *OLG*, 140 S. Ct. at 2064, 2067 (plaintiff's title of minister and fact she held herself out as a minister were not "necessary" to trigger ministerial exception but merely made *Hosanna-Tabor* an "especially easy" case).

[13] It is telling, perhaps, that cases Defendants offer to support their point do not address the ministerial exception. *See* Defs. Mem., 15 (citing *Serbian E. Diocese of the United States of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976) (court could not adjudicate which church faction was properly in power and therefore held title in an intra-church real estate dispute); *Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 420 (3d Cir. 2012) (court could not consider arguments about termination of plaintiff's membership from congregation on first amendment grounds). In *OLG* the Court cautioned courts against second-guessing schools' determinations that teachers have sufficient religious training, particularly "in light of the age of the

The record on what actually occurred at St. Stans eviscerates Defendants' assertion that it "expects" the seventh and eighth grade Social Studies and English teacher to perform religious duties. Mrs. C herself told Mr. Butler that he would be not required to teach religion, and had a similar conversation with Ms. Puglionisi. *See* Pl. Resp. Defs. 56.1 ¶¶ 201, 204-05. Mrs. C could not specifically recall observing Ms. Puglionisi's predecessor leading his class in prayer, and testified that it was not a "performance problem" that she did not see Ms. Puglionisi leading her class in prayer. *Id.* ¶¶ 208-09, 227.[14] And, despite abundant evidence showing that Mrs. C knew Ms. Puglionisi was essentially serving as a secular teacher, *id.* ¶¶ 218-46, Mrs. C approved of and even praised her performance, *id.* ¶¶ 241-42, 245.

These factual disputes, tracking the core holding of *OLG*, preclude the Court from holding that Plaintiff would have been a minister as a matter of law.

> ### b. Defendants' Evidence is Inadmissible and Fails to Establish the Absence of a Genuine Dispute.

Defendants' "say so" evidence fails on evidentiary grounds, too. Under Fed. R. Civ. P. 56(c), the party opposing summary judgment can show that a genuine dispute exists when "the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The Rule "contemplates that the parties will flag for the court material cited by opposing counsel which is not admissible, and hence not properly considered on summary judgment." *O'Brien v. Wisniewski*, No. 10 Civ. 120, 2012 WL

---

students taught," *OLG*, 140 S. Ct. at 2068, but reviewed in detail whether the teachers performed religious duties and whether the schools evaluated them on that performance, *see id.* at 2056-59.

[14] Participating in prayer or religious services alone is insufficient to support a minister designation. *See Herx*, 48 F. Supp. 3d at 1177 ("Labeling Mrs. Herx a 'minister' based on her attendance and participation in prayer and religious services with her students, which was done in a supervisory capacity, would greatly expand the scope of the ministerial exception and ultimately would qualify all of the Diocese's teachers as ministers, a position rejected by the *Hosanna–Tabor* Court.").

1118076, at *3 (D. Conn. Apr. 3, 2012).  When a summary judgment movant "fail[s] to fulfill its initial burden" of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied.  *See Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 160 (1970)).

Defendants offer a series of impermissibly conclusory statements about the Catholic school teacher's role in conveying the faith, each of which relies exclusively on one of three unauthenticated business records.[15]  Conclusory assertions unsupported by other evidence are inadmissible on summary judgment.  *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007) ("Although [plaintiff] submits that the regulations were a significant factor in the failure of these two restaurants, no evidence was adduced to support this conclusory assertion."); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000) (conclusory statements, conjecture, and inadmissible evidence insufficient to defeat summary judgment).  Business records, even if they "appear to be admissible" are "not self-authenticating" because "the declaration of [the proponent's] attorney does not provide the Court with all the information necessary to establish their admissibility under [FRE] 803."  *Singh v. Bay Crane Servs., Inc.*, No. 11 Civ. 720, 2013 WL 5655931, at *2 n.4 (E.D.N.Y. Oct. 11, 2013) (declining to consider unauthenticated records on summary judgment); *Danford v. City of Syracuse*, No. 09 Civ. 0307, 2012 WL 4006240, at *3 n.7 (N.D.N.Y. Sept. 12, 2012) (Fed. R. Civ. P. 56(c) requires affidavits

---

[15] Defendants also improperly cite fact witness testimony for legal conclusions (Pl. Resp. Defs. 56.1 ¶¶ 75, 111, 138) and expert material (*id.* ¶ 90). *See Davis v. City of New York*, 959 F. Supp. 2d 427, 435 & n. 30 (S.D.N.Y. 2013) ("[N]either expert nor lay witnesses may 'present testimony in the form of legal conclusions.'") (quoting *Cameron v. City of New York*, 598 F.3d 50, 62 & n. 5 (2d Cir. 2010)); *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (admitting portion of lay witness's testimony that "reflected specialized knowledge" was reversible error); *Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 171, 174 (D. Conn. 2005) (striking and declining to consider on summary judgment portions of lay witness's declaration that opined on industry custom and practice).

to be based on personal knowledge which counsel did not possess, and collecting cases).

Defendants' Exhibit 10 is a "State of the Academy" PowerPoint presentation. *See* Cea Decl., ¶ 12. Nothing in the record indicates who prepared it, who presented it, or lays any other foundation for its admissibility. But it is the only piece of evidence that Defendants cite to support their claim that St. Stans provides an education "grounded in Catholic Values, morals, and tradition." *See* Pl. Resp. 56.1, ¶ 7. Exhibit 12 is an undated "Catholic School Accreditation Association Document" that Defendants cite to show that St. Stans made "the [s]cheduling and [t]eaching of [r]eligion a priority." *See* Cea Decl., ¶ 14; Pl. Resp. 56.1, ¶ 12. Exhibit 13 is a welcome letter dated "July 2015" and addressed to "Catholic Elementary School Teacher." *See* Cea Decl., ¶ 15. Defendants' rely on these unauthenticated documents to support a series of broad generalizations about the role of Catholic school teachers in advancing the faith. *See* Pl. Resp. 56.1, ¶¶ 18, 19, 21-23. Although Dr. Chadzutko, the Diocese's 30(b)(6) witness, appears to have signed both Exhibits 12 and 13, they are introduced here by an attorney affidavit rather than sworn statement from Dr. Chadzutko providing authenticating information. *See Danford*, 2012 WL 4006240, at *3 n.7; *see also Ravenell v. Avis Budget Grp., Inc.*, No. 08 Civ. 2113, 2014 WL 1330914, at *2-3 (E.D.N.Y. Mar. 31, 2014) (declining to consider on summary judgment documents where defendant did not "submit[] any affidavit purporting to explain what these documents are, who made them, or why they are admissible"). Exhibits 10, 12, and 13 should be disregarded.

Defendants rely on four other exhibits, similarly devoid of any evidentiary foundation, to support their statements about what teachers allegedly do or what purportedly occurred at the 2015 new teacher orientation. *See* Cea Decl., ¶¶ 16, 21, 22, 28 (Exhibits 14, 19, 20, 26). None

of the exhibits is dated.  *See* Exhibits 14, 19, 20, 26.  Exhibits 14[16] and 19 are untitled with

nothing in the record showing who prepared or presented them (or if they were presented).

Defendants separately rely on each of these exhibits as the only support for conclusory

statements about a teacher's role in conveying the faith, and representations about what

purportedly occurred during the 2015 new teacher orientation.  *See* Pl. Resp. 56.1, ¶¶ 20, 24, 46-

48, 49, 50.  Exhibit 20 has a title and author, but nothing confirming it was actually delivered at

the orientation, but it is Defendants' only evidence for other assertions about what allegedly

occurred at the orientation.  *See* Cea Decl., ¶ 2; Pl. Resp. 56.1, ¶¶ 50, 51, 56.  Exhibit 26 is an

orientation agenda that reflects no title or author and is marked "draft," which Defendants rely on

for assertions about what happened at the event.  Pl. Resp. 56.1, ¶¶ 93, 95, 96.  Exhibits 14, 19,

20, 26 should be disregarded as well.  *See Osorio v. Mathews Prime Meats, Inc.*, 101 F. Supp. 3d

255, 263-64 (E.D.N.Y. 2015) (declining to rely on document lacking sufficient information to

establish its admissibility at trial and denying summary judgment).

### 2. As a Non-Ministerial Employee, Mr. Butler May Bring His Discrimination Claims.

The caselaw is clear that non-ministerial employees may bring employment claims and

can prevail against employers that assert religious reasons for their otherwise discriminatory

actions.  Defendants' arguments to the contrary misapprehend the law.

### a. The Ministerial Exception Permits Non-Ministerial Employees Like Mr. Butler to Bring Discrimination Claims Against Employers that Assert Religious Reasons for a Termination.

The ministerial exception does not insulate religious organizations' employment

decisions generally, nor does it insulate all employment decisions regarding parochial school

---

[16] Counsel for Defendants made representations about the use of the presentation during Plaintiff's deposition, but without establishing personal knowledge, leaving the document inadmissible.  *See* Ex. EE (Butler Tr. 81:14-15).

teachers. Defendants misstate the law when they say it "*prevents a court from evaluating the employment decisions of a religious organization* regardless of whether the court would be required to delve into religious doctrine." Defs. Mem., 8 (emphasis added). The ministerial exception does not create "general immunity from secular laws." *OLG*, 140 S. Ct. at 2060. Nor does it bar non-ministerial employees from bringing discrimination claims against religious employers. *See Rweyemamu v. Cote*,[17] 520 F.3d 198, 207 (2nd Cir. 2008) (Title VII is "*not inapplicable* to religious organizations as a general matter" and the ministerial exception "will permit lay employees – but perhaps not religious employees – to bring discrimination suits against their religious employers") (emphasis added); *see also CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 163-64 (N.D.N.Y. 2020) ("No court has found that the religious autonomy the First Amendment provides offers a blanket exception to religious organizations in their hiring and firing practices, or that anti-discrimination laws do not apply to religious employers."). Indeed, parochial school teachers have prevailed on summary judgment and at trial, including where schools have offered religious reasons for terminating them. *See Redhead*, 566 F. Supp. 2d at 137-38 (denying summary judgment against parochial school teacher who was fired after becoming pregnant out of wedlock and holding that "a jury remains the proper instrument for determining whether it was pregnancy or fornication that caused the Defendant to dismiss the Plaintiff"); *Herx*,[18] 48 F. Supp. 3d at 1183 (denying summary judgment against parochial school teacher who used in vitro fertilization despite Catholic prohibition against it and holding that

---

[17] When the Supreme Court adopted the ministerial exception in *Hosanna-Tabor* it acknowledged that the Courts of Appeals had already recognized the doctrine and drew on their jurisprudence, including the Second Circuit's decision in *Rweyamamu*. *See Hosanna-Tabor*, 565 U.S. at 188 & n.2 (citing *Rweyemamu*, 520 F.3d at 204-09).

[18] The plaintiff in *Herx* subsequently prevailed at trial. *See* 2014 WL 7692713 (verdict), and the court entered judgment against the defendant, 2015 WL 355962 (judgment).

there was a "triable issue" on "whether [plaintiff] was nonrenewed because of her sex, or because of a sincere belief about the morality of in vitro fertilization"); *see also Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, No. 19 Civ. 03153, 2020 WL 6434979, at *3 (S.D. Ind. Oct. 21, 2020) (denying motion on the pleadings against Catholic school teacher who allegedly "violated her employment contract by entering a same sex marriage").

> Defendants overstate the holding in *OLG* when they claim that
>
> the ministerial exception bars employment discrimination claims by lay teachers in religious schools, like Plaintiff, because the 'religious education and formation of students is the very reason' for Catholic schools' existence and therefore 'the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission.'

Defs. Mem., 2, 4 (the "decision to rescind its offer of employment to Plaintiff is not susceptible to civil adjudication because of the mission-centric position he sought"). The Court's recent decision in *OLG* did not announce a *per se* rule that all parochial school teachers are ministers. Instead *OLG* reaffirmed that the factors the Supreme Court considered in *Hosanna-Tabor* should not be applied as a "rigid formula," and admonished courts to instead conduct a fact-intensive, case-by-case analysis. *OLG*, 140 S. Ct. at 2062. The Court underscored the importance of its instruction by carefully limiting its decision only to the cases before it. *See id.*, at 2069; *see also Hosanna-Tabor*, 565 U.S. at 196. Similarly, the Second Circuit recently rejected the argument "that all parochial-school principals should be presumed to be ministers" because "any such categorical presumption runs counter to the teaching of *Hosanna-Tabor*, in which the Supreme Court looked to the specific circumstances of the plaintiff's employment to determine whether she was a minister." *Fratello*, 863 F.3d at 206 (citing *Hosanna-Tabor*, 565 U.S. at 190-92) (some parochial school principals "may perform few such religious functions – some, perhaps, none at all"). The ministerial exception protects religious organizations' right to select their ministers, but if it does not apply a religious reason for a termination is not an automatic defense.

17

> **b.     Defendants' Pretext Argument Misapplies the Law Because a Court Can Adjudicate Non-Ministerial Employees' Claims Even if the Employer Asserts a Religious Reason for its Actions.**

Defendants' confusion about the role of pretext analysis permeates their brief.  It begins with Defendants' misstatement (without citation) that Plaintiff "contended that Defendants' decision to rescind Plaintiff's offer 'due to the violation of Catholic faith and morals' was pretextual only, and therefore the exception should not apply."  Defs. Mem., 15.  Plaintiff's actual contention is that the ministerial exception should not apply *because his duties would not have been those of a "minister"* as recognized by the Supreme Court and Second Circuit.  *See* Pl. Mem., 9-15.  Once that analysis is complete, Plaintiff maintains that the evidence supports his substantive discrimination claims.  *See* Section I.A.2.

This case includes direct evidence of discrimination so the court need not conduct a pretext analysis.  But, even if a pretext analysis applied (*see infra* Section II.A.2), the trier of fact does not consider whether an employer's proffered religious reason is reasonable, only whether it is the real reason for its adverse action against the plaintiff.  The Second Circuit held, for example, in *DeMarco*, that a plaintiff can "challenge as pretextual the employer's justification without calling into question the value or truthfulness of religious doctrine."  4 F.3d at 171-73 (reversing dismissal of math teacher's age discrimination claim against a Mormon high school); *id.* at 170-71 ("to determine whether an employer's putative purpose is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable.  Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action."); *Redhead*, 566 F. Supp. at 135-37 ("although the validity of defendant's religious code may not be impugned, the allegedly discriminatory application of such a code to lay employees is a proper subject of judicial scrutiny"); *Herx*, 48 F. Supp. 3d at 1178 (jury could find, based on evidence to be presented,

"that an employer with so strong a view of this particular infertility treatment would discharge anyone involved with it, male or female" but "wouldn't be compelled to accept that avowed gender-neutrality" because "the Diocese hasn't terminated any men for participation in [any] infertility treatment"); *id.* at 1183.

When a court determines the ministerial exception does not apply, the employee's discrimination claim may proceed. *See Redhead*, 566 F. Supp. 2d at 129 ("Finding that consideration of the ministerial exception effectively allayed the concerns that the religion clauses of the First Amendment were designed to prevent, the court turned to the merits of plaintiff's discrimination claim."). As discussed below, Mr. Butler does not challenge the validity of Defendants' religious beliefs. He asserts that he was fired because he is gay.[19]

### B. The Statutory Exceptions Do Not Apply as a Matter of Law.

Defendants argue that Title VII's exceptions for religious and educational corporations provide a defense to Mr. Butler's claims. *See* Defs. Mem., 17. But Title VII's statutory language states that its protections do not apply to such entities' employment of individuals "of a particular religion." 42 U.S.C. §§ 2000e-1(a); 2000e-2(e)(2). It does not authorize discrimination based on sex.

The Second Circuit has long held that religious employers are subject to Title VII's provisions relating to discrimination based on sex. *See Fratello*, 863 F.3d at, 200 n.21; *Rweyemamu*, 520 F.3d at 207; *see also Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 331 (3d Cir. 1993) (collecting cases). Indeed, in *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 259-63 (E.D.N.Y.), *aff'd*, 201 F.3d 432 (2d Cir. 1999), the court held that Title VII's statutory exception barred plaintiff's religious discrimination claim, but then

---

[19] The school principal and the Diocese's superintendent testified that gay teachers could teach at St. Stans as long as they were celibate and unmarried. *See* Pl. Resp. Defs. 56.1 ¶¶ 279-81.

independently assessed the race and national origin discrimination claims she plead in the alternative arising out of the same facts.[20]

Eschewing this authority, Defendants largely rely on cases in which the plaintiff asserted a religious discrimination claim against his employer.  *See* Defs. Mem., 17-18 (citing *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 625 (6th Cir. 2000) (employee fired for joining church that accepted gay people could not sue for religious discrimination); *Killinger v. Samford Univ.*, 113 F.3d 196, 200 (11th Cir. 1997) (divinity school professor could not bring religious discrimination claim against school); *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (employee fired for remarrying without obtaining annulment could not sue for religious discrimination)).[21]  These out of circuit and readily distinguishable cases cannot subvert the Second Circuit's binding rule that Title VII exempts religious organizations from "religious-discrimination claims," and "does not exempt them from claims based on . . . gender." *Fratello*, 863 F.3d at 200 n.21.

Defendants cannot show that the ministerial exception or statutory exceptions, state or federal, apply in this case.

---

[20] The NYSHRL and NYCHRL carveouts also limit a religious employer's immunity to religious discrimination claims. *Jing Zhang v. Jenzabar, Inc.*, No. 12 Civ. 2988, 2015 WL 1475793, at *9 n.18 (E.D.N.Y. Mar. 30, 2015) (NYSHRL and NYCHRL "exempt religious organizations from religious creed employment discrimination liability"); *Scheiber v. St. John's Univ.*, 84 N.Y.2d 120, 127 (N.Y. 1994) (exemption to NYSHRL "operates to exclude from the definition of 'discrimination' exercise of a preference in hiring for persons of the same faith").

[21] The only other case Defendants cite is *Curay-Cramer v. Ursuline Acad. of Wilmington., Inc.*, 344 F. Supp. 2d 923 (D. Del. 2004), *aff'd on other grounds*, 450 F.3d 130 (3d Cir. 2006), in which an employee who was fired for publicly opposing abortion alleged she was punished more harshly than men who opposed religious teachings on different issues such as the Iraq war (and not because she was a woman who opposed abortion instead of a man who opposed abortion).

## II.   Material Disputes Remain Regarding Defendants' Motive for Terminating Mr. Butler's Employment.

The facts and evidence set forth above regarding the circumstances of Mr. Butler's termination, *see, e.g.*, Pl. Resp. Defs. 56.1 ¶¶ 119, 127, satisfy his burden to show that Defendants discriminated against him because of his gender (sexual orientation), and retaliated against him for raising concerns about his workplace rights being respected.  Defendants learned through discovery that their stereotypical assumptions about Mr. Butler are false (their own witnesses testified a gay, celibate teacher (like Mr. Butler) is eligible to teach at St. Stans), so they have revised their explanations for why they terminated him.  *Id.* ¶¶ 276-81.  There is, in any event, a dispute of fact as to the real reason Defendants fired Mr. Butler and that dispute should go to a jury.

### A.   Mrs. C's Termination Letter and Subsequent Email Satisfy Mr. Butler's Initial Showing for His Discrimination Claim Under Either a Mixed-Motive or Burden-Shifting Analysis.

The Second Circuit uses at least two analytical frameworks to assess discrimination claims – mixed motive (as articulated in *Price Waterhouse*) and burden-shifting (as defined by *McDonnell Douglas*) – and it applies them separately.  *See, e.g.*, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, (2d Cir. 2013) (reversing district court's summary judgment determinations that plaintiff failed to offer sufficient evidence under either pretext or mixed motives inquiries); *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997) ("On appeal, [plaintiff] makes arguments under both the *Price Waterhouse* and *McDonnell Douglas* frameworks, and we address those arguments separately.").

#### 1.   Mrs. C's Termination Letter and Subsequent Email are Direct Evidence of Discrimination Under a Mixed-Motive Analysis.

If a plaintiff can produce direct evidence of discrimination, then a "mixed-motive" analysis is appropriate.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258-59 (1989); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992).  In a "mixed motive" case, the

plaintiff must initially "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Tyler*, 958 F.2d at 1181 (quoting *Price Waterhouse*, 490 U.S. at 244-47 (plurality opinion)).  A plaintiff satisfies his burden in a mixed motive case if his evidence "directly reflect[s]" a discriminatory motivation.  *Raskin*, 125 F.3d at 60-61 (internal quotation marks omitted).  The evidence need not rule out all other motivations, but rather need only be "*sufficient to allow a trier to find both forbidden and permissible motives*."  *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992) (emphasis added)).  Once the plaintiff presents such evidence, the burden of proof shifts to the defendant to prove to the factfinder, as an "affirmative defense," that "that it would have reached the same decision . . . even in the absence of the impermissible factor." *Tyler*, 958 F.2d at 1181.

Mrs. C's correspondence are textbook examples of direct evidence.  *Compare* Pl. Resp. Defs. 56.1, ¶¶ 119, 127, *with Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001) (reversing district court's grant of summary judgment and holding supervisor's comments about "how much he enjoyed training young women" were direct evidence of age discrimination); *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 768-69 (S.D.N.Y. 2002) (denying summary judgment under mixed-motive approach where plaintiff sales associate pointed to sales policy that "white male customers were to be served by white female sales associates").  By firing Mr. Butler because he is a man who wishes to one day marry another man, Defendants treated him differently from a woman who wishes to one day marry a man.  As the Supreme Court recently held, "intentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating against homosexual . . . employees." *Bostock*, 140 S. Ct. at 1742; *see also Starkey*, 2020 WL 6434979, at *5 ("[T]he

religious grounds for the decision and Starkey's sexual orientation are two sides of the same coin.") (permitting parochial school teacher terminated for being gay to proceed with her claim).

Defendants cannot point to anything in the record to show they would have made the same decision absent the discriminatory factor – they would not have fired a female teacher who wanted to marry her boyfriend eventually.  "It doesn't matter if other factors besides the plaintiff's sex contributed to the decision" because "intentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal." *Bostock*, 140 S. Ct. at 1742.

### 2. Mr. Butler Satisfies His Prima Facie Showing Under the Burden-Shifting Analysis, Because Sex was the "But For" Cause of His Termination.

If a plaintiff proffers only indirect or circumstantial evidence of discrimination, then a "burden-shifting" analysis applies.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973); *Tyler,* 958 F.2d at 1180-81.  In a burden-shifting case a plaintiff first must establish a prima facie case, which "is not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  To succeed on a claim of employment discrimination under a burden-shifting analysis, the plaintiff must establish that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).

Here there is no dispute that Mr. Butler is a member of a protected class and suffered an adverse employment action.  Defendants challenge the second element, whether Mr. Butler was "qualified" for the position he held.  To make out a *prima facie* case that a plaintiff is qualified, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d. Cir. 2001).  In *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001), the

Second Circuit noted that "by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Id.* Here, Defendants hired Mr. Butler, and did so based on his qualifications. *See* Pl. Resp. Defs. 56.1 ¶¶ 68-70, 76-78, 253-546. At the very least this is an issue of fact for the jury.

For the fourth element, that the termination took place under circumstances giving rise to an inference of discrimination, "'a plaintiff may rely on direct evidence of what the defendant did and said in satisfying her initial burden under *McDonnell Douglas*," too. *Holtz*, 258 F.3d at 77 (quoting *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000)). The direct evidence of Mrs. C's correspondence discussed above satisfies this showing.[22] This is particularly true under the explanation of the "but for" causation standard the Supreme Court offered in *Bostock*, 140 S. Ct. at 1741, which one court considering a Catholic school's termination of a teacher who married another woman explained this way:

> The majority [in *Bostock*] explained that Title VII's "because of" test incorporated the but-for standard of causation. 140 S. Ct. at 1739. This form of causation is established whenever a particular outcome would not have happened but for a certain cause. *Id.* But-for causation in the Title VII context means "*a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision*. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.*

*Starkey*, 2020 WL 6434979, at *5 (quoting *Bostock*, 140 S. Ct. at 1739) (denying defendants' motion for judgment on the pleadings) (emphasis added).

---

[22] Defendants argue that Mr. Butler "must" identify a similarly situated teacher who planned to violate faith and morals. Defs. Mem., 22. In cases when the plaintiff offers indirect evidence only, "comparator" evidence (showing that similarly situated employees outside of plaintiff's protected class were treated differently) is one way to buttress the inference of discriminatory animus, but it is not the only way. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (indirect evidence can include *inter alia* "the employer's criticism of the plaintiff's performance in ethnically degrading terms . . . or its invidious comments about others in the employee's protected group"). Even if Mr. Butler did not have Mrs. C's letter to him and her email to Dr. Chadzutko to satisfy this element, and elected to use comparator evidence, a true comparator would be a female teacher who planned to marry her boyfriend eventually.

Once the plaintiff makes his prima facie showing, the defendant must use admissible evidence to articulate a legitimate reason for the employment decision. *See Tyler*, 958 F.2d at 1181. Ultimately, the plaintiff has an opportunity to show that the defendant's purported reason is pretextual and persuade "the trier of fact that a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Id.*, at 1181 (citing *Burdine*, 450 U.S. at 256). An employer's shifting rationale for their actions also shows pretext. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (defendants inconsistent assertions to EEOC, during deposition, and in litigation for terminating employee were evidence of pretext); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (jury could infer pretext based on discrepancies in employer's position over time, including employer no longer asserting earlier explanation). Since Mrs. C's email identifying Mr. Butler as the young man she hired before she knew he was gay, Defendants' explanations have shifted as evidence revealed their earlier reasons to be based on incorrect assumptions.

Defendants since-abandoned explanations to the NYCHRC (which they made in 2016, the year after the termination) show that homophobia and discriminatory stereotypes about gay men actually motivated their decision. Defendants suggested to the NYCHRC that they terminated Mr. Butler because he would be "partaking in sexual relations with another man," and entering into a civil marriage. *See* Pl. Resp. Defs. 56.1 ¶ 277, *see also* ¶¶ 107, 118. In fact, Mr. Butler is a devout Catholic, who was celibate and has no interest in a "cold, civil marriage" and continues to pray for the day when he can marry in the church. *Id.* ¶¶ 262-64. Notably, the reasons Defendants gave to the NYCHRC were offered closer in time to their decision to fire Mr. Butler, and were abandoned after evidence showed the assumptions they relied upon were incorrect, which is further evidence of pretext. *See Ethan Allen, Inc.*, 44 F.3d at 120.

Evidence that Defendants' own witnesses subsequently offered confirms that stereotyped

assumptions motivated their decision.  Mrs. C testified that gay teachers could teach at St. Stans

as long as they were celibate and not married:

> Q    Regarding the hiring process at St. Stans, as far as you understand it, are
> homosexuals eligible to be hired as a teacher at St. Stans?
> A    Yes, as long as they are celibate and not married.

*See* Ex. I (Cieloszczyk Tr. 28:5-10).

> Q    I'm going to -- I will represent to you, Mrs. C, that Ms. Butler testified that, in his E-
> Mail to you when he talked about his hope to marry his boyfriend eventually, his
> testimony was that he had no interest in civil marriage; he was interested in getting
> married when it was sanctioned by the church. Take that representation by me as true.
> [objection]
> Q    In light of that representation that I just made to you Mrs. C, in your -- in your view,
> would Mr. Butler have been eligible to be a teacher at St. Stans if he meant he would get
> married when the church sanctioned it?
> [objection]
> A    *If he meant that he would not marry until the church sanctioned it, then he would be*
> *eligible.*

*See* Ex. LL (Cieloszczyk Tr. 29:3-30:4).

Dr. Chadzutko, the Diocese's superintendent testifying as its corporate representative

confirmed:

> Q    Would it be okay for a teacher to be gay if he were celibate?
> A    Yes.
> Q    Would a gay teacher who was celibate be eligible for employment in the Brooklyn
> diocese?
> A    Yes.
> Q    Do you know whether or not Mr. Butler was celibate?
> A    I don't know.
> Q    It matters, though, according to your testimony, correct?
> A    It would matter, yes.

*See* Ex. J (Diocese 30(b)(6) 272:14-25).

Defendants only explanation for Mrs. C and Dr. Chadzutko's statements is that it is "not

what Plaintiff said to the Academy in 2015 nor what Defendants understood him to mean at that

time, and thus is irrelevant."  Defs. Mem., 21 n.5.  First, it *is* what Plaintiff said in 2015 – he said

he expected to marry his boyfriend "eventually."  Second, Defendants never asked him what he meant by "eventually," Pl. Resp. Defs. 56.1 ¶ 271.  It is not "what Defendants understood him to mean" because they jumped to stereotyped conclusions about what he meant, including that he was engaging in premarital sex and referring to a civil marriage.[23]  *Id.* ¶ 277.

To support their argument that their reliance on stereotypes was not discriminatory, Defendants cite only *Anderson v. Delphi Auto. Sys. Corp.*, 297 F. Supp. 2d 625, 628 (W.D.N.Y.), *aff'd*, 111 F. App'x 634 (2d Cir. 2004).  *Anderson* was brought by an employee who had been fired along with 13 co-workers in the culmination of a multi-year investigation into drug activity at the work place.  *Id.* at 626, 628.  The court held that the termination was not motivated by a discriminatory purpose because "[a]t the time the Company made the decision to terminate Anderson and the others, the Company had investigative reports, several of them, indicating illegal activities."  *Id.* at 628.  *Anderson* could not be more different than the case at hand.  Here, no one asked Mr. Butler a single question, including what he meant by "eventually."  Pl. Resp. Defs. 56.1 ¶ 271.  On this record a reasonable jury could find that Defendants fired him because he was gay, including by jumping to conclusions based upon discriminatory attitudes towards gay men.  *Id.* ¶¶ 127, 268 (St. Stans 30(b)(6) Tr. 81:9-82:9 (on the conference call after Mr. Butler sent his September 2, 2015 email, Dr. Chadzutko expressed his concern that "persons like that are not supposed to be in a classroom with students"), 277 (suggesting Mr. Butler would engage in pre-marital sex or enter a civil marriage).

---

[23] The cases Defendants cite to argue that a mistaken belief is not evidence of pretext, Def. Mem. 24-25, have no weight because the reasons in those cases were not discriminatory.  *See Hongyan Lu v. Chase Inv. Servs. Corp.,* 412 F. App'x 413, 417 (2d Cir. 2011) ("pattern of compliance issues"); *Velez v. SES Operating Corp.*, No. 07 Civ. 10946, 2009 WL 3817461, at *12 (S.D.N.Y. Nov. 12, 2009) (patients' complaints about inappropriate touching); *Kelderhouse v. St. Cabrini Home*, 259 A.D.2d 938, 393 (3d Dep't 1999) (falsifying time sheets).

Finally, both Defendants deny that they were the one who made the decision to terminate Mr. Butler's employment. *Id.* ¶ 269. Each claim it was the other. *Id.* This dispute between Defendants themselves over such a basic material fact further supports Mr. Butler's pretext showing. *See Berube v. Great Atl. & Pac. Tea Co.*, No. 06 Civ. 197, 2010 WL 3021522, at *7-8 (D. Conn. July 29, 2010) (evidence that no one took responsibility for decision to fire plaintiff together with other proof showed pretext and precluded summary judgment) (quoting *Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 523 (6th Cir. 1997) and collecting cases).

Defendants' most consistent articulation of their actions is that Plaintiff's statement of intent to marry his boyfriend did not "coincide with [its] Catholic morals and values" as "same sex marriage is not recognized by the Church." Defs. Mem., 17-18 citing Defs. 56.1 ¶¶ 107, 109. Assuming this reason is true (which Plaintiff does not concede), it relies on Defendants jumping to erroneous conclusions regarding what Mr. Butler meant by marrying his boyfriend "eventually" (that he was referencing civil marriage), which they never bothered to clarify.

Because Mr. Butler would not have been a minister, the Defendants' discriminatory actions are not shielded by the First Amendment and his case should go to a jury.[24]

### B. There is a Dispute in the Record Over Whether Defendants Retaliated Against Mr. Butler for His Protected Activity.

To establish a prima facie case for employment retaliation, the Plaintiff must establish that (1) he "engaged in protected activity" (2) that the employer "was aware of this activity" (3) that the employer "took adverse action against him," and (4) "a causal connection exists between

---

[24] This evidence satisfies Mr. Butler's showings for his state and city law claims, too. "[T]he standards for proving discrimination under [the NYSHRL] are the same as under Title VII." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under New York's Human Rights Law "is governed by the same standards as his federal claim" so his state claim was "subsumed within the Title VII analysis.") "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims . . . construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible[.]" *Mihalik*, 715 F.3d at 109 (internal citations omitted).

the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 177 (2d Cir. 2006) (internal quotations and citations omitted).  Where a plaintiff can establish a prima facie case, the analysis proceeds according to the *McDonnell Douglas* framework.  *See Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir. 1999) (noting that the burden-shifting framework applies to retaliation claims under Title VII).

On these facts, many of the elements of Mr. Butler's discrimination claim overlap with his retaliation claim.  On September 2, 2015, Mr. Butler wrote to Mrs. C, telling her that he is "homosexual and plan[ned] on marrying [his] boyfriend eventually" and after the orientation he had attended he could not "tell if [he] would be accepted."  Pl. Resp. Defs. 56.1 ¶ 99.  This is a textbook protected disclosure – Mr. Butler identified his protected characteristic and asked if his workplace rights would be impacted because of it, and since Mrs. C received the email then forwarded it to the Diocese, Defendants were clearly aware of it.  *See Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity."); *see also Carter v. Rosenberg & Estis, P.C.*, No. 95 Civ. 10439, 1998 WL 150491, at *8 (S.D.N.Y. Mar. 31, 1998) (upholding jury verdict for employee where employee went to her employer "for advice" about her colleague's treatment towards her after she rebuffed his request for a kiss, which she didn't characterize as "sexual harassment").

A short time period between an employee's protected disclosure and the employer's retaliation supports the employee's argument that the reasons offered are pretextual.  *Zann Kwan*, 737 F.3d at 847.  Here less than 24 hours passed between Mr. Butler sending an email asking if being gay would expose him to workplace discrimination and Defendants

discriminatory decision to fire him.  *See* Pl. Resp. Defs. 56.1 ¶¶ 98, 117.  But there is no dispute

that the termination was an adverse action caused by what Mr. Butler wrote.  *See* Amended

Answer, ¶¶ 51-52 (contents of email caused termination).[25]

It is for a jury to decide whether either Defendants' newest explanation for their actions,

*see supra* note 4, or its most consistent explanation – that Plaintiff's statement of intent to marry

his boyfriend did not "coincide with [its] Catholic morals and values" as "same sex marriage is

not recognized by the Church[,]"  Defs. Mem., 17-18 citing Defs. 56.1 ¶¶ 107, 109 – is credible

(and not pretextual) against their own witnesses' testimony (that celibate, unmarried gay teachers

are eligible to teach; that Mrs. C hired Mr. Butler before she knew he was gay; that neither

Defendant decided to terminate Mr. Butler's employment). [26]

### III.  The Diocese is a Proper Defendant Because it is Enmeshed in St. Stans' Operations and Management, and Made the Decision to Terminate Mr. Butler.

The Diocese is deeply enmeshed in all aspects of St. Stans' operations and administration

– it runs the school's Human Resources ("HR") function, can fire its teachers, remove its board

members, and dissolve its corporate form.  Courts use several legal tests to determine whether an

---

[25] Defendants suggest that "double life" is a neutral statement, Defs. Mem., 22; but that is not what Mr. Butler, or others, understand it to mean.  *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 689 (2000) (observing that plaintiff described himself as having "lived a *double life*" when he pretended to be heterosexual while he was actually homosexual) (emphasis added).  "Coded" comments about a plaintiff's protected characteristic can prove discriminatory animus.  *See, e.g., Colbert v. FSA Store, Inc.*, No. 19 Civ. 9828, 2020 WL 1989404, at *4 (S.D.N.Y. Apr. 27, 2020) (questions about plaintiff's "athletic prowess" and presumed "athletic skills" were evidence of racial stereotyping); *Fullwood v. Sodexo, Inc.*, No. 16 Civ. 6527, 2018 WL 3439866, at *11 (W.D.N.Y. July 17, 2018) ("facially non-discriminatory terms like welfare queen, terrorist, thug, [and] illegal alien can invoke racist concepts").

[26] Defendants are not entitled to summary judgment on Mr. Butler's wage claim.  Contrary to their assertions, Defs. Mem., 24 n. 6, time spent attending mandatory, job-related training sessions is compensable.  *See Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 194 (E.D.N.Y. 2015); *see also Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2016) (courts construe nearly identical terms of FLSA and NYLL together); *Apolinar v. Glob. Deli & Grocery, Inc.*, No. 12 Civ. 3446, 2013 WL 5408122, at *4 (E.D.N.Y. Sept. 25, 2013) (NYLL and FLSA's definition of employment nearly identical).  Defendants knew or should have known that Mr. Butler attended the orientation, sex abuse training, and that he would have to set up his classroom before their letter was scheduled to arrive on September 5, 2015.  *See* Ex. 28.

entity other than the plaintiff's direct employer can be liable for a discrimination claim, *see Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 379 (2d Cir. 2006) (discussing various tests), and rarely grant summary judgment on joint employment because of its "fact-intensive character." *See, e.g.*, *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 143-44 (2d Cir. 2008), *cf.* Ex. LL (Cieloszczyk Tr. 19:22-23:5) (describing the intricacies of Diocese's control over school hiring decisions). Regional dioceses have repeatedly been found to jointly employ parochial school teachers on facts similar to the ones here. *See Gargano v. Diocese of Rockville Ctr.*, 888 F. Supp. 1274, 1283 (E.D.N.Y. 1995), *aff'd*, 80 F.3d 87 (2d Cir. 1996) (upholding verdict for parochial school teacher); *Roman Catholic Diocese of Brooklyn*, 221 NLRB 831, 833 (1975), *granted enforcement by N.L.R.B. v. Roman Catholic Diocese of Brooklyn*, 535 F.2d 1387, 1387 (2d Cir. 1976); *see also Krasner v. Episcopal Diocese of Long Island*, 431 F. Supp. 2d 320, 325 (E.D.N.Y. 2006).

Under any test that courts in the Second Circuit use to determine whether an entity can be liable in an employment claim, the Diocese qualifies.

### A. The Diocese is an Employer Under the "Joint Employer" and Common Law Agency Tests.

In *Gargano*, a teacher terminated by a parish school prevailed at trial on her employment claims, and on her claim that the regional diocese was also her employer. The *Gargano* court upheld the verdict, and relied on *National Labor Relations Board v. Roman Catholic Diocese of Brooklyn,* 535 F.2d 1387 (2d Cir. 1976), which addressed circumstances "virtually indistinguishable" from those in *Gargano*. 888 F. Supp. at 1279. In pointing to factors supporting a joint employment relationship, the *Gargano* court found significant evidence that the diocese recruited teachers, maintained their personnel files, and promulgated templates for the contract and handbook that were "recommendations rather than binding, but they [were]

31

generally followed[,]" and used by the parish school, holding there was "more than ample

evidence" to satisfy the "joint employer" test, and the common law agency, too.  *Id.*

Here, nearly identical facts satisfy the joint employer test: the Diocese recruited teachers,

Pl. Resp. Defs. 56.1 ¶¶ 284-91, maintained personnel records about them, *id.* ¶¶ 300-06, and

promulgated a template contract and handbook that St. Stans followed, *id.* ¶¶ 39, 161, 186, 307-

311.  It also set and ensured teacher candidates met certain criteria, *id.* ¶¶ 282-83, 287-88, 290,

292, sponsored and administered employee benefit plans, *id.* ¶¶ 318-19, set requirements related

to pay, *id.* ¶¶ 320-24, devised teacher supervision and assessment protocols, *id.* ¶ 311, and had

the right to terminate teachers, including when it directed Mrs. C to fire Plaintiff, *id.* ¶¶ 325-33.

For the same reasons discussed in *Gargano* and the other cited cases, the Diocese is a joint

employer here.  *See also St. Jean v. Orient-Express Hotels Inc.*, 963 F. Supp. 2d 301, 307

(S.D.N.Y. 2013); *Fowler v. Scores Holding Co*., 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009)

(applying joint employment test to Title VII, NYSHRL and NYCHRL claims).

The *Gargano* court held that the common law agency test was also satisfied because the

school's handbook "*which was promulgated by the Diocese*" (emphasis in original) set forth

terms and conditions of employment, addressed teacher pay, included policies on hiring

procedures, tenure, insurance benefits, teacher evaluation, and school calendar.  *Id.* at 1282; *see*

*also Gulino*, 460 F.3d at 379 (adopting common law agency factors to determine employment

relationship with right to control as most important).[27]  Here, the Diocese controlled and had the

---

[27] The Second Circuit characterizes the initial inquiry as whether the employee "ha[s] been hired in the
first instance," but "the question of whether someone is or is not an employee under Title VII usually
turns on whether he or she has received direct or indirect remuneration from the alleged employer." *York
v. Ass'n of Bar of City of New York*, 286 F.3d 122, 125-26 (2d Cir. 2002).  Promise or provision of fringe
benefits is sufficient.  *See id*. at 126; *see also Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire
Dist.*, 180 F.3d 468, 473 (2d Cir. 1999).  Here, had Defendants not fired Plaintiff, the Diocese would have
provided him with fringe benefits, including medical, dental, pharmaceutical coverage and his pension
plan.

right to control Plaintiff: it set his job qualifications, the terms of his employment, and made the decision to fire him.  Pl. Resp. Defs. 56.1 ¶¶ 282-83, 292, 307-17, 325-35.[28]  The Diocese is an employer under the common law agency test, too.

### B.  The Diocese Is Liable Because It Performed St. Stans' HR Function.

An entity is also liable under Title VII where the plaintiff's direct employer "has delegated one of its core duties" to the entity.  *Gulino*, 460 F.3d at 377 (citing *Spirt v. Teachers Ins. and Annuity Ass'n*, 691 F.2d 1054 (2d Cir. 1982) *vacated and remanded on other grounds*, 463 U.S. 1223 (1983)); *accord Pathan v. Conn.*, 19 F. Supp. 3d 400, 419 (D. Conn. 2014).  St. Stans delegated its HR function to the Diocese, making it liable under *Spirt*.  *See* Pl. Resp. Defs. 56.1 ¶¶ 45, 282-340.

### C.  The Diocese and St. Stans Formed a Single Integrated Enterprise.

Two entities "deemed part of a single integrated enterprise . . . are subject to joint liability for employment-related acts."  *Fowler*, 677 F. Supp. 2d at 681.[29]  Courts consider the entities' "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial support."  *Id.*; *see Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995) (establishing factors).  Here, the Diocese's management of St. Stans' HR function is strong evidence of centralized control of labor relations, Pl. Resp. Defs. 56.1 ¶¶ 45, 282-340, while the school's corporate structure and

---

[28] Courts' use similar factors to assess whether an entity is an "employer" under the NYSHRL and NYCHRL.  *See State Div. of Human Rts. v. GTE Corp.*, 109 A.D.2d 1082, 1083 (1st Dep't 1985); *Lation v. Fetner Properties, Inc.*, No. 17 Civ. 3276, 2017 WL 6550691, at *3 (S.D.N.Y. Dec. 22, 2017).  Accordingly, this analysis applies equally to those claims.  Courts also apply common law factors to determine whether an entity is an employer under the NYLL.  *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013).

[29] Contrary to Defendants' characterization, Def. Mem., 33, *Gulino* observed that the Second Circuit's application of this test "*has been* confined" to the wholly-owned subsidiary and general/sub-contractor contexts, but it did not preclude its application to other scenarios. *Gulino*, 460 F.3d at 378.

Participation Agreement with the Diocese demonstrate their deeply interrelated operations, common management, and financial control. Pls. Resp. Defs. 56.1 ¶¶ 8, 150, 154, 157-58, 341-55.

The Diocese argues that it was not on notice of which theory of liability Plaintiff intended to pursue in showing that it could be liable for its conduct. *See* Defs. Mem., 31. Defendants cite two cases where the courts dismissed pleadings that had inadequately alleged that one defendant could be liable under the claims asserted. *Id.* Here, Defendants were clearly on notice of Plaintiff's allegations and had the opportunity to pursue them during discovery. *See* Answer to Amended Complaint, ECF 23, ¶¶ 81, 82 (Sixteenth Affirmative Defense alleging that "Plaintiff was not an employee of the Diocese . . . nor was the Diocese an integrated employer with the Academy.").

Defendants rely on language in the contract, handbook, and orientation materials that the Diocese promulgated to argue Mr. Butler was a minister, but deny that it can be liable for its central role in the decision to terminate Mr. Butler's employment for being gay. These positions are untenable. Defendants have failed to show they are entitled to summary judgment on Mr. Butler's claims.

## CONCLUSION

For the forgoing reasons, Mr. Butler contends that Defendants' motions for summary judgment should be denied.

Respectfully submitted,


By: /s/ Kathleen Peratis
    **OUTTEN & GOLDEN LLP**

    Kathleen Peratis
    Amy Biegelsen
    Eliana J. Theodorou
    685 3rd Ave., 25th Fl.
    New York, NY 10017
    Telephone: (212) 245-1000




## CERTIFICATE OF SERVICE

I, Kathleen Peratis, hereby certify that on this 21st day of December, 2020, a true and correct copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT and attachments was served upon all counsel of record via FTP.


    /s/ Kathleen Peratis
    Kathleen Peratis

1