UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

CODY BUTLER,

                        Plaintiff,

-against-

ST. STANISLAUS KOSTKA CATHOLIC
ACADEMY and
THE DIOCESE OF BROOKLYN,

                        Defendants.

DATE OF SERVICE:
JANUARY 11, 2021


19-CV-3574 (EK)(ST)

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE

 

Richard J. Cea, Esq.
Wingate, Kearney & Cullen, LLP
45 Main Street, Ste. 1020
Brooklyn, New York 11201
(718) 852-5900
*Attorneys for Defendants St. Stanislaus Kostka Catholic Academy and the Roman Catholic Diocese of Brooklyn, New York*

*Of counsel*
Mark E. Chopko, Esq.
Marissa Parker, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT. ...............................................................................................1

II.    THE MINISTERIAL EXCEPTION BARS THIS ACTION. ..................................2

III.   STATUTORY EXEMPTIONS AND NEW YORK STATE CONSTITUTION. .....7

IV.   PLAINTIFF CANNOT PREVAIL ON THE MERITS. ............................................7

V.    THE DIOCESE WAS NEVER PLAINTIFF'S EMPLOYER. ................................11

    A.   Plaintiff Does Not Argue the Diocese Is A Direct Employer. ..................................11

    B.   The Diocese Cannot Be Held Liable Under Any Other Theories. ...........................12

VI.   CONCLUSION. ........................................................................................................15

## **TABLE OF AUTHORITIES**

**CASES**                                                                                       **PAGE NUMBER(S)**

*Arculeo v. On-Site Sales & Mktg., LLC*,
    425 F.3d 193 (2d Cir. 2005)..................................................................................12, 13

*AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*,
    10-CV-1539 (JAM), 2014 WL 7270160 (D. Conn. Dec. 18, 2014) ......................................4, 5

*Clinton's Ditch Coop. Co. v. NLRB*,
    778 F.2d 132 (2d Cir. 1985).........................................................................................12

*Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc.*,
    344 F. Supp. 2d 923 (D. Del. 2004) ..............................................................................10

*Dwyer v. Horne*,
    12-CV-1176 (NG)(VMS), 2017 WL 5197234 (E.D.N.Y. Nov. 9, 2017) ................................14

*Fitzgerald v. Alleghany Corp.*,
    904 F. Supp 223 (S.D.N.Y. 1995). ..................................................................................8

*Fratello v. Archdiocese of New York*,
    863 F.3d 190 (2d Cir. 2017)...........................................................................................4

*Gargano v. Diocese of Rockville Ctr.*,
    888 F. Supp. 1274 (E.D.N.Y. 1995).................................................................................13

*Geraci v. Rest. at Apple Greens, Inc.*,
    16-CV-1385 (BKS)(DJS), 2019 WL 1386318 (N.D.N.Y. Mar. 27, 2019) ..............................15

*Gulino v. N.Y. State Educ. Dep't*,
    460 F.3d 361 (2d Cir. 2006)....................................................................................11, 14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012) ......................................................................................................3

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
    716 F.3d 10 (2d Cir. 2013)...............................................................................................8

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ......................................................................................................3

*Little v. Wuerl*,
 929 F.2d 944 (3d Cir. 1991) ................................................................................................ 7

*Mason v. R.C. Archdiocese of Trenton*,
 18-CV-10733 (MAS)(TJB), 2019 WL1320299 (D.N.J. Mar. 22, 2019) ............................. 13

*NLRB v. Catholic Bishop of Chicago*,
 440 U.S. 490 (1979) ............................................................................................................ 3

*Our Lady of Guadalupe v. Morrissey-Berru*,
 140 S. Ct. 2049 (2020) ........................................................................................................ 3

*Redhead v. Conference of Seventh-day Adventists*,
 566 F. Supp. 2d 125 (E.D.N.Y. 2008) ................................................................................. 5

*Robinson v. Zurich N. Am. Ins. Co.*,
 892 F. Supp 2d 409 (E.D.N.Y. 2012) ............................................................................. 8, 9

*Sarmiento v. Queens Coll.*,
 386 F. Supp. 2d 93 (E.D.N.Y. 2005), *aff'd*, 153 Fed. App'x 21 (2d Cir. 2005) ............... 10

*Stinson v. City of N.Y.*,
 17-CV-3949 (KBF), 2018 WL 2727886 (S.D.N.Y. June 6, 2018) ................................... 12

*Taylor v. Polygram Records*,
 94-CV-7689 (CSH), 1999 WL 124456 (S.D.N.Y. Mar. 8, 1999) ....................................... 9

*Ticali v. Roman Catholic Diocese*,
 41 F. Supp. 2d 249 (E.D.N.Y. 1999) .................................................................................. 7

*Walters v. Metro Educ. Enters.*,
 519 U.S. 202 (1997). ......................................................................................................... 11

*York v. Assn. of the Bar*,
 286 F.3d 122 (2d Cir. 2002) .............................................................................................. 11

*Zhang v. Jenzabar*,
 No. 12-CV-2988 (RRM)(RER), 2015 WL 1475793 (E.D.N.Y. Mar. 30, 2015). ............... 7

**STATUTES AND RULES**

E.D.N.Y. Local Rule 56(d) ....................................................................................................... 1

FED. R. EVID. 901(b)(4) ............................................................................................................ 5

**<u>OTHER</u>**

*Redhead v. Conference of Seventh-Day Adventists*,
  03-CV-6187 (DLI), *Transcript of Trial Before the Honorable Dora Irizzary United States District Judge, and a jury* (July 29, 2008), *attached as* Exhibit 38 ........................................5, 6

Defendants St. Stanislaus Kostka Catholic Academy (the "Academy") and the Roman Catholic Diocese of Brooklyn, New York, ("Diocese," and together, "Defendants"), by their attorneys, respectfully submit this reply memorandum of law.

## I. **PRELIMINARY STATEMENT.**

Through their cross-motions for summary judgment, the parties agree that if the Court finds the parochial primary school teaching position sought by Plaintiff in 2015 is ministerial, summary judgment must be awarded in Defendants' favor. (Pl. Opp. at 1). Plaintiff's 90-page opposition to Defendants' Statement of Undisputed Facts,[1] despite its repetitive and frivolous assertions,[2] cannot obscure the concessions that bar his case. Notably, Plaintiff admits that "[t]he Academy views its teachers to be ministers of the Faith" and that it "considers its teachers essential to the ministry of conveying the Faith." (Pl. R. ¶¶ 25-26). He recognizes that as an Academy teacher, he was "expected to attend mass with his students" and obligated to "include the Church's teachings within the content/subject matter of all subjects." (Pl. R. ¶¶ 34, 79-80, 89). And, he concedes that in rescinding his employment offer, Defendants took the position "that Mr. Butler's employment should be terminated because he violated Catholic faith and morals." (Pl. Addl. ¶

---

[1] Plaintiff's Responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment contains two parts: (1) Plaintiff's responses to Defendants' statements, referred herein as "Pl. R."; and (2) Plaintiff's Additional Facts, referred herein as "Pl. Addl.".

[2] Plaintiff often cites to his own assertions, rather than admissible evidence as required by E.D.N.Y. Local Rule 56(d). (*See e.g.*, Pl. R. 7, 15, 30, 85, 86; *see also* Defendants' Reply Statement of Undisputed Facts ("Defs. Reply 56.1"), fn. 3). And, in responding to Defendants' statements, he excessively "avers" additional "facts," many of which are (1) duplicative of facts he later asserts (*e.g.*, *cf.* Pl. R. 30 *with* Pl. Addl. 248; *cf.* Pl. R. 42 *with* Pl. Addl. 199; *cf.* Pl. R. 42 *with* Pl. Addl. 200; *cf.* Pl. R. 62 *with* Pl. Addl. 201; *cf.* Pl. R. 62 *with* Pl. Addl. 214; *cf.* Pl. R. 89 *with* Pl. Addl. 210), (2) unrelated to the fact asserted by Defendants, (*see, e.g.*, Pl. R. 93, 110, 113, 114, 165), or (3) the same fact initially asserted. (*see, e.g.*, Pl. R. 126). Further, many times Plaintiff asserts that a witness "testified" a specific piece of testimony, which is a description of evidence, not a fact. (*see, e.g.*, Pl. R. 30, 109; Pl. Addl. 197, 198; *see also* Defs. Reply 56.1, fn. 4). Moreover, Plaintiff disputes a fact with evidence which does not dispute the fact asserted (*see, e.g.*, Pl. R. 14, 29, 54, 55); disputes or objects his own clear testimony (*see, e.g.* Pl. R. 90, 91, 95, 121, 259); contradicts his previous statements (*e.g.*, *cf.* Pl. R. 2 *with* 18, 92; *cf.* Pl. R. 69 *with* 76, 169, 291); and objects to a legal opinion despite none is offered (*see* Pl. R. 75). *See also* n.3 herein.

329). Thus, Defendants are entitled to summary judgment on the constitutional and statutory bases that protect a religious school's selection of the teachers that carry out its faith-based education.

## II. THE MINISTERIAL EXCEPTION BARS THIS ACTION.

Plaintiff presents no obstacle to applying the ministerial exception. Plaintiff asks this Court to ignore his own critical admissions and evidence about other Academy teachers that demonstrate the Academy primary school teaching position sought by Plaintiff is one of ministry. (Pl. Opp. at 7-12.) Plaintiff admits that the Academy views its teachers to be ministers of the Faith, essential to ministry of conveying the Faith. (Pl. R. ¶¶ 25-26). Plaintiff also admits that the Academy requires that all teachers be role models to the students by living the Faith. (Pl. R. ¶ 37). Plaintiff admits that the Academy holds daily prayer in the auditorium, that he, like all Academy teachers, would have been expected to attend mass with his students, and that he signed a Contract requiring him to include the Church's teachings in the content of all subjects taught. (Pl. R. ¶¶ 34, 64, 65, 89, 79-80). He agrees that the Principal reminds teachers at monthly faculty meetings to incorporate the Faith and religion into their teachings, "including those who do not teach religion." (Pl. R. ¶¶ 58-59). Mr. Casiano and Ms. Puglionisi, the predecessor and successor teachers of the position Plaintiff sought, incorporated religion into the classroom, prayed with their students, and led their respective students in prayer. (Defs. Reply 56.1, ¶¶ 86, 88, 132, 133, 134, 209, 235-238).[3] Indeed, Plaintiff, in pursuit of the Academy teaching position, himself acknowledged that "the

---

[3] Where Plaintiff mischaracterizes testimony or only offers argument to dispute a fact, that fact should be deemed admitted. To dispute that Mr. Casiano did not incorporate religious topics or lead prayer in the classroom, Plaintiff misrepresents the Principal's testimony. (*See* Defs. Reply 56.1 ¶¶ 209, 238). Even more glaring, he objects (but does not dispute) that Mr. Casiano prayed with his students by claiming the Principal – who testified "yes" when asked by Plaintiff's counsel if she "recalled specifically seeing Mr. Casiano engage in prayer with the students" – does not have "personal knowledge of Mr. Casiano's thoughts . . . ." (*See* Defs. Reply 56.1 ¶ 88). As for Ms. Puglionisi, Plaintiff disputes that she prayed with students (including at Stations of the Cross) by claiming Ms. Puglionisi did not testify to these occurrences. (Pl. R. ¶¶ 64, 65, 87, 132, 134). But an absence of testimony by Ms. Puglionisi on this point does not dispute that the Principal has a "specific recollection" of Ms. Puglionisi participating in prayer. (Defs. Reply 56.1 ¶¶ 64, 65, 87, 132, 134).

2

cornerstone of this curriculum is Christ" and that he wanted to "integrate contemporary pedagogical methods with the universal and eternal values we are raised with in the Catholic faith." (Pl. R. ¶¶ 68-70). Plaintiff believes teaching the Faith is a ministry. (Pl. R. ¶ 71).

Plaintiff's opposition also asks this Court to ignore the Supreme Court's assessment of the role of parochial primary school teachers in guiding students, by word and action, toward the goal of living their lives in accordance with the faith, not just in *Our Lady of Guadalupe* and *Hosanna-Tabor*, but in bedrock First Amendment jurisprudence involving parochial primary schools. *See* Defs. Mem. at 5-6, discussing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979); *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971). Each of these seminal cases recognized that parochial primary school teachers are vital to carrying out the ministry of faith-based education and do so with a purpose of inculcating the Faith in the students. As Defendants explained in their opposition to Plaintiff's cross-motion (hereinafter referred to as "Defs. Opp."), Plaintiff mis-frames the ministerial exception as it applies to his case:

i. Although it did not adopt a *per se* rule, the Supreme Court has voiced a strong presumption that parochial primary school teachers are ministerial due to the inherently evangelizing role of mission-based education, most recently in *Our Lady of Guadalupe*. (Defs. Opp. at 10-13).

ii. If summary judgment is not granted, a jury will be forced to evaluate whether Plaintiff's stated intent to marry his boyfriend in contravention of Catholic values was the reason for rescission of his employment offer, an evaluation that would violate the First Amendment. (Defs. Opp. at 13-16).

iii. Plaintiff's re-telling of Ms. Puglionisi's year of teaching at the Academy as one where "she did nothing that had anything to do with religion" (Pl. Opp. at 1) wrongfully omits that she led students in prayer, supported their Confirmations, encouraged contributions to Catholic missions, and incorporated religion into lessons. (Defs. Opp. at 16-17).

iv. Plaintiff critically ignores the Academy's expectations for all of its teachers, as memorialized in its Contract and Handbook, and shared during the New Teacher Orientation ("NTO") program. (Defs. Opp. at 17-18).

Thus, and as discussed further below, not only does the record amply support application of the ministerial exception to Plaintiff's claims, withholding application of the ministerial exception will create the very entanglement that the exception is designed to prevent against. As the Second Circuit has noted:

> Judges are not well positioned to determine whether ministerial employment decisions rest on practical and secular considerations or fundamentally different ones that may lead to results that, though perhaps difficult for a person not intimately familiar with the religion to understand, are perfectly sensible—and perhaps even necessary—in the eyes of the faithful. . . . In light of these concerns, the Supreme Court in *Hosanna-Tabor* made clear that the First Amendment does not tolerate a judicial remedy for any minister claiming employment discrimination against his or her religious group, regardless of the group's asserted reason (if any) for the adverse employment action.

*Fratello v. Archdiocese of New York*, 863 F.3d 190, 203-04 (2d Cir. 2017).

Turning to Plaintiff's argument challenging the authenticity of Defendants' business records (Pl. Opp. at 12-15), Defendants have mooted the challenge through affidavits, and easily confirmed the Academy's record of teaching as a ministry.[4] (*See* Exhibits ("Ex.") 39-41). Moreover, these objections are baseless, as the documents to which Plaintiff objects were produced by Defendants in the course of discovery (and identified in connection with Plaintiff's requests, *see, e.g.*, Ex. AA, R. 5; Ex. 43) and often bear titles, dates, letterhead, signatures, and/or authors.[5] *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.,* 10-CV-1539 (JAM), 2014 WL 7270160, at *8, n. 12 (D. Conn. Dec. 18, 2014) (citing cases recognizing that "the mere act of

---

[4] As for Plaintiff's hearsay objections, he objects to these exhibits as business records due to the lack of authentication, (Pl. Opp. at 13), but, as set forth *supra*, the documents are authenticated.

[5] Plaintiff's objections are further disingenuous. Although he argues exhibits 10, 12, 13, 14, 19, 20, and 26 must be "disregarded," he relies on some of these documents to support his own assertions (*see* Pl. R. ¶¶ 6, 93, 121, 122, 168, 259, 316) and does not always object to the documents. (*See* Pl. R. ¶¶ 6, 8, 9, 11, 17, 92, 93). And, although he objects to Defs. Ex. 26, which Defendants rely on in-part to support the dates of the NTO (Pl. R. ¶ 94), he attaches and relies on another document produced by Defendants, Plaintiff's Ex. FF, to assert the same dates for the NTO. (Pl. Addl. ¶ 257). In setting forth all his exhibits Plaintiff's counsel submits an attorney declaration where she states that she makes all "statements based on personal knowledge" and "would so testify if called as a witness." *See* November 19, 2020 and December 21, 2020 Declarations of Kathleen Peratis. But it is puzzling that Plaintiff's counsel would have personal knowledge of the events she claims, including the NTO, documents or any items in the transcripts.

production . . . implicitly authenticates a document"); FED. R. EVID. 901(b)(4) (authenticating through "Distinctive Characteristics and the Like").  But more importantly, if summary judgment is not granted, all of the evidence concerning expectations for Academy teachers (*e.g.*, Exs. 12-20, 22, 23, 26-28, 33; Pl. Exs. A-C, O, P-S, U, V, Y, Z), including serving as role models for their students and upholding Catholic values and morals as it relates to Plaintiff's plan to engage in gay marriage (*e.g.*, Exs. 12-17, 19, 20, 26-28; Pl. Exs. A-C, O, Y, Z), will need to be assessed at trial. Indeed, this is what Plaintiff argues for, contending a jury should be allowed to assess whether the Academy rescinded Plaintiff's employment offer because he was gay or because he intended to enter into a gay marriage, and whether the Academy made that decision not to employ as a teacher a person who stated an intention to act inconsistently with Catholic belief.  (Pl. Opp. at 19-28).

The palpable entanglement created by this dispute is precisely why this Court entered a directed verdict in the *Redhead* case, which involved discrimination claims arising from the firing of a pregnant, unmarried female teacher from a parochial school for violation of the school's religious code that forbids sex outside of marriage.  *See Redhead v. Conference of Seventh-day Adventists*, 566 F. Supp. 2d 125, 128 (E.D.N.Y. 2008); Ex. 38, *aff'd Redhead v. Conference of Seventh-Day Adventists*, 360 F. App'x 232, 235 (2d Cir. 2010).  There, the Court denied summary judgment and allowed plaintiff to present her case as to whether the defendant fired plaintiff because she violated the school's religious code, or whether the defendant singled plaintiff out for termination because of her gender and pregnancy.  *Redhead*, 566 F. Supp. 2d at 128.  Prior to trial, plaintiff contended her duties at the school "were not primarily religious" and although she "could not challenge the sincerity, plausibility or wisdom of defendant's policy against sex outside of marriage," she could attempt to prove discrimination by arguing that the school's policy was applied in a discriminatory manner.  Ex. 38, Tr. 234:4-9.  Ultimately, plaintiff's duties at trial were

5

found to be more religious in nature than she had previously admitted, insofar as trial testimony revealed she was expected to and did integrate religious principles into her lessons and attend daily worship services with her students. Ex. 38, Tr. 235:7-13. In light of the lawful reason given by the school for plaintiff's termination (sex outside of marriage violated the school's religious code) before she claimed discrimination, the jury could have only found for the plaintiff by specifically questioning the validity and plausibility of church doctrine that the defense witnesses claim motivated the adverse employment action, which would have violated the First Amendment, leading to a directed verdict in the school's favor. Ex. 38, Tr. 237:1-20.

So too here, Plaintiff contends that the role of an Academy teacher is not primarily religious and that he can prove discrimination by arguing Defendants' policy requiring teachers to conduct themselves according to Catholic faith and morals was applied in a discriminatory manner, i.e., that a woman and a man who each plan to marry a man are treated differently by the Academy. (Pl. Opp. at 22). These contentions inevitably invite the Court and a jury to disregard that the First Amendment affords the Academy the right to select the teachers to carry out its Catholic education mission. The record establishes that in both structure and practice, Academy teachers incorporate religion into the classroom, pray with their students, lead their respective students in prayer, serve as role models of the Faith, and that the expectations for the Plaintiff's 2015 teaching position was no different – including explicit notice of cause for termination if a teacher violates the tenets of Catholic morality or teaches contrary to Catholic doctrine. (Pl. R. ¶¶ 34, 37, 38, 40, 44; Defs. Reply 56.1 ¶¶ 43, 67, 88, 208, 209). Further, in response to Plaintiff's email advising the Academy that he planned to enter into a gay marriage eventually, the Academy rescinded Plaintiff's employment offer for a lawful reason: gay marriage goes against the teaching of the Catholic church regarding morals and values because same sex marriage is not recognized. (Pl. R

6

¶ 108).  Critically, it is inconceivable that a jury could evaluate Plaintiff's claims and Defendants' defenses without considering the "sincerity, plausibility or wisdom" of the Academy's view that its teachers are required to conduct themselves according to Catholic faith and morals and that a plan to enter into a gay marriage violates Catholic faith and morals.

### III.   STATUTORY EXEMPTIONS AND NEW YORK STATE CONSTITUTION.

Plaintiff's arguments regarding the statutory exemptions fail.  In arguing that the Title VII exemptions only apply to religious creed suits, Plaintiff again attempts to sidestep the slew of legal authority which applies the exemptions to protect a religious employer from an employee's contrary conduct or belief.  (*See* Defs. Mem. at § II.B; Defs. Opp. at § II.A).  While Plaintiff criticizes the appellate cases cited by Defendants as "out of circuit," this District has recognized that "[t]he Second Circuit has yet to weigh in on the construction of any of the [federal, state, or city statutory religious exemptions]."  *See Zhang v. Jenzabar*, No. 12-CV-2988 (RRM)(RER), 2015 WL 1475793, at *9 (E.D.N.Y. Mar. 30, 2015).  Indeed, in *Ticali v. Roman Catholic Diocese*, the Court did not analyze the Title VII statutory exemptions.  41 F. Supp. 2d 249, 259-60 (E.D.N.Y. 1999).  As for the state and city exemptions, he again ignores entirely that both protect religious entities which make a decision "to promote the religious principles for which it is established or maintained," the case here.[6]  (*See* Defs. Mem. at § II.B; Defs. Opp. at § II.B).  As for the NYS Constitution, he lumps this argument with the ministerial exception, despite Defendants having separately moved on the grounds of the NYS Constitution's free exercise clause.

### IV.   PLAINTIFF CANNOT PREVAIL ON THE MERITS.

Nor can Plaintiff prevail under the *McDonnell-Douglas* burden shifting framework.[7]  First,

---

[6] Although Plaintiff refers to Defendants' "affirmative defenses" (Pl. Opp. at 5), Defendants' motion is not limited to their affirmative defenses as the statutory religious exemptions cannot be waived, *see Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991), including where there is opportunity to respond. *Zhang*, 2015 WL 1475793, at *9, n 17.

[7] A mixed-motive review is inappropriate here.  To trigger a mixed-motive analysis, "a plaintiff initially must

7

Plaintiff cannot establish a *prima facie* case. As for his discrimination claim, he mainly argues that the Academy must have believed him to be qualified by initially offering him employment. But, the Academy offered employment *before* Plaintiff revealed on September 2, 2015 his intention to marry his boyfriend, which it considered a violation of Catholic faith and morals. And, Plaintiff does not dispute that Academy teachers must be practicing Catholics, (Pl. R. ¶¶ 27, 28) and Plaintiff stated himself that he would not consider himself an "ideal" model of a practicing Catholic. (Ex. 3, 60:11-15).[8] Nor can his retaliation claim stand as the undisputed facts show he did not engage in a protected activity. Specifically, Plaintiff does not dispute that he sent the E-mail (*i.e.* the supposed protected activity) because "there was some shift in this understanding that [he] needed clarification on." (Pl. R. ¶ 101). Thus, by his own admission, the E-mail was sent for "clarification," not to "oppos[e] an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

As for pretext, Plaintiff asserts several overwhelmingly inconsistent theories, all of which fail as a matter of law and fact. Plaintiff's primary argument that he would have been eligible for employment if he meant that he only intended to marry his boyfriend when sanctioned by the Church unravels any notion of pretext. This reveals Plaintiff's homosexuality was not the bar, but rather Defendants view that Plaintiff violated Catholic Faith and morals. (*See* Pl. R. 108, 110).

More critically, it does not matter what Plaintiff meant – all that matters is what Defendants believed in response to Plaintiff's own, unprompted disclosure. "It is well settled that the mere

---

present 'more focused' evidence of discrimination than is required to establish a *prima facie* case under pretext analysis." *Fitzgerald v. Alleghany Corp.*, 904 F. Supp 223, 228 (S.D.N.Y. 1995). But Plaintiff asserts nothing more as direct evidence than what he argues is pretext. Although he claims direct evidence through the Principal's letter to Plaintiff, this letter states the decision is based on "faith and morals" and does not reflect a direct, discriminatory attitude. Nor can the November 2015 E-mail show discriminatory animus for the same reasons set forth *infra*.

[8] Although Plaintiff disputes his testimony (Pl. R. ¶ 91), the Court can see for itself. When asked "do you believe it would be important for you as a teacher at St. Stan's to be a role model as a practicing Catholic?," Plaintiff responded "Oh, of a practicing Catholic? I don't know. I wouldn't have held myself out as ideal." (Ex. 3, 60:11-15).

8

fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp 2d 409, 430-31 (E.D.N.Y. 2012) (citing cases). Here, Defendants believed Plaintiff violated the Faith. (Defs. Statement of Undisputed Facts, ¶¶ 107-118). Indeed, even under Plaintiff's version of the events, the Diocese made the final determination (Pl. Opp. at 30), and he actively asserts that "the Diocese took the position that Mr. Butler's employment should be terminated because he violated Catholic faith and morals." (Pl. Addl. ¶ 329). To save his case, Plaintiff now claims that Defendants should have asked what he meant by the word "eventually." But the law puts no onus on an employer to ask follow-up questions; rather, an employer is entitled to its subjective judgment, including a "negative conclusion," "without the intrusion of third-party hindsight." *See Taylor v. Polygram Records*, 94-CV-7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999).[9]

Similarly unpersuasive is Plaintiff's fictional characterization of a "shifting" rationale. The Position Statement and Answer both make clear that Plaintiff's offer was rescinded due to a violation of the Faith regarding his intention to enter into a same-sex marriage. (*See* Ex. E, ¶ 41 (stating that Plaintiff's "choice to marry another man is a clear and obvious violation of Church teachings."); ECF No. 23, ¶¶ 48, 50, 52 (asserting that Plaintiff must convey the Faith and that "[w]hen Plaintiff informed the Academy principal of his sexual orientation and his intent to enter into a same sex marriage, he was informing the Academy of his intent to breach his employment

---

[9] Moreover, Defendants did ask Plaintiff during this litigation if he intended to marry a member of the same sex, and he responded that the question "amounts to harassment" and "Defendants are well aware that his future intent with respect to his potential relationship status is irrelevant." (Pl. R. 139-40). Thus, Plaintiff suggests on the one hand that Defendants should have asked what he meant by the word "eventually," yet on the other that such question is harassing and that Defendants *knew* his future intentions are irrelevant to the issues in this case.

9

contract . . ." )). It is from these documents he now claims that rescinding his offer was based on the two "stereotypical assumptions" that he was engaging in "pre-marital sex" and was referring to a civil marriage. (Pl. Opp. at 27). But nothing supports that Defendants assumed Plaintiff engaged in *pre-marital* sex, *i.e.* sex before marriage, but rather, at most, sex within his marriage. (Ex. E, ¶ 39 ("Mr. Butler has clearly indicated, *by his marriage*, that he will be partaking in sexual relations with another man. Such is in violation of church law.")) (emphasis added).[10] As for the alleged assumption that Plaintiff was referring to a civil marriage, Plaintiff does not explain why this is discriminatory, particularly given that the Church does not permit same-sex marriage.

Plaintiff's remaining arguments are unavailing. As for the Principal's November 2015 e-mail, he fails to acknowledge that she clarified three times that "[i]t didn't make a difference" that she offered employment before knowing Plaintiff was gay. (Ex. 4, 42:17-44:8). He gives no reason why this clarifying testimony should be disregarded, or how a jury would conclude differently on this record. *See Sarmiento v. Queens Coll.*, 386 F. Supp. 2d 93, 105 (E.D.N.Y. 2005), *aff'd*, 153 Fed. App'x 21 (2d Cir. 2005) ("single misstatement . . . is insufficient to establish a viable claim of pretext."). Nor is pretext shown by the assertion that neither the Diocese nor Academy admit they made the decision to "terminate" Plaintiff, as he agrees the Principal notified Dr. Chadzutko for "advice" and a discussion involving the two thereafter occurred. (Pl. R. ¶ 106; Pl. Addl. ¶ 326). That the Principal considered the Diocese's position binding is logical, given that this issue involved Catholic faith and morals. *See also Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc.*, 344 F. Supp. 2d 923, 927 (D. Del. 2004) (noting Catholic school consulted with Bishop and the Diocese and "received permission" to terminate employee).

---

[10] Further undermining the legitimacy of this new argument by Plaintiff, Plaintiff previously sought and received a protective order prohibiting Defendants from inquiring into his "sex life," claiming that his sexual activity bears "no possible relevance to the issues being litigated" and is "not related to any of the claims or defenses in this case." (ECF 26, 31).

10

## V. THE DIOCESE WAS NEVER PLAINTIFF'S EMPLOYER.[11]

The record does not establish that the Diocese was Plaintiff's employer, either directly or indirectly. Defendants do not dispute that the Diocese plays a role in certain Academy affairs, including regarding Catholic identity. But the question here is whether the Diocese qualifies as an employer for the purposes of the relevant laws – and the answer is no.

### A. Plaintiff Does Not Argue the Diocese Is A Direct Employer.

Plaintiff does not assert that the Diocese was a direct employer. (*See* Pl. Opp. at 30-31 ("Courts use several legal tests to determine whether an entity *other than the plaintiff's direct employer* can be liable for a discrimination claim . . . .") (emphasis added)). Nonetheless, even if Plaintiff did pursue the Diocese as a direct employer, his undisputed facts do not meet the pre-requisite of a Title VII employment relationship as he admits that: (1) he was interviewed and hired by the Academy (Pl. R. ¶¶ 76-78); and that (2) the Academy would have paid him from its own bank account (Pl. R. ¶ 189)[12]; *see Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 371 (2d Cir. 2006). Moreover, even if these pre-requisites were met, the undisputed facts show that the Diocese did not exercise the day-to-day control necessary for a direct employment relationship. (*See, e.g.*, Pl. R. ¶¶ 76-78, 130 (Academy interviews and hires applicants); Pl. R. ¶¶ 58-59

---

[11] Defendants' note Plaintiff's opposition memorandum is in violation of the Court's page limit requirement. Defendants requested an additional ten pages for their opening Memorandum of Law and five additional pages for this reply for the purpose of briefing that the Diocese was never Plaintiff's employer. (ECF No. 53). In response, Plaintiff requested "an additional ten pages in his opposition brief to oppose Defendants' arguments." (ECF No. 54). The Court granted both requests on October 27, 2020, and, as such, the parties were permitted additional pages to brief the issue that the Diocese is not a proper party. (*See* Electronic Order dated October 27, 2020). Nonetheless, the first 30 pages of Plaintiff's opposition brief do not address the Diocese as an employer.

[12] Although Plaintiff argues that fringe benefits are sufficient to qualify as payment from the purported employer, (Pl. Opp. at 32, n. 27), the Supreme Court has noted that "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll," not the case here. (Pl. R. 189). *See Walters v. Metro Educ. Enters.*, 519 U.S. 202, 206 (1997). As for fringe benefits, the Second Circuit in *York* cited by Plaintiff explained that these benefits "must meet a minimum level of 'significance' or substantiality, in order to find an employment relationship in the absence of more traditional compensation." *York v. Assn. of the Bar*, 286 F.3d 122, 126 (2d Cir. 2002). Here, although Plaintiff claims that if "Defendants had not fired Plaintiff," the Diocese "would have provided" him with fringe benefits," (Pl. Opp. at 32, n. 27) nothing in the record supports that Plaintiff would have availed himself of these benefits.

(Principal holds monthly faculty meetings); Pl. R. ¶¶ 180-182 (Principal conducts formal teacher observations; Diocese does not review or provide templates); Pl. R. ¶ 185 (Principal conducts informal teacher observations); Pl. R. ¶ 179 (Diocese does not review teacher evaluations); Pl. R. ¶ 184 (Principal provides feedback); Pl. R. 178, Pl. Addl. ¶ 228 (teachers submit weekly lesson plans to Principal; Diocese does not review); Pl. R. ¶ 194 (Academy sets vacation schedules); and Pl. R. ¶ 195 (Academy provides classroom materials)).

### B. The Diocese Cannot Be Held Liable Under Any Other Theories.

At the outset, Plaintiff is precluded from asserting the alternative theories at this time. This summary judgment stage of the litigation is the first time Plaintiff has articulated that he seeks to hold the Diocese liable as both a joint and single employer (in fact, the Diocese was not named in the NYCCHR action). *See Stinson v. City of N.Y.*, 17-CV-3949 (KBF), 2018 WL 2727886, at *9 (S.D.N.Y. June 6, 2018) (stating plaintiff must "give[] fair notice to defendants of his theory."). In arguing that Defendants had notice, he cites to Defendants' sixteenth affirmative defense which states that "Plaintiff was not an employee of the Diocese . . . nor was the Diocese an integrated employer with the Academy . . . ." (Pl. Opp. at 34; ECF No. 23, ¶¶ 81-82). But Defendants' affirmative defense does not, and could never, put them on notice of what Plaintiff himself intended to pursue. And, in any event, this affirmative defense states nothing regarding joint employment, a wholly different legal theory.

Moreover, Plaintiff's attempt to hold the Diocese liable as both a joint and single employer is impossible. The Second Circuit has found that an entity cannot be both, explaining that: "in a 'joint employer' relationship, there is no single integrated enterprise. A conclusion that employers are 'joint' assumes that they are separate legal entities . . . ." *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985) (quotations omitted); *see also Arculeo v. On-Site Sales & Mktg.,*

12

*LLC*, 425 F.3d 193, 197-98 (2d Cir. 2005). He ignores this entirely.

In any event, Plaintiff has not established that the Diocese is a joint employer. To do so, he predominantly attempts to characterize the Academy's Handbook and its policies as that of the Diocese. But the Handbook is clearly labeled that of the Academy (Ex. 16, DEF001), and the record reflects that the Academy was provided with the "legal and procedural" content and could change policies. (Ex. 2, 83:17-85:6). More importantly, it was not the Diocese generally which "promulgated" the legal and procedural aspects of the Handbook, but rather the Office of the Superintendent ~ Catholic School Support Services ("OSS"). (Ex. 2, 82:21-83:4). The distinction is crucial as the services provided by the OSS are through a voluntary Participation Agreement, for a fee, and "as needed and requested" by the Academy. (Ex. 30, at § A and DEF140; Ex. 42, at § A and DEF1187; Ex. HH, 133:21-24). There is no suggestion in *Gargano v. Diocese of Rockville Ctr.*[13] that the Handbook or services provided by the defendant were similarly provided under contract for a fee and as requested. And, Plaintiff refers to the Handbook as that of the Academy (Pl. Addl. ¶¶ 219, 224, 310), further highlighting his attempt to twist this issue solely to hold the Diocese liable as an employer.

Plaintiff's remaining arguments regarding joint employment are similarly unavailing. It is undisputed that the Academy interviews applicants, offers employment, enters into contracts with teachers (and maintains those contracts), may post job listings independent from the Diocese, and maintains copies of teacher evaluations, and that the Principal, and not the Diocese, holds faculty meetings, conducts observations and evaluations, provides feedback, and reviews lesson plans.

---

[13] Plaintiff refers to the *Gargano* opinion to support that the Diocese is also an employer under the "common law agency" test (Pl. Opp. at 32-33), but the *Gargano* opinion evaluated whether two entities were joint employers, looking to common law agency principles as a guide. *Gargano v. Diocese of Rockville Ctr.*, 888 F. Supp. 1274, 1280 (E.D.N.Y. 1995); *see also Mason v. R.C. Archdiocese of Trenton*, 18-CV-10733 (MAS)(TJB), 2019 WL1320299, at *8 (D.N.J. Mar. 22, 2019) ("The Court in *Gargano* specifically considered whether two entities—the school and the diocese—could jointly oversee hiring practices.").

(Pl. R. ¶¶ 58-59, 76-79, 130, 163, 171, 178-79, 180-182, 184-85; Pl. Addl. ¶ 228). Moreover, the Second Circuit has recognized that "control[ling] basic curriculum and credentialing requirements" does not establish "the workaday supervision necessary to an employment relationship." *Gulino*, 460 F.3d at 379. As for payment, Plaintiff does not dispute that the Academy pays its own employees from its bank account. (Pl. R. ¶ 189). In attempting to argue that the Diocese sets standards related to pay, he misrepresents the evidence. (Defs. Reply 56.1 ¶¶ 320-324). Regarding benefits, Plaintiff does not dispute that the Academy provides some benefits separate from that of the Diocese. (Pl. R. ¶ 175).

Finally, Plaintiff cannot prevail by claiming the Diocese and Academy constituted a single integrated enterprise. This theory only applies to wholly-owned subsidiaries or sub-contractor contexts, neither at issue here. *See Gulino*, 460 F.3d at 378. Although Plaintiff argues that *Gulino* "did not preclude its application to other scenarios," (Pl. Opp. at 33, n. 29), *Gulino* expressly declined to apply the theory outside of the two contexts set forth above. *Gulino*, 460 F.3d at 378. Moreover, the elements are not met. Plaintiff does not dispute that there is no common ownership. (Pl. R. ¶ 142). As for centralized control over labor relations, he merely points to his conclusion that the Diocese manages "St. Stans' HR function." (Pl. Opp. at 33).[14] But to support this, he cites mainly to his own assertions, which are largely a mischaracterization of the evidence. (*See* Defs. Reply 56.1 ¶¶ 282-340). To the contrary, he admits that the Academy had control regarding hiring,

---

[14] Plaintiff also claims the Diocese can be liable due to its purported "HR function" under *Spirt v. Teachers Ins. And Annuity Ass'n*, cited by *Gulino*. (Pl. Opp. at 33). But *Gulino* recognized that although *Spirt* previously "enunciated a narrow rule" that a third party may incur liability if "an employer has delegated one of its core duties," the Supreme Court thereafter "ruled that the common-law should supply the definition of 'employee' in the absence of a statutory definition." *Gulino*, 460 F.3d at 377. *Gulino* further called into question the *Spirt* opinion. *Id.* at 377-78. Moreover, this District, relying on the Second Circuit, has recognized the joint employer and single integrated enterprise theories as the two doctrines for indirect employer liability in the context of Title VII. *See Dwyer v. Horne*, 12-CV-1176 (NG)(VMS), 2017 WL 5197234, at *4 (E.D.N.Y. Nov. 9, 2017) (stating that the Second Circuit in *Arculeo* presented "two recognized doctrines" of indirect employer liability in the context of Title VII: "single employer or single integrated employer" and "joint employer") (quotations omitted).

14

supervising, and recruiting its employees. (*See supra* § V.A.). Nor can he show an interrelation of operations, which he claims is evident solely by the Participation Agreement. (Pl. Opp. at 33-34). This voluntary and formal agreement demonstrates an arm's length relationship between the two, undermining a finding of single employer status. *See Geraci v. Rest. at Apple Greens, Inc.*, 16-CV-1385 (BKS)(DJS), 2019 WL 1386318, at *14 (N.D.N.Y. Mar. 27, 2019) (noting single employer status is characterized by "lack of an arm's length relationship"). Finally, he cannot show common management, as he admits that the two entities are separately incorporated and that the Academy has its own Board of Directors and officers. (Pl. R. ¶¶ 141, 143, 145, 147). The assertions in his 56.1 opposition regarding the Diocese's control over the Academy and its "corporate structure" are baseless, as he claims that "Diocesan Members" have various levels of control over the Academy, despite that the Diocese has no members. (*See* Defs. Reply ¶¶ 349-55; Ex. 7).

## VI. CONCLUSION.

Defendants respectfully submit that summary judgment be granted with prejudice as to all of Plaintiff's claims. To the extent the Court does not dismiss all of Plaintiff's claims, the Diocese separately submits that it be dismissed as an improper party.

Dated: January 11, 2021
       Brooklyn, New York

                                   WINGATE, KEARNEY & CULLEN LLP
                                   By:    *s/ Richard J. Cea, Esq.*
                                   Richard J. Cea, Esq.
                                   *Attorneys for Defendants*

*Of counsel*
Mark E. Chopko, Esq.
Marissa Parker, Esq.