**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CODY BUTLER,

                 Plaintiff,

v.

ST. STANISLAUS KOSTKA CATHOLIC
ACADEMY, and THE DIOCESE OF
BROOKLYN,

              Defendants.

No. 19-cv-3574


**MEMORANDUM OF LAW**
**IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................ 1

PROCEDURAL HISTORY.................................................................. 4

STATEMENT OF FACTS ................................................................. 4

LEGAL STANDARD.................................................................... 8

ARGUMENT ............................................................................. 9

    I.   Mr. Butler Is Entitled to Summary Judgment on the "Ministerial Exception," Defendants' Third Affirmative Defense. .................................. 9

        A.  None of the Factors from *Hosanna-Tabor* or *OLG* Weigh in Favor of Applying the Ministerial Exception Here. ........................................ 10

        B.  Abundant and Undisputed Facts Show that Defendants Would Not Have Required Mr. Butler to Perform, Much Less Evaluate His Performance of, the Vital Religious Duties that Make an Employee a "Minister." ....................................................................... 11

        C.  The Title Defendants Used, The Training They Required, and the Public Representations They Made About Their Teachers All Weigh Against Applying the Ministerial Exception. ..................................... 13

        D.  The Ministerial Exception is *the* Framework for Applying First Amendment Protections for Religious Employers, So Mr. Butler is Entitled to Summary Judgment on Defendants' Second Affirmative Defense. ............................................................................. 15

    II.  Mr. Butler is Entitled to Summary Judgment on the "Statutory Exceptions," Defendants' Fifth, Sixth, and Seventh Affirmative Defenses. ............... 15

CONCLUSION............................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................8, 9

*Bohnert v. Roman Catholic Archbishop of S.F.*,
   136 F. Supp. 3d 1094 (N.D. Cal. 2015) .............................................................12

*Bostock v. Clayton Cty.*,
   140 S. Ct. 1731 (2020) .......................................................................................16

*Boyd v. Harding Academy of Memphis, Inc.*,
   88 F.3d 410 (6th Cir. 1996) ...............................................................................16

*DeMarco v. Holy Cross High Sch.*,
   4 F.3d 166 (2d Cir. 1993) ...............................................................................3, 16

*EEOC v. Pacific Press Publishing Ass'n*,
   676 F.2d 1272 (9th Cir. 1982) ...........................................................................16

*Fratello v. Archdiocese of New York*,
   863 F.3d 190 (2d Cir. 2017) ...............................................................................14

*G4S Int'l Emp. Servs. (Jersey), Ltd. v. Newton-Sealey*,
   975 F.3d 182 (2d Cir. 2020) .................................................................................8

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964) ..............................................................................................9

*Herx v. Diocese of Ft. Wayne-S. Bend Inc.*,
   48 F. Supp. 3d 1168 (N.D. Ind. 2014) .........................................................12, 16

*Hopkins v. Women's Div., General Bd. of Global Ministries*,
   238 F. Supp. 2d 174 (D.D.C. 2002) ...................................................................16

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ..................................................................................... *passim*

*Hough v. Roman Catholic Diocese of Erie*,
   No. 12 Civ. 253, 2014 WL 834473 (W.D. Pa. Mar. 4, 2014) .............................13

*Jing Zhang v. Jenzabar, Inc.*,
   No. 12 Civ. 2988, 2015 WL 1475793 (E.D.N.Y. Mar. 30, 2015) .........................17

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396 (2d Cir. 1998) .................................................................................9

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
   875 F.3d 107 (2d Cir. 2017)...................................................................8

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ............................................................. *passim*

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3d Cir. 2006)..............................................................16

*Redhead v. Conference of Seventh-Day Adventists*,
   440 F. Supp. 2d 211 (E.D.N.Y. 2006) ...................................12, 13, 14

*Richardson v. Nw. Christian Univ.*,
   242 F. Supp. 3d 1132 (D. Or. 2017) ......................................9, 12, 13

*Rweyemamu v. Cote*,
   520 F.3d 198 (2d Cir. 2008)........................................................14, 16

*Scheiber v. St. John's Univ.*,
   84 N.Y.2d 120 (N.Y. 1994) ...............................................................17

*Staehr v. Hartford Fin. Servs. Grp.*,
   547 F.3d 406 (2d Cir. 2008) ...............................................................2

**Statutes**

42 U.S.C. § 2000e *et seq.*................................................................ *passim*

N.Y. Admin. Code § 8-107 ....................................................................3

N.Y. Exec. Law § 296..............................................................................3

N.Y. Lab. Law § 652 ..........................................................................1, 4

**Other Authorities**

10 Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and
   Procedure § 2712 (4th ed.)...............................................................8

Fed. R. Civ. P 56(a) ...............................................................................8

Chico Harlan et al., *Pope Francis Calls for Civil Union Laws for Same-Sex
   Couples*, Wash. Post (Oct. 21, 2020) ................................................2

Tracy Connor, *'Who Am I To Judge?': The Pope's Most Powerful Phrase In
   2013*, NBC News (Dec. 22, 2013) ....................................................2

## PRELIMINARY STATEMENT

In August 2015, Plaintiff Cody Butler signed a contract with Defendant St. Stanislaus

Kostka Academy ("St. Stan's") to teach 7th and 8th grade Social Studies and English Language

Arts.  *See* Declaration of Kathleen Peratis ("Peratis Decl."), ¶ 4.  The next week Mr. Butler

attended an orientation session where an instructor made comments that Mr. Butler understood to

be homophobic.  The day after orientation, Mr. Butler sent an email to St. Stan's principal,

Christina Cieloszczyk (referred to by colleagues, and here, as "Mrs. C").  The email referenced

his experience at the orientation, and asked whether he, as a homosexual man who "plan[ned] on

marrying [his] boyfriend eventually," would be welcome at St. Stan's.  *Id.* ¶ 5.  The very next

day, Mrs. C consulted with Defendant Diocese of Brooklyn ("the Diocese"), and without asking

Mr. Butler what he meant by "eventually," sent Mr. Butler a letter thanking him for his "email

and [his] honesty," and firing him "due to the violation of the Catholic faith and morals."  *Id.* ¶ 6.

Mr. Butler retained counsel who contacted Mrs. C via email, which she forwarded to the Diocese

noting that it was "regarding the gay young man that I had hired in August before I knew he was

gay."  *Id.* ¶ 7.  Mr. Butler now seeks relief from Defendants' violation of the federal, state, and

city civil rights statutes that protect employees from discrimination based on sexual orientation.[1]

Since this matter began at the New York City Human Rights Commission, and

throughout this lawsuit, Defendants consistently and repeatedly asserted that while Mr. Butler

appeared to be qualified for the position, they terminated him because his intention to marry a

man violated the "faith and morals" of the school.  *Id.* ¶ 8 (Ex. E (Position Statement) ¶¶ 34-43);

---

[1]     Mr. Butler also makes a claim for unpaid wages, pursuant to N.Y. Lab. Law § 652.
Between the time when he signed the contract and received the termination letter, he attended
mandatory trainings and prepared his classroom, but Defendants never paid him for that work.

*id.* ¶ 9 (Ex. F (Interrogatory Response No. 4)); *id.* ¶ 10 (Ex. G (Requests for Admissions, Nos. 24, 26)); *see also* ECF No. 23 (Answer to Amended Complaint), ¶¶ 50-52.  During discovery, Defendants' witnesses admitted that neither Mr. Butler's sexual orientation nor his intention to marry "eventually" posed a bar to his employment, because Mr. Butler was celibate and would only have married his boyfriend if and when same-sex marriage was sanctioned by the Church.[2] *See* Peratis Decl., ¶¶ 12-16.[3]  After the close of discovery, Defendants indicated for the first time that they have new legal defenses for what the purported "violation of the Catholic faith and morals" was, and that they will be moving for summary judgment on these new, as well as other, claims and defenses.  *See* ECF No. 49.  Plaintiff will oppose consideration of legal and factual defenses that were not previously alleged.

Here, however, Mr. Butler's motion is for partial summary judgment on Defendants' constitutional and statutory affirmative defenses to his discrimination claims because, on this record, Defendants cannot prove that Mr. Butler would have been a "minister."  Defendants,

---

[2]     The Court may take judicial notice of the fact that shortly before Mr. Butler was hired, Pope Francis made statements supportive of gay people, which were seen as heralding a sea change in the Church's attitude towards homosexuality, *see* Tracy Connor, *'Who Am I To Judge?': The Pope's Most Powerful Phrase In 2013*, NBC News (Dec. 22, 2013), https://www.nbcnews.com/news/world/who-am-i-judge-popes-most-powerful-phrase-2013-flna2D11791260.  Recently, Pope Francis actually endorsed same-sex unions.  Chico Harlan et al., *Pope Francis Calls for Civil Union Laws for Same-Sex Couples*, Wash. Post (Oct. 21, 2020), https://www.washingtonpost.com/world/europe/pope-francis-civil-unions/2020/10/21/805a601c-139e-11eb-a258-614acf2b906d_story.html; *see Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 424 (2d Cir. 2008) (court may take judicial notice of news reports).

[3]     Ex. I (Cieloszczyk Tr. 27:21-30:4) ("Q:  [A]re homosexuals eligible to be hired as a teacher at St. Stan's?  A:  Yes, as long as they are celibate and not married."); Ex. J (Diocese 30(b)(6) Tr. 272:17-25) ("Q:  Would a gay teacher who was celibate be eligible for employment in the Brooklyn diocese?  A:  Yes."); Ex. K (Butler Tr. 97:7-16 ("Marriage is a sacrament to me and I pray for the day when I'm able to actually have that marriage in the church.")); Ex. L (DeGeorge Tr. 15:11-16:24; 19:1-8); Ex. M (Salazar Tr. 50:22-51:12).

therefore, do not have access to the "ministerial exception," a First Amendment principle that bars "ministers" from bringing employment discrimination cases against their religious employers. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). The Supreme Court has held that in evaluating whether a particular employee is a minister, "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). The job Mr. Butler would have done, according to his successor who actually did the job, bore none of the hallmarks of "minister." Amanda Puglionisi, the teacher that Defendants hired to replace Mr. Butler, summed it up this way: "I didn't do anything religion-related within the classroom." *See* Peratis Decl., ¶ 17 (Ex. N (Puglionisi Tr. 18:5-9)). Nothing in the record puts her statement in dispute. This rules out the application of the ministerial exception.

In addition, because the Supreme Court has made clear that the ministerial exception is *the* framework that courts should use when determining whether an employment claim would violate a religious employer's First Amendment rights, Defendants' second affirmative defense, which broadly invokes the Free Exercise and Establishment Clauses as jurisdictional bars, fails as well. Finally, Defendants mistakenly contend that the statutory exceptions in Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*. (Title VII), the New York State Human Rights Law, N.Y. Exec. Law § 296 (NYSHRL); and the New York City Human Rights Law, N.Y. Admin. Code § 8-107 (NYCHRL) bar Mr. Butler's claims. These defenses, too, fail as a matter of law. Those statutory provisions protect religious employers from *religious* discrimination claims, but they do not provide immunity from claims that assert discrimination based on sex. *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993) ("Title VII expressly exempts certain religious institutions from its prohibitions upon discrimination based on religion. . . . However, religious institutions that otherwise qualify as 'employer[s]' are

3

subject to Title VII provisions relating to discrimination based on race, gender and national origin." (internal citation omitted)).

Mr. Butler, therefore, respectfully moves this Court for partial summary judgment on Defendants' Second (First Amendment), Third (ministerial exception), Fifth (Title VII), Sixth (NYSHRL) and Seventh (NYCHRL) affirmative defenses.

## PROCEDURAL HISTORY

On June 18, 2019, Plaintiff filed his complaint in the Eastern District of New York, asserting claims for discrimination and retaliation under Title VII, NYSHRL, NYCHRL; and for unpaid wages, pursuant to N.Y. Lab. Law § 652. *Id*. ECF No. 1. On December 20, 2019, Plaintiff filed an amended complaint, ECF No. 22, which Defendants Answered on January 9, 2020, ECF No. 23. Discovery ended on August 31, 2020. *See* ECF No. 46. On September 14, 2020, the Parties filed pre-motion letters requesting leave to file motions for summary judgment, ECF Nos. 49, 50, and on September 18 and 21, 2020, the Parties filed responses. ECF Nos. 51, 52. On October 20, 2020, this Court issued a scheduling order for summary judgment briefing, pursuant to which Mr. Butler now moves for partial summary judgment on Defendants' Second, Third, Fifth, Sixth and Seventh affirmative defenses. *See* ECF No. 23, ¶¶ 43-56, 59-64.

## STATEMENT OF FACTS

The teachers who actually performed the job for which Mr. Butler was hired did not perform religious duties: Amanda Puglionisi, whom Defendants hired to replace Mr. Butler, testified that in the full academic year she taught at St. Stan's she "didn't do anything religion-related within the classroom," and she elaborated in some detail. *See* Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("Pl. SUMF"), ¶¶ 1-2.

While at St. Stan's Ms. Puglionisi's students attended a separate "religion" class taught by a different teacher. *Id.* ¶¶ 3-4. Ms. Puglionisi did not lead her students in prayer, and St.

Stan's principal, Mrs. C, does not recall seeing Ms. Puglionisi's predecessor, Adrian Casiano, do so either.  *Id.* ¶¶ 5-6.  St. Stan's required students to attend mass "a handful" of times during the year.  *Id.* ¶ 7.  Ms. Puglionisi did not help plan school masses or prepare her students for confirmation – her only role was to make sure her students were "being quiet" during the services.  *Id.* ¶¶ 7-9.  Ms. Puglionisi did nothing to evaluate her students' religious development. *Id.* ¶ 10.   Ms. Puglionisi did not convey anything of the Catholic faith or even anything "religious" to her students but instead tried to impart values by teaching them to be "good Samaritans" and to "help each other and support each other."  *Id.* ¶ 11-12.

This is in line with the expectations Mrs. C conveyed to Mr. Butler and, separately, to Ms. Puglionisi, during the hiring process.  When Mr. Butler signed his employment contract in August 2015, Mrs. C told him that he would not be expected to teach religion because they have a separate teacher for that.  *Id.* ¶ 13.  Ms. Puglionisi testified that during her interview Mrs. C did not ask Ms. Puglionisi about her commitment to Catholic education, or tell Ms. Puglionisi that she would be expected lead her class in prayer, or convey the Catholic faith to her students in any other way.  *Id.* ¶¶ 14-17.

Accordingly, although Mrs. C did not observe Ms. Puglionisi regularly leading prayer she did not view it as a "performance problem," nor did Mrs. C criticize or discipline her for not including religion in the classroom – to the contrary, Mrs. C lauded her performance.  *Id.* ¶¶ 18-19, 21 ("Great lesson!"), ¶ 27.  St. Stan's did not assess the teachers based on their students' religious growth or how well, or even if, they incorporated religious material into their teaching. *Id.* ¶¶ 20-35.  For its annual assessments, the school used a form from a handbook provided by the Diocese.  *Id.* ¶ 23.  There was no space on the form designated for assessing, or even mentioning, the teacher's incorporation of religion into instruction.  *Id.* ¶¶ 24-25.  Mrs. C's

summative assessment for Ms. Puglionisi at the end of the 2015-16 school year did not reference religion, but congratulated her on "a very successful first year of teaching." *Id.* ¶¶ 26-27.

Mrs. C's feedback was based on her personal knowledge.  Mrs. C periodically observed teachers in their classrooms.  *Id.* ¶¶ 20-21; 32-35.  Mrs. C formally observes teachers and provides written feedback at least once a year, but because she was a new teacher Mrs. C observed Ms. Puglionisi's teaching frequently, approximately once per week.  *Id.* ¶¶ 33-35.  The only formal observation reports Defendants produced do not mention any religious elements in the lessons observed, and do not indicate that as a shortcoming.  *Id.* ¶¶ 20-22.  To the contrary, Mrs. C complimented Ms. Puglionisi in her report, writing "Great Lesson!"  *Id.* ¶ 21.  Mrs. C was also aware of Ms. Puglionisi's instruction because each week St. Stan's teachers submitted lesson plans to Mrs. C, which she reviewed.  *Id.* ¶ 36.  Ms. Puglionisi submitted weekly lesson plans to Mrs. C for her approval, which Mrs. C received.  *Id.* ¶ 37.

The only curriculum St. Stan's uses is New York State's Common Core curriculum, which it instructed its teachers to follow.  *Id.* ¶¶ 38-39.  Ms. Puglionisi's lessons tracked the state curriculum and were "virtually the same" as those she teaches now in a New York City public school.  *Id.* ¶ 40.  Mrs. C testified that Mr. Casiano's lessons also tracked the state curriculum. *Id.* ¶ 41.  "Sample" lesson plans Defendants produced from the 2019-20 school year for the classes that Mr. Butler would have taught make no reference to religion.  *Id.* ¶ 42.

For her English class, Ms. Puglionisi chose novels from a list published by the New York State Department of Education and made her selections without considering whether the novels contained religious themes.  *Id.* ¶¶ 43-44.  Mrs. C approved her selections.  *Id.* ¶ 45.  Ms. Puglionisi did not teach religion in connection with her novels or assign essays on religious topics.  *Id.* ¶¶ 46-47.  Nor did Ms. Puglionisi incorporate religious themes into her Social Studies assignments.  *Id.* ¶ 48.  Mrs. C does not specifically recall Mr. Casiano assigning religious topics

for essays.  *Id.* ¶ 49.  St. Stan's does not provide its seventh and eighth grade Social Studies and English teachers with religious textbooks.  *Id.* ¶¶ 50-51.  St. Stan's provided no additional curriculum or material aside from New York State's Common Core curriculum.  *Id.* ¶ 52.

St. Stan's only title for members of its faculty is "teacher."  *Id.* ¶ 53.  Defendants distinguish between "lay" employees, and "religious" ones, who are members of a religious order, like priests or nuns.  *Id.* ¶ 54.  Lay and religious employees are eligible for different employment benefits, and subject to distinct employment policies.  *Id.* ¶¶ 55-56.  Mr. Butler would have been a lay teacher.  *Id.* ¶ 57.  Defendants do not hold their lay teachers out to the public, parents, or students as "ministers."  *Id.* ¶¶ 58-60.

Defendants' only employment hiring criteria were for teachers to hold a bachelor's degree, pass a background check, sign a "Code of Conduct" document to certify compliance with the school's sexual abuse policies, and provide a copy of a college transcript.  *Id.* ¶ 61. Defendants did not require that their applicants have any formal religious training or a degree from a religious institution.  *Id.* ¶¶ 62-65.  Though Ms. Puglionisi did not have any formal religious training, Mrs. C was "impressed" with Ms. Puglionisi during her interview and remarked that Ms. Puglionisi was "exactly" what St. Stan's needed: a teacher to teach English language [] arts and social studies to seventh and eighth graders."  *Id.* ¶¶ 66-67.

The only religious training the Diocese required was for teachers, after they were hired, to obtain a "Certificate of Faith Formation" by attending courses it arranges.  *Id.* ¶ 68.  The Certificate had to be earned before the beginning of the teacher's fifth year, but St. Stan's did not do anything to track which teachers still needed to earn one.  *Id.* ¶¶ 69-70.  Ms. Puglionisi took none of the Certificate of Formation courses before she left St. Stan's for a position with a public school.  *Id.* ¶ 71.  Defendants did not require that any of the teachers' other professional development courses be religion-based.  *Id.* ¶¶ 72-73.  To the contrary, they require that "[a]ll

professional development should: Be planned with the New York State Common Core State Learning Standards as an underpinning." *Id.* ¶ 72. During her year at St. Stan's, Ms. Puglionisi did not take any professional development courses that focused on religion. *Id.* ¶ 74. St. Stan's represented that it had a policy of requiring a "letter of good standing" from each teacher's pastor, but that policy was not uniformly enforced: Ms. Puglionisi never provided one. *Id.* ¶¶ 75-76.

## LEGAL STANDARD

A party may move for summary judgment on a claim, defense, or "part of each claim or defense," including affirmative defenses. Fed. R. Civ. P 56(a). Courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* Summary judgment separates "formal from substantial issues, eliminate[s] improper assertions, [and] determine[s] what, if any, issues of fact are present for the jury to determine." 10 Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2712 (4th ed.) (footnotes omitted).

"It is well-established that a defendant . . . bears the burden of proving its affirmative defense." *G4S Int'l Emp. Servs. (Jersey), Ltd. v. Newton-Sealey*, 975 F.3d 182, 187 (2d Cir. 2020) (quoting *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001)). When, as here, the burden of persuasion at trial would be on the non-moving party, the moving party satisfies his burden "(1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Conclusory allegations, conjecture, and speculation

. . . are insufficient to create a genuine" dispute.  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d

Cir. 1998).

## ARGUMENT

### I.    Mr. Butler Is Entitled to Summary Judgment on the "Ministerial Exception," Defendants' Third Affirmative Defense.

In *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 246, 257 (1964), the U.S.

Supreme Court observed that the Civil Rights Act of 1964 was a "comprehensive" undertaking

to deal with "a moral and social wrong."  This year, the Court grappled with one of the few

exceptions to the comprehensiveness of the law's scope, the "ministerial exception," which

exempts religious employers from employment claims brought by their "ministers."  *Our Lady of

Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (*OLG*).  The exception is

"grounded" in the First Amendment's "Establishment Clause [which] prevents the Government

from appointing ministers, and the Free Exercise Clause [which] prevents it from interfering with

the freedom of religious groups to select their own."  *Hosanna-Tabor*, 565 U.S. at 184, 188.  The

"quintessential case" is one "where a church wants to dismiss its minister for poor performance."

*OLG*, 140 S. Ct. at 2068.  Accordingly, the exception bars a "minister's" discrimination claim

even if the employer's conduct was not obligated by its religious belief.

Society has a substantial interest in enforcing employment discrimination statutes and

religious groups have an interest in exempting their ministers from the reach of these statutes, if

they can prove that the employee in question actually is a minister.  *See Hosanna-Tabor*, 565

U.S. at 190; *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1143 (D. Or. 2017) ("The

ministerial exception 'operates as an affirmative defense,' which means that the employer has the

burden of showing the exception applies." (quoting *Hosanna-Tabor*, 565 U.S. at 195 n.4)).

Defendants have not nearly met that burden here.

9

A.    **None of the Factors from *Hosanna-Tabor* or *OLG* Weigh in Favor of Applying the Ministerial Exception Here.**

The Supreme Court adopted the "ministerial exception" in *Hosanna-Tabor* and addressed its contours again more recently in *OLG* (also construing *St. James School v. Biel*, No. 19-348). These cases do not impose a "rigid formula for deciding when an employee qualifies as a minister.'" 140 S. Ct. at 2067 (quoting *Hosanna-Tabor*, 565 U.S. at 190). Taken together, based on disparate fact patterns, they instruct that it is what the teacher actually does that matters.

The teacher in *Hosanna-Tabor* held the title of "Minister of Religion, Commissioned," which she earned through significant religious training and a vote of the congregation from the church that ran the school that employed her. *Id.* at 191. The teacher "held herself out as a minister of the Church" by claiming tax deductions that were only available to those earning their compensation "in the exercise of the ministry." *Id.* at 191-92. Although they took up only 45 minutes of her day, the substance of her religious duties was significant: she taught her students religion, led them in prayer, and took them to chapel services that she periodically led herself. *Id.* at 192. Based on these facts, the Court held that the teacher was a "minister" which provided a defense against the disability retaliation suit she brought after the school refused to reinstate her following a medical leave of absence. *Id.* at 179, 190.

In *OLG*, although the teachers did not hold the title, training, or tax status of the teacher in *Hosanna-Tabor*, the Court held that they were ministers under the exception based on "abundant record evidence that they both performed vital religious duties[,]" as "the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith." *OLG*, 140 S. Ct. at 2066. The teachers in *OLG* and *Biel* had primary responsibility for teaching religion to their elementary school students, they taught or led their students in prayer and prepared their students to participate in Mass. *See OLG*, 140 S. Ct. at 2056-59, 2066-68. Both schools provided the teachers with religious curricula and textbooks,

and both teachers assessed their students' religious development. *See id.* Significantly, all of the teachers in both *Hosanna-Tabor* and *OLG* were evaluated on their religious instruction. *See Hosanna-Tabor*, 565 U.S. at 191; *OLG*, 140 S. Ct. at 2057, 2059.

None of the factors that caused the Court in these three cases to deem the teacher "ministers" is present here.

### B.      Abundant and Undisputed Facts Show that Defendants Would Not Have Required Mr. Butler to Perform, Much Less Evaluate His Performance of, the Vital Religious Duties that Make an Employee a "Minister."

In *OLG* the Court held that "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. Here, the person who actually did the job for which Mr. Butler was hired, Ms. Puglionisi, "didn't do anything religion-related within the classroom." *See* Pl. SUMF, ¶ 2. Mr. Butler would not have been "the member[] of the school staff who [was] entrusted most directly with the responsibility of educating their students in the faith[,]" *OLG*, 140 S. Ct. at 2066, because a separate teacher taught a "religion" class for seventh and eighth graders. *See* Pl. SUMF, ¶¶ 3-4; 14. Undisputed evidence shows that St. Stan's would have required that Mr. Butler's teaching track the State curriculum and would have provided secular textbooks, and not used any religious criteria to evaluate his job performance.

The record is replete with evidence: Ms. Puglionisi did not lead students in prayer. *See* Pl. SUMF ¶¶ 5-6. She did not help plan school masses or prepare her students for confirmation. *Id.* ¶¶ 7-9. She did not assess her student's religious development. *Id.* ¶ 10. The principal, Mrs. C, told both Ms. Puglionisi and Mr. Butler from the outset that they would not teach religion. *Id.* ¶¶ 13; 16. St. Stan's instructed the teachers who taught the classes Mr. Butler would have taught to follow the State's curriculum, and provided secular textbooks and materials. *Id.* ¶¶ 38-39; 43-45; 50-52. Ms. Puglionisi was a successful teacher at St. Stan's: Mrs. C observed Ms. Puglionisi's teaching at least once a week and lauded her performance. *Id.* ¶¶ 21, 27, 35.

Defendants did not assess Ms. Puglionisi, or any of the other teachers, on how well, or even whether, they incorporate religious teaching in his classroom. *Id.* ¶¶ 20-31.

Here, Mr. Butler would not have had, and Ms. Puglionisi did not have, any religious duties at all; much less the "significant" or "vital" religious duties that the decisions turned on in *Hosanna-Tabor* and *OLG*. In the entire record, Defendants failed to produce any evidence to the contrary. But even if Mr. Butler would have had some minimal religious duties, that alone would not have made him a minister, because courts have declined to apply the exception where those religious duties are not primary. *See Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 221-22 (E.D.N.Y. 2006) (Irizarry, J.) (ministerial exception did not apply because teacher's "duties were primarily secular" where she taught one hour of daily Bible study and attended religious ceremonies with students once per year but there was no record "that plaintiff involved Seventh-day Adventist teachings when she taught secular subjects, which took up the bulk of her day"), *adhered to on reconsideration*, 566 F. Supp. 2d 125 (E.D.N.Y. 2008); *see also Richardson*, 242 F. Supp. 3d at 1145 (assistant professor "performed some important religious functions" but was not a minister because they were "wholly secondary to her secular role: she was not tasked with performing any religious instruction and she was charged with no religious duties such as taking students to chapel or leading them in prayer"); *Bohnert v. Roman Catholic Archbishop of S.F.*, 136 F. Supp. 3d 1094, 1101, 1114 (N.D. Cal. 2015) (teacher was not a "minister" even where 20 percent of her job was to coordinate logistical programming in the campus ministry); *Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) (English teacher at Catholic school was not a minister where she was not charged with teaching religion class, which was taught by a separate teacher, and only religious duties involved attending and participating in religious services in a supervisory capacity).

In *OLG*, the Court observed that "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important." 140 S. Ct. at 2066. However, it is not enough: a Supreme Court majority has now twice declined to adopt concurrences from Justice Thomas that would defer entirely to a religious organization's characterization of its employee as a minister. *See id.* at 2069-71; *Hosanna-Tabor*, 565 U.S. at 196-97. Instead, courts have consistently held that the ministerial exception does not apply when the employer *represents* that an employee has religious responsibilities, but, like here, fails to provide evidence that the employee actually performed any. *See, e.g.*, *Richardson*, 242 F. Supp. 3d at 1145 (professor was not a minister notwithstanding being "expected to integrate her Christianity into her teaching and demonstrate a maturing Christian faith"); *Hough v. Roman Catholic Diocese of Erie*, No. 12 Civ. 253, 2014 WL 834473, at *4-5 (W.D. Pa. Mar. 4, 2014) (affidavits regarding the important religious function of teachers in Catholic school were insufficient to support dismissal of teachers' complaint on ministerial exception grounds); *Redhead*, 440 F. Supp. 2d at 215, 221 (exception did not apply where employment contract required tithing to the church as a condition of employment, but there were no records of tithe paying).

### C. The Title Defendants Used, The Training They Required, and the Public Representations They Made About Their Teachers All Weigh Against Applying the Ministerial Exception.

None of the factors from *Hosanna-Tabor* weigh in favor of applying the exception here. Mr. Butler would have been a lay teacher with no other title, *see* Pl. SUMF ¶¶ 53; 57-59, so Defendants cannot use this factor to show the defense applies. *See, e.g.*, *Richardson*, 242 F. Supp. 3d at 1145 ("plaintiff's title, assistant professor of exercise science, was secular" and weighed against applying exception). The Defendants here did not require any religious training as a prerequisite for hiring teachers of seventh and eighth graders, neither Mr. Butler nor Ms. Puglionisi had advanced religious training, and instead Defendants only required completion of a

ten-hour Diocese-developed professional development course before starting one's fifth year of instruction. *See* Pl. SUMF ¶¶ 61-66; 68-69. Ms. Puglionisi did not have this certificate and completed none of the courses for earning it. *Id.* ¶ 71. Since Defendants offer teachers one-year contracts, the certificate is actually not a cognizable requirement at all. Peratis Decl.¶ A. Finally, in *Hosanna-Tabor* the teacher "held herself out as minister of the Church" by "accepting the formal call to religious service" and claiming a special ministry-related housing exemption on her taxes. *Hosanna-Tabor*, 565 U.S. at 191-92. Defendants did not hold out Ms. Puglionisi or any of its teachers as ministers. *See* Pl. SUMF, ¶¶ 58-60. As discussed above, none of the "significant religious duties" performed by the teacher in *Hosanna-Tabor* were in play here.

In *Hosanna-Tabor*, the Court identified two factors that were "relevant," but must be assessed alongside the "other considerations" of title, training and whether they were "held out" as a minister: 1) how much time a teacher spent on religious versus secular duties, and 2) whether a "called" teacher's duties were the same as a "lay" teacher's. *Hosanna-Tabor*, 565 U.S. at 193-94. Here, Ms. Puglionisi "didn't do anything religion-related within the classroom[,]" and taught "virtually the same" lessons at the New York City public school she moved to after a year at St. Stan's. *See* Pl. SUMF ¶¶ 2, 40. On these facts, Defendants cannot show that Mr. Butler would have been a minister.

Courts in general, and, obviously the Supreme Court and Second Circuit in particular, are careful to decide cases only on the facts before them. *See OLG*, 140 S. Ct. at 2069; *Hosanna-Tabor*, 565 U.S. at 196; *Fratello v. Archdiocese of New York*, 863 F.3d 190, 206 (2d Cir. 2017) ("In each case, therefore, we must assess the specific circumstances of employment."); *see also Redhead*, 566 F. Supp. 2d at 135 ("The Second Circuit was very careful to limit its holding in [*Rweyemamu*] to the facts before it, and to avoid creating a large exemption from Title VII for religious employers."). As discussed above, on this record, undisputed evidence shows that Mr.

Butler did not have any of the attributes that made the teacher a minister in *Hosanna-Tabor*, nor is disputed that he would not have been the person most directly entrusted with this students' religious development or required to perform any "vital religious duties" that he would have been evaluated on, as in *OLG*.

Given the undisputed facts in this record, Defendants cannot show that Mr. Butler's duties would have made him a "minister" under the exception.  Mr. Butler is entitled to summary judgment on this affirmative defense.

### D. The Ministerial Exception is *the* Framework for Applying First Amendment Protections for Religious Employers, So Mr. Butler is Entitled to Summary Judgment on Defendants' Second Affirmative Defense.

Defendants assert an additional Constitutional defense.  ECF 23 (Answer) ¶¶ 43-54.  They allege that the First Amendment's Establishment and Free Exercise Clauses "bar[] this Court from scrutinizing and interfering with the employment actions of Defendants based upon religious beliefs when those actions involve conveying and/or practicing the Roman Catholic Faith."  *Id.* at ¶¶ 53, 54.  The Supreme Court has made clear that the "ministerial exception" is *the* framework courts must use to balance society's interest in enforcing its civil rights laws with an employer's religious interests.  *See OLG*, 140 S. Ct. at 2055.  There is no legal basis for the proposition that a religious employer's actions are generally non-justiciable.  Even the ministerial exception is limited to certain "key" employees, and acts as an affirmative defense rather than a jurisdictional bar.  *See id.*; *Hosanna-Tabor*, 565 U.S. at 195 n.4.  Mr. Butler is therefore entitled to judgment as a matter of law on this defense.

## II.   Mr. Butler is Entitled to Summary Judgment on the "Statutory Exceptions," Defendants' Fifth, Sixth, and Seventh Affirmative Defenses.

Defendants' affirmative defenses based on carve-outs in the relevant anti-discrimination statutes also fail as a matter of law, ECF No. 23 (Answer) ¶¶ 59-64.  It is well-settled that those

statutory exemptions allow religious employers to limit employment to candidates of the same

religion, but they do not authorize discrimination based on other protected categories.  As the

Second Circuit observed, "Title VII expressly exempts certain religious institutions from its

prohibitions upon discrimination based on religion. . . . However, religious institutions that

otherwise qualify as 'employer[s]' are subject to Title VII provisions relating to discrimination

based on race, gender and national origin."  *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173

(2d Cir. 1993) (internal citation omitted); *Rweyemamu v. Cote*, 520 F.3d 198, 207 (2d Cir. 2008)

("[T]he legislative history of Title VII makes clear that Congress formulated the limited

exemptions for religious institutions to discrimination based on religion with the understanding

that provisions relating to non-religious discrimination would apply to such institutions."

(quoting *DeMarco,* 4 F.3d at 173).[4]  Dissenting from the Court's recent decision in *Bostock v.*

*Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020), Justice Alito acknowledged that courts have

interpreted Title VII's carve-out to provide "only narrow protection" that does not allow a

religious employer to discriminate based on sex.  *Id.* at 1781 & n.55.

---

[4]      *See also Petruska v. Gannon Univ.,* 462 F.3d 294, 303 (3d Cir. 2006) ("Title VII does not
confer upon religious organizations the right to make those same decisions on the basis of race,
sex, or national origin." (quoting *Rayburn v. General Conf. of Seventh–Day Adventists,* 772 F.2d
1164, 1166 (4th Cir.1985))); *Boyd v. Harding Academy of Memphis, Inc.,* 88 F.3d 410, 413 (6th
Cir. 1996) (Section 2000e–1(a) doesn't "exempt religious educational institutions with respect to
all discrimination.  It merely indicates that such institutions may choose to employ members of
their own religion without fear of being charged with religious discrimination.  Title VII still
applies, however, to a religious institution charged with sex discrimination."); *EEOC v. Pacific
Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir. 1982) ("The legislative history of this
exemption shows that although Congress permitted religious organizations to discriminate in
favor of members of their faith, religious employers are not immune from liability for
discrimination based on race, sex, national origin, or for retaliatory actions against employees
who exercise their rights under the statute."); *Hopkins v. Women's Div., General Bd. of Global
Ministries*, 238 F. Supp. 2d 174, 180 (D.D.C. 2002) (applying Title VII to a race discrimination
claim against a religious employer); *Herx*, 48 F. Supp. 3d at 1175 ("Title VII's exemptions are
limited specifically to claims of discrimination premised upon religious preferences, and
[plaintiff] isn't complaining about religious preference.").

The same is true for the NYSHRL and NYCHRL.  *See, e.g.*, *Jing Zhang v. Jenzabar, Inc.*, No. 12 Civ. 2988, 2015 WL 1475793, at *9 n.18 (E.D.N.Y. Mar. 30, 2015) (NYSHRL and NYCHRL "exempt religious organizations from religious creed employment discrimination liability"); *Scheiber v. St. John's Univ.*, 84 N.Y.2d 120, 127 (N.Y. 1994) (exemption to NYSHRL "operates to exclude from the definition of 'discrimination' exercise of a preference in hiring for persons of the same faith").  Therefore, Mr. Butler is entitled to summary judgment on the Defendants' statutory defenses.

## CONCLUSION

For the foregoing reasons, Mr. Butler respectfully requests that the Court grant his Motion for Partial Summary Judgment on Defendants Second, Third, Fifth, Sixth and Seventh affirmative defenses.

Dated: November 19, 2020                            Respectfully submitted,
          New York, NY


                                        By:  */s/ Kathleen Peratis*
                                             **OUTTEN & GOLDEN LLP**
                                             Kathleen Peratis
                                             Amy Biegelsen
                                             Eliana J. Theodorou
                                             685 3rd Ave., 25th Fl.
                                             New York, NY 10017
                                             Telephone: (212) 245-1000