## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CODY BUTLER,<br><br>               Plaintiff,<br><br>   -against-<br><br>ST. STANISLAUS KOSTKA CATHOLIC<br>ACADEMY and<br>THE DIOCESE OF BROOKLYN,<br><br>               Defendants. | **ORAL ARGUMENT**<br>**REQUESTED**<br><br><br><br>**DATE OF SERVICE:**<br>**July 7, 2021**<br><br><br><br>**19-CV-3574 (EK)(ST)** |

**SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT PURSUANT COURT ORDER DATED JUNE 9, 2021**

Richard J. Cea, Esq.
Wingate, Kearney & Cullen, LLP
111 John Street, Suite 1040
New York, New York 10038
(718) 852-5900

Mark E. Chopko, Esq. (*pro hac* admission pending)
Marissa Parker, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018
(215) 564-8091

*Attorneys for Defendants St. Stanislaus Kostka
Catholic Academy and the Roman Catholic Diocese
of Brooklyn, New York*

# **TABLE OF CONTENTS**

**Page**

Table of Authorities.................................................................................................ii

Preliminary Statement...........................................................................................1

Legal Argument ....................................................................................................1

     I.     First Amendment Freedoms of Religion and Expressive Association
           Both Apply...............................................................................................1

     II.    The Ministerial Exception is a "Safe Harbor" Application of These
           First Amendment Principles. ...................................................................7

     III.   The First Amendment Applies Even If the Ministerial Exception
           Does Not. ...............................................................................................11

     IV.   On this Record, Plaintiff Cannot Overcome the Academy's First
           Amendment Rights or Sincerely Held Beliefs.................................16

Conclusion .............................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aparicio v. Christian Union, Inc.*,
  18-cv-0592, 2019 WL 1437618 (S.D.N.Y. March 29, 2019) ..........................................12, 13

*Bilquin v. Roman Catholic Church*,
  No. 018588/99, 2000 N.Y. Misc. LEXIS 515 (Sup. Ct. Nassau Cty. 2000) ..........................15

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) .......................................................................................................2, 6, 7

*Burwell v. Hobby Lobby Stores*,
  573 U.S. 682 (2014) ...........................................................................................................17

*Cath. High Sch. Ass'n of Archdiocese of N.Y. v. Culvert*,
  753 F.2d 1161 (2d Cir. 1985) .........................................................................................18, 19

*Congregation Beth Yitzhok v. Briskman*,
  566 F. Supp. 555 (E.D.N.Y. 1983) .........................................................................................1

*Corp. of the Presiding Bishop v. Amos*,
  483 U.S. 327 (1987) (Brennan, J., concurring).................................................................*passim*

*Curay-Cramer v. Ursuline Academy*,
  450 F.3d 130 (3d Cir. 2006)...........................................................................................16, 21

*DeMarco v. Holy Cross High School*,
  4 F.3d 166 (2d Cir. 1993).........................................................................................18, 19, 21

*In re Diocese of Lubbock*,
  No. 20-0127, --- S.W.3d ---, 2021 WL 2386133 (Tex. June 11, 2021)....................3, 4, 13, 14

*Duquesne Univ. of the Holy Spirit v. N.L.R.B.*,
  947 F.3d 824 (D.C. Cir. 2020) .............................................................................................10

*EEOC v. Catholic University of America*,
  83 F.3d 455 (D.C. Cir. 1996) ................................................................................................1

*Fulton v. City of Philadelphia, Pennsylvania*,
  141 S.Ct. 1868 (2021)......................................................................................................5, 17

*Gonzalez v. Archbishop of Manila*,
  280 U.S. 1 (1929)...........................................................................................................2, 17

*Hall v. Baptist Mem. Health Care Corp.*,
   215 F.3d 618 (6th Cir. 2000) ............................................................14

*Hosanna-Tabor Lutheran Church and School v. EEOC*,
   565 U.S. 171 (2012).................................................................*passim*

*Jones v. Wolf*,
   443 U.S. 595 (1979)..................................................................4, 6

*Kavanagh v. Zwilling*,
   997 F. Supp. 2d 241 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (2d Cir. 2014)...................3, 17

*Kedroff v. Saint Nicholas Cathedral*,
   344 U.S. 94 (1952).....................................................................1, 4

*Killinger v. Samford Univ.*,
   113 F.3d 196 (11th Cir. 1997) ........................................................14

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971)...........................................................10, 13, 15

*Little v. Wuerl*,
   929 F.2d 944 (3d Cir. 1991).......................................................14, 15

*Lown v. Salvation Army*,
   393 F. Supp. 2d 223 (S.D.N.Y. 2005) ...............................................15

*Mitchell v. Helms*,
   530 U.S. 793 (2000)....................................................................17

*Moon v. Moon*,
   431 F. Supp. 3d 394 (S.D.N.Y. 2019), *aff'd*, 833 F. App'x 876, No. 20-168,
   Slip op (2d Cir. 2020), *cert. denied*, No. 20-1415, 2021 WL 2405175 (U.S.
   June 14, 2021)................................................................1, 3, 4, 17

*N.L.R.B. v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979)........................................................2, 9, 10, 15

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)...................................................................5, 6

*Our Lady of Guadalupe School v. Morrissey-Berru*,
   140 S.Ct. 2049 (2020)..........................................................6, 8, 9, 11

*Ram v. Lal*,
   906 F. Supp. 2d 59 (E.D.N.Y. 2012) ................................................17

*Redhead v. Conference of Seventh-Day Adventists*,
   03-cv-6187 (E.D.N.Y. July 29, 2008) (Transcript at Dkt. No. 60-43, Defs. Ex.
   38) ............................................................................................................................20

*Rweyemamu v. Cote*,
   520 F.3d 198 (2d Cir. 2008)....................................................................................1, 13

*Schreiber v. St. John's Univ.*,
   84 N.Y.2d 120 (1994) .................................................................................................15

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976)...........................................................................................2, 4, 6

*Watson v. Jones*,
   80 U.S. 679 (1871)..............................................................................................*passim*

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ....................................................................................................17

**Statutes**

42 U.S.C. § 2000e-2(m)......................................................................................................19

42 U.S.C. § 2000e(j) ..........................................................................................................14

42 U.S.C. § 2001e-1(a) .......................................................................................................14

42 U.S.C. § 2001e-2(2)(a)...................................................................................................14

National Labor Relations Act .............................................................................................10

**Other Authorities**

First Amendment, U.S. Constitution ..............................................................................*passim*

Mark E. Chopko and Marissa Parker, *Still a Threshold Question: Refining The
   Ministerial Exception Post Hosanna-Tabor*, U.N.C. First Amendment L.
   Rev. 233 (May 2012), available at https://www.stradley.com/-
   /media/files/publications/2012/05/university-of-north-carolina-school-of-law-
   first-amendment-law-review--chopko--parker.pdf ...................................................8

Michael McConnell, *Accommodation of Religion*, 1985 Sup. Ct. Rev. 1, 28 .............................9

Tully, Tracey, "An Unmarried Catholic Schoolteacher Got Pregnant.  She Was
   Fired." N.Y. Times (June 28, 2021) ......................................................................21

## PRELIMINARY STATEMENT

Following oral argument on June 9, 2021, this Court asked for additional briefing on two questions: Outside of the "ministerial exception" context, what protection does the First Amendment afford a religious institution at the summary judgment stage of a "mixed-motive" discrimination case, when one alleged motive is prohibited by Title VII and another is protected under the religion clause(s)? If any First Amendment protection exists, what level of evidentiary support for the religious motive must be adduced to trigger such protection(s)?

In summary and as explained within, the ministerial exception is a specific application of a broader autonomy principle that precludes the civil courts from intruding on the administration of religious institutions that organize themselves and their workforces on religious principles. This principle is firmly and broadly protected as aspects of Religious Freedom and Expressive Association guaranteed by the First Amendment, which applies even if the ministerial exception does not. When the religious institution makes a *prima facie* showing of its principled basis for an adverse employment decision, in this case with the incompatibility of an employee or candidate, those protected rights cannot be probed or weighed against other competing secular interests.

## LEGAL ARGUMENT

### I.    First Amendment Freedoms of Religion and Expressive Association Both Apply

It is well settled that religious institutions enjoy broad freedom to organize and govern themselves and their employees according to religious doctrine. *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008). Whether that rule is characterized as one of "autonomy" (*EEOC v. Catholic University of America*, 83 F.3d 455, 467-68 (D.C. Cir. 1996)), justiciability (*Congregation Beth Yitzhok v. Briskman*, 566 F. Supp. 555, 557-58 (E.D.N.Y. 1983)), ecclesiastical abstention (*Moon v. Moon*, 431 F. Supp. 3d 394, 404-06 (S.D.N.Y. 2019), *aff'd*, 833 F. App'x 876, No. 20-168, Slip op at 3 (2d Cir. 2020),

*cert. denied*, No. 20-1415, 2021 WL 2405175 (U.S. June 14, 2021)), or "competence" or "jurisdiction" (*Watson v. Jones*, 80 U.S. 679, 729 and 733 (1871)), the rule is the same: civil courts have no authority to decide questions about whether a person's conduct adheres to religious teaching and beliefs and to penalize those mission-driven organizations, even with money damages, for adhering to their values.  To do so involves the Court in interpreting and defining matters that affect the governance and organization of the religious institution.

This rule extends to the discipline and composition of the religious workforce.  It precludes the consideration of substantive questions in secular disputes that will ultimately involve religion (*Gonzalez v. Archbishop of Manila*, 280 U.S. 1, 16 (1929)), and recognizes that "the very process of inquiry" can violate the First Amendment's proscription against interference in religious agencies (*N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)).  It preserves the right of religious organizations to select or exclude members based on whether they believe or abide by religious tenets, without government interference. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) (abstaining from dispute that involved core questions of church discipline and composition of church hierarchy and reorganization).  The First Amendment's guarantee of religious freedoms is buttressed by the First Amendment's associational freedoms:

> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.

*Watson*, 80 U.S. at 728–29; *see also Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

- 2 -

The early expressions of the rule in *Watson v. Jones* recognized that "the civil courts exercise no jurisdiction [over] a matter which concerns theological controversy, church discipline, ecclesiastical government or the conformity of the members of the church to the standard of morals required of them."  80 U.S. at 733.  The Supreme Court there foresaw a slippery slope that if the exclusion were drawn too narrowly, many disputes rooted in the application of religious doctrine would find their way into the secular courts, undermining the legitimate authority of religious bodies over their own institutions.  *Id.* at 733-34.  *See also Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 343-44 (1987) (Brennan, J., concurring) (voting to sustain the constitutionality of the broad Title VII religious employer exemption without which he feared that legitimately protected rights might be chilled by skittish religious organizations seeking to avoid getting sued).

The basic rule continues to be applied today.  In November 2020, the Second Circuit in *Moon*, *supra*, affirmed the dismissal of a case for lack of jurisdiction on this basis, notwithstanding the serial and well-pleaded secular claims of fiduciary duty, defamation, tortious interference and others.  833 F. App'x at 879 (rejecting plaintiff's argument that court could rely on neutral principles of law to grant his relief).  *See also Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 247, 252–54 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (2d Cir. 2014) (holding court lacked jurisdiction over plaintiff's libel *per se* claim based on a church's press release that plaintiff "was found guilty by a Church court of multiple counts of sexual abuse of a minor," because establishing the truth or falsity of this statement was central to the dispute and would result in impermissible entanglement).

Very recently, the Texas Supreme Court applied the doctrine to dismiss the defamation and intentional infliction of emotional distress claims of a deacon protesting his Bishop's decision to list him among credibly accused clergy.  *In re Diocese of Lubbock*, No. 20-0127, --- S.W.3d ---,

2021 WL 2386133 (Tex. June 11, 2021). Years earlier, Deacon Guerrero had been stripped of his diaconal duties and was not among the Diocese's active clergy, and thus the ministerial exception was not applied.  He argued that his claims were permitted because the Diocese's actions went "beyond church walls" to the issue of sex abuse, a social matter that is not strictly ecclesiastical. The court disagreed, explaining that the deacon's claims "directly call into question the Diocese's investigation and conclusions that led to the creation of the list, they necessarily reach behind the ecclesiastical curtain."  *Id.* at *6.  "The Diocese, in exercising its right to shape its own faith and mission, disclosed to the public its reforms to handling sexual-abuse allegations within the church. . . . [A]llowing Guerrero's suit to move forward would threaten the Diocese with civil tort liability for acting in accord with its directive to investigate its clergy or for not conducting that investigation consistent with judicial standards." *Id.* at *9.  In concluding that the ecclesiastical abstention doctrine barred Guerrero's claims, the *Lubbock* court applied, among other precedent, *Watson*. *Id.* at *4.

While the First Amendment does not bar all claims against religious bodies, civil jurisdiction can only attach if a suit brought against a religious organization can be resolved solely on neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or intrusion into church governance.  *Kedroff*, 344 U.S. at 116; *Jones v. Wolf*, 443 U.S. 595, 603–05 (1979); *Milivojevich*, 426 U.S. at 710; *Moon*, 833 F. App'x at 879.  Stated differently, "courts should consider not only whether a neutral principle exists without regard to religion, **but also whether the application of neutral principles would impose civil liability upon a church for complying with its own internal rules and regulations or resolving a religious matter**." *In re Lubbock*, No. 20-0127, 2021 WL 2386133, at *5 (Tex. June 11, 2021) (emphasis added).

- 4 -

Here, allowing this case to move forward will erode the constitutional rights of religious schools like the Academy by inviting a jury eventually to punish the Academy for enforcing its internal rules that require primary schoolteachers – as role models for their students – to live the Faith without question.  Plaintiff undisputedly volunteered to the Academy that "I am homosexual and plan on marrying my boyfriend eventually, and after being told all day that I have to live church doctrine I feel wounded and unwanted."  (Dkt. No. 57-7, Defs. Ex. 27).   The Academy replied "Thank you for your email and your honesty.  Unfortunately we cannot enter into a contract for employment with you as a teacher in this Catholic institution due to the violation of faith and morals of our school."  (Dkt. No. 57-7, Defs. Ex. 28).   These facts and issues implicate central tenets of faith for Catholics and many other religious adherents. *See Fulton v. City of Philadelphia, Pennsylvania,* 141 S.Ct. 1868, 1875 (2021) (recognizing Catholic Social Services holds the religious belief that "marriage is a sacred bond between a man and a woman"); *Obergefell v. Hodges*, 576 U.S. 644, 656-57 (2015) ("Marriage is sacred to those who live by their religions"); *Hosanna-Tabor Lutheran Church and School v. EEOC*, 565 U.S. 171, 185-86 (2012) ("whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.").  The Religion Clauses protect mission-driven organizations precisely because they embrace the call to Faith.

Religious organizations also warrant First Amendment protections and corresponding judicial abstention due to their freedom of expressive association:

> [R]eligious activity derives meaning in large measure from participation in a larger religious community. Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals.  Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should

conduct them, is thus a means by which a religious community defines itself.

*Amos*, 483 U.S. at 342 (1987) (Brennan, J., concurring in the judgment).  Because religious schools are themselves religious institutions, the First Amendment prevents the government from interfering with their regulation of conduct on matters of religious doctrine, which ensures that religious organizations may select and govern both their leaders *and* members pursuant to their religious beliefs. *See Watson*, 80 U.S. at 733 (courts exercise no jurisdiction over matters concerning "the conformity of the members of the church to the standard of morals required of them"); *Milivojevich*, 426 U.S. at 714 (quoting *Watson*, 80 U.S. at 733-34); *see also Obergefell*, 576 U.S. at 679-80 ("The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.").  Without this protection, religious schools would be forced to hire (or reinstate) nonconforming teachers and thereby submit to official dictates contrary to the schools' conceptions of the faith and orthodoxy. *See Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049, 2060-61 (2020); *Milivojevich*, 426 U.S. at 713-14.

Abstention in this context also rests on *Boy Scouts of America v. Dale*, *supra*, where the Court dealt with the conflict between freedom of association and a state public accommodation statute when the Boy Scouts dismissed a homosexual scout leader. Despite acknowledging that the state had a compelling interest in eliminating discrimination, *see id.* at 657, it was outweighed by the Boy Scouts' First Amendment right to associate with those of its choosing and to communicate its moral beliefs. *Id.* at 661 ("[P]ublic or judicial disapproval of a tenet of an organization's expression does not justify the State's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message."). The Free Exercise

Clause in the same way allows religious schools to select members that abide by their beliefs and moral codes.  As the Court said in *Hosanna-Tabor*, "[r]equiring a church to accept or retain an unwanted minister" - or an unwanted primary parochial teacher - would "interfere[] with the internal governance of the church" by "depriving the church of control over the selection of those who will personify its beliefs." 565 U.S. at 188; *see also id.* at 200 (Alito, J. and Kagan, J., concurring) (free expression principle from *Dale* "applies with special force with respect to religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals").  This point is echoed in the right not to be publicly associated with messaging that conflicts with a group's belief, a corollary to the principle that religious schools may not be forced to affirm conduct that violates their religious principles. *See Dale*, 530 U.S. at 648 ("forced inclusion of an unwanted person in a group infringes on the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints"); *see also Hosanna-Tabor*, 565 U.S. at 196 ("The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission.").

## II.    The Ministerial Exception is a "Safe Harbor" Application of These First Amendment Principles.

The ministerial exception, as it has come to be called over time, is a specific application of these principles.  The exception grows from the same historical roots and purposes of the broader principles of institutional autonomy restated by the unanimous Court in *Hosanna-Tabor*, 565 U.S. at 184-87, 196 (further noting that the "ministerial exception has been around in the lower courts for 40 years") and the principle that the government has no business in policing "the selection of church 'functionaries.'" *Id.* at 184. The Court explicitly roots the exception in both religion

clauses, but it has strong associational protections as noted herein.  To restate the ministerial exception as a test: a "minister" may not sue their "church" in the civil courts over the "terms and conditions of their ministry."  Mark E. Chopko and Marissa Parker, *Still a Threshold Question: Refining The Ministerial Exception Post Hosanna-Tabor*, 10 U.N.C. FIRST AMENDMENT L. REV. 233, 244, 277 et seq. (May 2012), available at https://www.stradley.com/-/media/files/publications/2012/05/university-of-north-carolina-school-of-law-first-amendment-law-review--chopko--parker.pdf.  It is not disputed that St. Stanislaus Academy is a "church" and that the case involves the terms and conditions expected of all teachers in the school.  The only issue is whether the role offered to Plaintiff as a parochial schoolteacher qualified as a "minister."  If answered in the affirmative, no further analysis is needed to find that civil adjudication of Plaintiff's claims will violate the First Amendment.  *See Hosanna-Tabor*, 565 U.S. at 194 (rejecting argument by plaintiff to explore pretext of dismissal because it "misses the point of the ministerial exception. The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason.  The exception instead ensures that the authority to select and control who will minister to the faithful.").

Plainly, Plaintiff aspired to be and – for the duration of his teacher orientation – was a "church functionary" in the role of a religious schoolteacher.  The Supreme Court in *Guadalupe*, 140 S.Ct. at 2066, summarized the role of "teacher" like this:

> [B]oth … schools expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important.

This principle finds its origin in *Watson*, where the Court recognized the various faith communities "each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not supposed that the judges of the civil courts can be as competent in ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own." 80 U.S at 729.  The scope of duties and essential qualities that a person would bring to the performance of duties in a religious institution, especially a school, is a question of self-definition of the institution, beginning with the relationship between the role performed by the person, and the mission of the larger faith community. "Part of the freedom of a church to operate a school is its ability to deal with its agents in accordance with church doctrine, otherwise the church's strength and distinctiveness as a religious educator would be threatened." Michael McConnell, *Accommodation of Religion*, 1985 SUP. CT. REV. 1, 28.

As *Guadalupe* recognizes, a person is a "minister" for purposes of the exception based on what that person does.  140 S.Ct. at 2064.  And the "what" reflects all of the expectations and qualities of the employee role, not just whether a teacher formally teaches religion as an academic subject or brings children to religious observances.  That latter focus invites the kind of quantitative nit-picking that the Court rejected.  A more accurate constitutional definition of "minister" that embodies the full measure of the Supreme Court jurisprudence is "a person who occupies a 'position of ministry.'"  Viewing the matter through that lens more clearly focuses attention on the connection between the "task" and the "Faith." Here, it is well-settled from the record that a "teacher" is a person who occupies a position of ministry at the Academy.

A primary schoolteacher in a religious school who is expressly charged with incorporating religious instruction into the school day and who is required to be an example of church values to the students has a pervasively religious relationship with the school. As the Supreme Court has

long recognized, there is a "critical and unique role of the teacher in fulfilling the mission of a church operated school." *Catholic Bishop of Chicago*, 440 U.S. at 501 (construing National Labor Relations Act to preclude NLRB jurisdiction over religious schools and their employment relationships with teachers because the relationship was too imbued with religious expectations). The doctrinal underpinning of this statement from *Catholic Bishop of Chicago* is the line of "school aid" cases: "What was said of the schools in *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971), is true of the schools in this case: 'Religious authority necessarily pervades the school system.'" *Catholic Bishop of Chicago*, 440 U.S. at 501. In those cases, the Court cited the critical role of teachers to fulfill the religious mission of the religious schools.

Rejecting actual testimony by teachers that they did not inject religion into their classes and the finding of a district court that religion did not affect the content of secular instruction, the Court said: "The teacher is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith." *Lemon*, 403 U.S. at 618. The Court reasoned that religious schools were integral to the advancement of the faith, *id.* at 616-17, and that dedicated teachers were integral to the success of that mission. "Doctrines and faith are not inculcated or advanced by neutrals." *Id.* at 618. *See also Duquesne Univ. of the Holy Spirit v. N.L.R.B.*, 947 F.3d 824, 828 (D.C. Cir. 2020) (ruling that NLRB lacked exercise jurisdiction over religious university adjunct faculty relations even if its jurisdiction were limited to faculty members held out as "playing a specific religious role" because it would "lead to the sort of intrusive inquiry that *Catholic Bishop* sought to avoid, [with the Board] making determinations about [the University's] religious mission and whether certain faculty members contribute to that mission," which "is no business of the State") (internal citations omitted).

This reasoning was solidified in *Guadalupe*, where the Court held that two Catholic elementary school teachers were ministers "even though [they] taught primarily secular subjects, lacked substantial religious titles and training, and were not even required to be Catholic." 140 S. Ct. at 2072 (Sotomayor, J., dissenting). What mattered, the Court said, was that in addition to their many secular duties, they also "performed vital religious duties": "forming students in the Catholic faith," "pray[ing] with their students, attend[ing] Mass with the students," and "guid[ing] their students, by word and deed, toward the goal of living their lives in accordance with the faith." *Id.* at 2066 (majority). These actions were inherent in the position itself and were evident from "the schools' definition and explanation of their roles" as reflected in "their employment agreements and faculty handbooks." *Id.* The same is true here.

The undisputed evidence shows that had Plaintiff proceeded to teach children at the Academy, he would have had these important religious duties too.  From the time his application was accepted, he was subject to the Academy's expectation that, through word and deed, a "teacher" is expected to exhibit and advance the Faith daily.  If a teacher cannot or will not do that, or is uncomfortable "conformi[ng] … to a standard of morals required of them" as defined by the church, *Watson*, 80 U.S. at 733, that person cannot fulfill the position of ministry and is subject to discharge, even if that job action might violate a secular nondiscrimination law.  *Guadalupe*, 140 S. Ct. at 2069 ("When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow"); *Hosanna-Tabor*, 565 U.S. at 196.

## III.   The First Amendment Applies Even If the Ministerial Exception Does Not.

This case is controlled by a basic principle: The First Amendment protects the freedom of the Catholic Church to run Catholic schools based on Catholic principles.  This includes the

freedom to choose employees who fully embrace Catholic beliefs and practices.  While Defendants strongly believe that this freedom is easiest illustrated in the safe harbor of the ministerial exception, this freedom is the First Amendment as described above. The formative cases (pre-*Hosanna-Tabor*) used the broader frame of these First Amendment principles before the label "ministerial exception" attached.  This freedom requires that where a sincerely held religious belief is the stated basis for a religious organization's allegedly wrongful action, a civil court must abstain from adjudicating the claims.  Where the ministerial exception does not apply, the default is not to surrender to the secular but give deference to the broader principle outlined above, namely that no civil court has the authority to adjudicate cases that involve challenging the plausibility of the organization's asserted religious motive.

Several recent cases aptly demonstrate this principle. First, in *Aparicio v. Christian Union, Inc.*, 18-cv-0592, 2019 WL 1437618, *7, *10 (S.D.N.Y. March 29, 2019), the court explicitly rejected application of the ministerial exception but dismissed the Title VII claim on First Amendment grounds.  There, the plaintiff worked as the public affairs director for a religious organization, CUI, that funded and operated student leadership organizations on Ivy League campuses.  *Id.* at *1.  Plaintiff personally complained and routinely reported complaints from donors about the organization's complementarian policy, which denied women leadership positions in CUI's ministry, as a form of gender discrimination.  *Id.*  CUI disciplined Plaintiff concerning a lack of progress in generating revenue, which Plaintiff disputed as false, and CUI subsequently terminated Plaintiff for bad performance.  *Id.* at *2.  Plaintiff filed a complaint with the EEOC, alleging he was fired for voicing his concerns about CUI's discriminatory employment policies.  *Id.* The EEOC determined that plaintiff's expressed opposition to the complementarian

policy constituted protected activity and that CUI's asserted defense lacked credibility, ultimately issuing a right-to-sue letter. *Id.*

In analyzing the case, the court discussed the ministerial exception and concluded that CUI qualified as a religious organization, but that plaintiff's position did not qualify as one of ministry. *Id.* at *4-*5. The court agreed that plaintiff had engaged in protected activity under Title VII, namely that he personally complained and criticized CUI's gender-biased employment practices as violative of employment law, and that plaintiff's complaint properly alleged CUI terminated plaintiff for this protected activity. *Id.* at *9. Importantly, however, the court also determined that CUI's sexually discriminatory complementarian policy was protected by the First Amendment, citing *Lemon* and *Rweyemamu*. The policy reflected CUI's "right to choose who performs certain religious roles within the organization," and therefore the First Amendment "bar[red] the Court from asserting Title VII's secular sensibilities" on that policy through the vehicle of a discrimination or retaliation claim. Because Plaintiff complained about the sexually discriminatory nature of CUI's policy barring women from serving as directors in CUI's ministry and alleged that CUI retaliated against him for "expressing this anti-religious view," the court dismissed plaintiff's Title VII claim. *Id.* at *10.

*Lubbock*, discussed above, is also particularly instructive here, as it confirms that this doctrine bars claims that would "impose civil liability upon a church that complies with its own internal governance" — which is just what Plaintiff's claims would do here, by punishing the Academy for complying with its internal rules for Catholic educators. 2021 WL 2386133, at *7, *9 ("compliance with [an internal church] directive" was "a predicate to [the plaintiff's] suit"). It also confirms that "ecclesiastical autonomy" and the "ministerial exception" are "independent" First Amendment doctrines, which protect religious organizations in different ways. *Id.* at *4 &

n.1.  So regardless of whether the ministerial exception applies in any given case, the church autonomy or ecclesiastical abstention doctrine (as styled in the Second Circuit) bars claims arising from concededly religious decision-making by a religious organization.

We would be remiss if we did not point out that the First Amendment imbues Defendants' statutory defenses, and the religious exception in Title VII occupies this territory.[1]  In *Little v. Wuerl*, the court held that the exemptions to Title VII attached to a Catholic school's decision not to rehire a Protestant elementary school teacher because she remarried without undertaking a canonical annulment process required by the Catholic Church. 929 F.2d 944, 951 (3d Cir. 1991). There, plaintiff's employment contract stated that she was subject to dismissal "for serious public immorality, public scandal or public rejection of the official teachings, doctrine or laws of the Roman Catholic Church." *Id.* at 945. Her role did not include "responsibility for teaching religion" but she "attended Catholic ceremonies with her pupils and participated in the school's programs for teachers that were intended to strengthen their ability to impart 'Catholic' values to students." *Id.* The school did not renew plaintiff's contract due to the circumstances of her remarriage violating Catholic doctrine.  *Id.*  The plaintiff did not challenge the sincerity of the asserted religious doctrine.  *Id.* at 946.

---

[1]  Both Title VII statutory exemptions allow religious agencies considerable latitude to order their workforces according to religious doctrine. 42 U.S.C. § 2001e-1(a) (exempts "a religious corporation [or] educational institution . . . with respect to the employment *of individuals of a particular religion* to perform work connected with the carrying on by such corporation [or] educational institution . . . of its activities.");  42 U.S.C. § 2001e-2(2)(a) ("it shall not be an unlawful employment practice for a school . . . or other educational institution or institution of learning *to hire and employ employees of a particular religion if such school* . . . is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion . . . or if the curriculum of such school . . . is directed toward the propagation of a particular religion."); *see also* 42 U.S.C. § 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as *belief*, . . .") (emphasis added throughout). Courts recognize that a "particular religion" includes the "decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 200 (11th Cir. 1997).

The court determined that that "Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" *Id.* at 951. Citing *Lemon* and *Catholic Bishop*, among others, the court recognized that the First Amendment barred plaintiff's claim because "if this court were to review the Parish's decision, it would be forced to determine what constitutes "the official teachings, doctrine or laws of the Roman Catholic Church" and whether plaintiff has "rejected" them." *Id.* at 948. It also gave weight to fact that the "religious significance of parochial schools— and their teachers in particular—is proclaimed by the Catholic Church, has been recognized by the courts, and is not challenged by [plaintiff]." *Id.* The court cautioned that under the circumstances, "inquiry into the employer's religious mission is not only likely, but inevitable, because the specific claim is that the employee's beliefs or practices make her unfit to advance that mission. It is difficult to imagine an area of the employment relationship less fit for scrutiny by the secular courts. Even if the employer ultimately prevails, the process of review itself might be excessive entanglement." *Id.* at 949.[2]

The constitutional protections afforded to religious organizations, whether expressed through statutory defenses or jurisprudence, not only encompass the right to select a workforce

---

[2] Plaintiff's New York State and New York City law claims are also precluded by statutory exemptions, which by their plain language, apply not only to religious creed suits, but also where a religious entity makes an employment decision to promote its religion. *See Bilquin v. Roman Catholic Church*, No. 018588/99, 2000 N.Y. Misc. LEXIS 515, at *2 (Sup. Ct. Nassau Cty. 2000); *see also Lown v Salvation Army*, 393 F. Supp. 2d 223, 251-254 (S.D.N.Y. 2005) (explaining State and City exemptions were available to religious organizations as long as the complained-of actions were "calculated… to promote the religious principles for which it was established or maintained."); *Schreiber v. St. John's Univ.*, 84 N.Y.2d 120, 127-28 (1994) ("Issues concerning a hiring decision calculated to promote religious principles of a religious institution highlight the tension between constitutional Free Exercise and Establishment Clauses, as well as the potential for excessive entanglement in religious affairs").

that believes and adheres to their religious tenets, but also not to be embarrassed by their employees, protecting both orthodoxy and orthopraxy. *Amos*, 483 U.S. 327, 344-45 (Brennan, J. concurring).   Indeed, "there are circumstances, like those presented here, where a religious institution's ability to 'create and maintain communities composed solely of individuals faithful to their doctrinal practices' will be jeopardized by a plaintiff's claim of gender discrimination." *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 141 (3d Cir. 2006).   Ms. Curay-Cramer, a Catholic middle school teacher terminated for signing a public pro-choice advertisement, claimed that the Academy's practice of firing anyone who has or contemplates an abortion was illegal, and based her gender discrimination claim on the theory that similarly-situated male employees had been treated less harshly.  *Id.* at 133.  Citing *Catholic Bishop*, the court determined that plaintiff's Title VII claim would run afoul of the First Amendment because it would require the court "to measure the degree of severity of various violations of Church doctrine. . . . Comparing [plaintiff] to other [academy] employees who have committed 'offenses' against Catholic doctrine would require us to engage in just the type of analysis specifically foreclosed by *Little*." *Id.* at 139 (3d Cir. 2006).[3]  As discussed below, this reasoning equally applies to the case at bar.

## IV.   On this Record, Plaintiff Cannot Overcome the Academy's First Amendment Rights or Sincerely Held Beliefs.

When a secular dispute proceeding under "neutral principles of law" collides with a religious question, the civil courts are required to abandon attempts to adjudicate and instead defer to the views of religious authorities.  *Jones v. Wolf*, 443 U.S. 595, 602, 604 (1979).  Courts are

---

[3]   Also relevant to the case at bar, the *Curay-Cramer* court rejected plaintiff's attempt to demonstrate after-the-fact that she engaged in opposition activity protected by Title VII (namely by arguing that she signed the pro-choice petition to protest the academy's illegal practice), noting that "it is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative."  *Id.* at 137.

required in cases like this one to look beyond the secular anti-discrimination labels and focus on whether the specific elements of the plaintiff's claim can be litigated without the court stepping into religious issues. *Moon*, 431 F. Supp. 3d at 409-410, *Kavanagh*, 997 F. Supp. 2d at 250-51. If the adjudication of a claim will involve the court in resolving a religious matter, that is enough to trigger the protections of the First Amendment. *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) ("[I]nquiry into … religious views … is not only unnecessary but also offensive. It is well established … that courts should refrain from trolling through a person's or institution's religious beliefs."). *See also Amos*, 483 U.S. at 343-44 (Brennan, J., concurring) (a "case-by-case" inquiry into whether an organization's activities are religious or secular entangles the government in religious affairs and "create[s] the danger of chilling religious activity" by disrupting "the community's process of self-definition"). Therefore, the Supreme Court has held that the civil courts must not involve themselves in the resolution of an otherwise secular dispute that necessarily involves a court or jury in testing the validity of determinations that reflect religious doctrines. *Gonzalez*, 280 U.S. at 16; *Ram v. Lal*, 906 F. Supp. 2d 59, 69-70 (E.D.N.Y. 2012). The same rule governs disputes involving employment discrimination laws.

Religious liberty must be respected, even when it conflicts with another important interest. *Fulton*, 141 S.Ct. at 1882; *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Non-discrimination laws are unquestionably valuable, but those laws must yield when they will cause constitutional harm to religious groups. Assessing the application of those laws against a set of facts that express religiously motivated and constitutionally protected actions will only compound the injury to First Amendment rights, as discussed *supra*.

Assessing the truthfulness of the religious motivation for Plaintiff's termination in this case collides with the First Amendment's required deference to the Academy's religious beliefs and the

principles discussed in this brief. *E.g.*, *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 724 (2014) (federal courts have no business addressing whether religious beliefs are plausible). Defendants submit that, if the ministerial exception does not apply, First Amendment protections control, based upon the *prima facie* showing of the Academy's sincerely held belief that marriage exists between a man and a woman and that Plaintiff's stated intent to marry his boyfriend contravened this belief, and that Plaintiff felt "wounded and unwanted" after being told he had to live "church doctrine."  Otherwise, the First Amendment closes the door on further adjudication, even if another non-religious motive can be demonstrated by Plaintiff, because impermissible entanglement will result from the inquiry into and resolution of such a mixed-motive claim.

The Second Circuit's "but for" causation requirement in *Culvert* and *DeMarco* does not compel a different result. Those cases establish that a mixed-motive claim can only be civilly adjudicated if the non-religious motive was the decisive, "but for" cause of the adverse action. *Cath. High Sch. Ass'n of Archdiocese of N.Y. v. Culvert*, 753 F.2d 1161, 1168 (2d Cir. 1985) (First Amendment prohibits inquiry into an asserted religious motive to determine whether it is pretextual, holding that lay teacher could not be reinstated at a parochial school, even if he or she demonstrated unlawful discrimination, if the teacher still would have been fired for the asserted religious reason); *DeMarco v. Holy Cross High School*, 4 F.3d 166, 172 (2d Cir. 1993) (plaintiff may not raise plausibility challenge to an employer's putative religious justification for an employment decision, and anything less than a non-religious "decisive cause" leads to entanglement).  In practice, this means that as long as the adverse action would have occurred for the stated, sincerely held religious beliefs, it does not matter if there is another or many other possible reasons.  The constitutional impediment to civil adjudication is that a court cannot discard the religious organization's assessment without having the fact finder impermissibly wade into the

religious organization's processes to rule out the religious motive. For "[i]f we allow the camel to stick its nose into the constitutionally protected tent of religion, what will follow may not always be controlled." *Culvert*, 753 F.2d at 1166.

*DeMarco* distinguished the Circuit's "but for" proof requirement from the allegedly lower level of proof required to recover money damages under Title VII's 42 U.S.C. § 2000e-2(m)[4] where an unlawful intent was one of the employer's motives. *DeMarco*, 4 F.3d at 172 (noting in dicta that even after Title VII "motivating factor" amendment, proof of "but for" causation of non-religious motive was required for remedy of reinstatement). That distinction has been abrogated by the Supreme Court's reasoning in *Hosanna-Tabor*, 565 U.S. at 194. There, plaintiff Perich abandoned her claim for reinstatement, but sought frontpay, backpay, compensatory and punitive damages, and attorney's fees. *Hosanna-Tabor*, 565 U.S. at 194. The Court noted that Perich's adjustment of remedies made no difference: "An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination. Such relief would depend on a determination that Hosanna–Tabor was wrong to have relieved Perich of her position, and it is precisely such a ruling that is barred by the ministerial exception." *Id.* It is also precisely the kind of ruling that is barred by the First Amendment here – to potentially punish a religious organization with a judgment of money damages for rescinding an offer of employment to a parochial schoolteacher who professed an intent to violate Catholic doctrine, who confessed to feeling "wounded and unwanted" after being told during orientation he had to "live church doctrine," and

---

[4] This subsection allows a plaintiff to state a mixed-motive claim where other factors are not protected by Title VII, which can include legitimate unprotected reasons like poor job performance or personality conflicts, but not avoid or otherwise overcome the First Amendment safeguards that apply when one of the factors is the religious motive of a religious employer.

who questioned whether he would "be a welcome member" at the Academy.  (Dkt. No. 57-7, Defs. Ex. 27).

Thus, where the termination of a purportedly non-ministerial employee involves both an alleged motive prohibited by Title VII and another protected under the First Amendment, and where a *prima facie* showing that the organization's protected religious reason is plausible, the civil inquiry must end.  Otherwise, the fact-finder will be forced to question whether to believe the Academy when it took Plaintiff at his word that he was not sure whether he could live by the school's religious code.  It does not matter that this claim is given a secular label or framed as a secular cause of action; the facts cannot be distilled and segregated into a purely secular inquiry. The proofs in this case require the Court and ultimately a jury to look behind the labels and decide whether in fact they believe church authorities lied when *they* believed *him*. In the particular facts of this case, that analysis is invariably bound up in an assessment of what church leaders thought about the suitability of Plaintiff for employment as a parochial schoolteacher based upon what *he said* to the Academy.

The need to temper such an inquiry is illustrated by the events leading to and analysis underlying the directed verdict in *Redhead v. Conference of Seventh-Day Adventists*, 03-cv-6187 (E.D.N.Y. July 29, 2008) (Transcript at Dkt. No. 60-43, Defs. Ex. 38).  The court there recognized that the First Amendment required abstention from a jury determination where the defendant religious school had "stated a lawful reason for plaintiff's termination before plaintiff raised her allegation of [gender] discrimination and indeed has adhered to its proffered religious basis for plaintiff's termination throughout this case.  On this record, the jury can only find for the plaintiff by questioning [defendant's representatives] and specifically questioning the validity and plausibility of the church doctrine that the defense witnesses claim motivated the adverse

employment action." Ex. 38 at 237.   So too here.   Absent a clear path around religious doctrine, there will always be the temptation that a jury will impose its own views as to how a religious organization ought to have utilized its belief system.[5]   The court must use its role as gatekeeper to safeguard against this erosion of First Amendment freedoms.

To come full circle on the question of burden in this case, Defendants have already met their *prima facie* requirement through a record showing (1) every teacher's obligation to teach and convey Catholic Faith and be a role model for students in the employment contract signed by Plaintiff and the accompanying handbook, (Dkt. No. 57-5, 57-6, Defs. Exs. 15, 16) (2) Plaintiff's email after the first day of new teacher orientation, stating his "concern[] about my position within the diocese and school," his plan to engage in homosexual marriage eventually, his feeling of being "wounded and unwanted" "after being told all day that I have to live church doctrine," and his pointed question as to whether he "would still be a welcome member of the St. Stan's community," (Dkt. No. 57-7, Defs. Ex. 27), and (3) the Academy's response to rescind Plaintiff's employment offer "due to the violation of the Catholic faith and morals of our school" (Dkt. No. 57-7, Defs. Ex. 28).   Here, the Academy determined that Plaintiff's religious beliefs and actions did not coincide with that of its own.[6]   Neither Plaintiff nor the Court can challenge the Academy's religious judgment in that regard.   *DeMarco*, 4 F.3d at 171; *Curay-Cramer*, 344 F. Supp. 2d at

---

[5]   *See, e.g.*, Tully, Tracey, "An Unmarried Catholic Schoolteacher Got Pregnant.  She Was Fired."  N.Y. TIMES (June 28, 2021) (president of Catholic schoolteacher union commenting on firing of teacher for violation of school's religious doctrine, stating that "The church is supposed to hate the sin, but not hate the sinner. . . .They should be very happy that she's not having an abortion. Don't you think?").

[6]   Relatedly, it is entirely legitimate for an employer to decline to hire an employee who voluntarily questioned his fit for the job after one day of orientation.  To the extent uncertainty existed on an employee's part, and an employer had corresponding reservations about how the employee would perform in light of that uncertainty, it seems a far better outcome for the employer to have acted promptly than to have stayed silent out of fear of igniting litigation.  *See Amos*, 483 U.S. at 343-44 (Brennan, J. concurring) (cautioning that a religious "community's process of self-definition would be shaped in part by the prospects of litigation" if First Amendment principles are construed too narrowly).

935.   Thus, neither the Court nor a jury can resolve Plaintiff's mixed motive claim, which involves challenging the plausibility of the religious reason proffered by the Academy in rescinding Plaintiff's employment offer, without running afoul of the First Amendment.

### **CONCLUSION**

Based on the foregoing reasons of fact and law, Defendants ask the Court to grant summary judgment and dismiss Plaintiff's claims.

Respectfully submitted,


*/s/Richard J. Cea*
Richard J. Cea
Wingate, Kearney & Cullen
111 John Street, Suite 1040
New York, New York 10038


*/s/Marissa Parker*
Mark E. Chopko (*pro hac* admission pending)
Marissa Parker
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103

5061648