IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CODY BUTLER,<br><br>               Plaintiff,<br><br>  -against-<br><br>ST. STANISLAUS KOSTKA CATHOLIC ACADEMY and<br>THE DIOCESE OF BROOKLYN,<br><br>               Defendants. | ORAL ARGUMENT REQUESTED<br><br>DATE OF SERVICE:<br>August 18, 2021<br><br><br>19-CV-3574(EK)(ST) |

**SUPPLEMENTAL REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT PURSUANT TO COURT ORDER DATED JUNE 9, 2021**

Richard J. Cea, Esq.
Wingate, Kearney & Cullen, LLP
111 John Street, Suite 1040
New York, New York 10038
(718) 852-5900

Mark E. Chopko, Esq.
Marissa Parker, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018
(215) 564-8091

*Attorneys for Defendants St. Stanislaus Kostka
Catholic Academy and the Roman Catholic Diocese
of Brooklyn, New York*

## **TABLE OF CONTENTS**

**<u>Page</u>**

Table of Authorities .................................................................................................................... ii

Preliminary Statement ..................................................................................................................1

Legal Argument ............................................................................................................................2

      I.      Context Matters When Applying the Protections of the First Amendment. ........................................................................................................2

      II.     The First Amendment Requires Civil Abstention at Summary Judgment Here. ....................................................................................................7

      III.    Plaintiff's Case Turns on His Profession of Contrary Religious Views. ...................................................................................................................9

Conclusion ..................................................................................................................................12

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Aparicio v. Christian Union, Inc.*,
  18-cv-0592, 2019 WL 1437618 (S.D.N.Y. March 29, 2019)..............................................6, 9

*Bob Jones University v. United States*,
  461 U.S. 574 (1983).............................................................................................................3

*Curay-Cramer v. Ursuline Academy*,
  450 F.3d 130 (3d Cir. 2006).................................................................................................6

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005).............................................................................................................3

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003)...............................................................................................................8

*In re Diocese of Lubbock*,
  624 S.W.3d 506 (Tex. 2021)................................................................................................6

*Forrester v. Rauland-Borg Corp.*,
  453 F.3d 4126 (7th Cir. 2006) .............................................................................................8

*Holcomb v. Iona College*,
  521 F.3d 130 (2d Cir. 2008).................................................................................................8

*International Society For Krishna Consciousness, Inc. v. Barber*,
  650 F.2d 430 (2d Cir. 1981)..............................................................................................2, 8

*Kavanagh v. Zwilling*,
  997 F. Supp. 2d 241 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (2d Cir. 2014).........................6

*Lown v. Salvation Army*, Inc.,
  393 F. Supp. 2d 223 (S.D.N.Y. 2005)..................................................................................9

*Ohio Civil Rights Commission v. Dayton Christian Schools*,
  477 U.S. 619 (1986)..........................................................................................................4, 8

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020)......................................................................................................5, 6

*Patrick v. LeFevre*,
  745 F.2d 153 (1984).............................................................................................................3

*Schmidt v. Bishop*,
 779 F. Supp. 321 (S.D.N.Y. 1991) ...................................................................................6

*Starkey v. Roman Catholic Archdiocese of Indianapolis*
 Case No. 1:19-cv-03153, Dkt. No. 141 at 15-16 (S.D. Ind. Aug. 11, 2021) ............................5

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
 471 U.S. 290 (1985) ..........................................................................................................3

*United States v. Lee*,
 455 U.S. 252 (1982) ..........................................................................................................3

**Other Authorities**

U.S. Constitution, Amend. I ................................................................................. *passim*

Title VII ............................................................................................................... *passim*

**PRELIMINARY STATEMENT**

Plaintiff's opposition treats this case as one involving a secular employment dispute: religion is, at best, an afterthought, and the First Amendment is inapplicable. This approach is factually and legally wrong, at once both hyperbolic and unmoored from the summary judgment record before the Court.

Three central flaws pervade Plaintiff's opposition. First, context matters. Plaintiff's cases largely address the First Amendment's role in disputes involving public (not religious) institutions, resisting taxing authority, and direct challenges to government regulations. Plainly, these markedly different contexts produce markedly different legal analyses, and do not address the Court's questions in this private employment dispute with a religious employer raising the application of religious doctrine. The First Amendment rules on non-interference in church institutions, which is the nucleus of the First Amendment principles undergirding a religious school's right to order its workforce on religious principles, is not a balancing test or an evaluation of competing interests. It is a boundary that cabins the adjudicative authority of a court.

Second, and relatedly, Defendants do not seek unbridled immunity from all judicial review just because they are religious organizations. Rather, in Defendants' view, the First Amendment protections of religious freedom and expressive association require non-interference in the governance of a religious institution <u>in the context of</u> a prospective employee professing beliefs that render him unsuitable for the important role of teacher in a Catholic primary school.

Third, Plaintiff ignores that <u>his own words</u> were the stated reason and trigger for the Academy's rescission of Plaintiff's teaching contract. A jury will be asked to weigh these facts if the case proceeds, as they form the basis for the Academy's actions. To allow this case to persist would mean that the State can punish a religious organization for taking Plaintiff at his word when

he volunteered his plans to violate religious doctrine and voiced his discomfort with the idea of living the doctrine consistent with the contractual obligations of an Academy teacher.

## LEGAL ARGUMENT

I.     **Context Matters When Applying the Protections of the First Amendment.**

In a leap without basis, Plaintiff attempts to interpose First Amendment analyses from unrelated contexts onto the private religious employment dispute pending summary judgment here. For example, Plaintiff relies extensively on *International Society For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430 (2d Cir. 1981), (Dkt. No. 78, Plaintiff's Supplemental Opposition ("Supp. Opp.") at 10, 15, 16, 22), which concerns a religious group's lawsuit against state officials, resisting a state antisolicitation regulation used at the New York State Fair in violation of the Free Exercise Clause. Where the existence of a religion and the sincerity of its practices are disputed by the State (in *Barber*, the trial court found Sankirtan to be commercial speech, rather than religious speech), a court must first determine that religious members are engaged in a religious practice that is burdened by the regulation before applying and analyzing the level of burden that State must justify to uphold its regulation. *Id.* at 438-41. Thus, the Second Circuit engaged in a limited "threshold" analysis to confirm that Sankirtan – which requires roving devotees to approach the uninitiated, to inform them of the precepts of the religion, and to seek monetary donations – is in fact a sincerely-held religious practice. *Id.* at 432. The Second Circuit reversed the trial court's dismissal of the Krishna members' complaint and held that the State unconstitutionally interfered with the Krishna members' free exercise rights by enacting and enforcing its anti-solicitation rule because the State failed to show that methods less restrictive than an outright prohibition were ineffective in checking occasional misconduct associated with Sankirtan. *Id.* at 444-47.

To restate the obvious, if Defendants were attacking the constitutionality of Title VII or other rule, they, too, would be required to demonstrate a burden to sustain their case. That is not this case; Defendants are private religious organizations and no government regulation is being affirmatively challenged here. Nor does Plaintiff challenge the existence of the Catholic religion, the sincerity of Defendants' belief that marriage is between a man and a woman, or that the Academy's teachers serve as Catholic role models to their students. These are elemental principles for Catholic primary schools.

Plaintiff's discussion of other Free Exercise challenge cases and other constitutionality challenges to a statute or regulation applied by a government actor to a religious organization or its members are equally unhelpful to the questions at bar for the same reasons. (Supp. Opp. 5-7). So too with respect to cases where an individual's religious interests are balanced against the government's unique security interests,[1] taxing authority,[2] or recordkeeping requirements.[3] *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 710 (2005) (noting "[c]ontext matters" when applying the "compelling governmental interest standard," explaining that RLUIPA does not elevate accommodation of religious observances over state-run institutions' needs to maintain order and

---

[1] *E.g., Patrick v. LeFevre*, 745 F.2d 153 (1984) (a pre-*Employment Division v. Smith*, pre-RFRA, pre-RLUIPA case concerning prisoner's right to practice religion). (Supp. Opp. at 17).

[2] *E.g.*, *Bob Jones University v. United States*, 461 U.S. 574 (1983) (holding that any nonprofit organization which seeks to avail itself of the privilege of tax-exempt status must comply with Internal Revenue Code's provisions concerning the same, and that the practice of racial discrimination in education violates a fundamental national public policy that cannot be viewed as conferring a public benefit as required by the IRC's tax-exemption rules); *United States v. Lee*, 455 U.S. 252 (1982) (rejecting suit for tax refund by Amish employer, holding that statutory exemption for self-employed members of religious groups who oppose social security taxes is only available to self-employed individuals and not to employers or employees). (Supp. Opp. at 5, 7, 8).

[3] *E.g.*, *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290 (1985) (finding Secretary of Labor could enforce Fair Labor Standards Act's recordkeeping requirements against religious nonprofit engaged in commercial activities whose workers were not volunteers but rather received some form of payment). (Supp. Opp. at 7).

security, institutions like prisons and mental hospitals "where the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise.").

More troubling is Plaintiff's repeated use of *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 627-28 (1986), for the propositions that "when religious beliefs directly conflict with workers' rights statutes, the law typically prevails," and "*Dayton* confirms that when an employer offers a religious reason for its actions, the pretext inquiry in a burden-shifting framework on summary judgment does not offend the Constitution." (Supp. Opp. at 6-7, 11-12, 17). *Dayton Christian Schools* does not stand for either proposition. *Dayton Christian Schools* concerned a religious employer suing in federal court to enjoin an initial state-level inquiry into a sex discrimination claim. The Supreme Court explicitly held, 5-4, only that the religious school's underlying constitutional challenges to plaintiff's sex discrimination claim "should be decided on the merits" in the pending state-level civil proceeding, and that attempting a run-around to a federal court (perceived as more amenable to a Free Exercise argument) was barred pursuant to the *Younger* abstention doctrine. *Id.* at 628. *Dayton Christian Schools* does not contain a specific or general finding that constitutional protections for religious organizations yield to employment discrimination laws. Further, that case presented a decidedly different posture than the case here, where Defendants already participated in a state-level investigation regarding Plaintiff's claim and have engaged in years of federal court proceedings that were initiated by Plaintiff.

Perhaps predictably, Plaintiff does not offer any response to Defendants' argument that the ministerial exception is one application of these First Amendment principles where the court need not engage in any analysis about the basis for an adverse employment decision if the court finds that the employer is a religious organization and the employee's role is ministerial. (Defendants'

Supplemental Brief ("Supp. Br.") at 7-8). Another recent case reinforces the view that employment in the ministry of religious education favors the application of the ministerial exception even in circumstances where the school employee characterizes the position as largely secular. In *Starkey v. Roman Catholic Archdiocese of Indianapolis*, a school guidance counselor sued on the basis of Title VII for discrimination arising from her same-sex marriage, arguing that the ministerial exception did not apply because "her duties are virtually identical to those" of a guidance counselor at a public school. Case No. 1:19-cv-03153, Dkt. No. 141 at 15-16 (S.D. Ind. Aug. 11, 2021). The district court granted summary judgment in the Catholic school's favor on the ministerial exception. Citing *Amos*, the court observed the line-drawing necessary in the field of religious education: "that Starkey characterizes her work as a guidance counselor in purely secular terms does not change the result because it would be inappropriate for this court to draw a distinction between secular and religious guidance offered by a guidance counselor at a Catholic school. . . . Here, what qualifies as secular or religious guidance in the context of a Catholic high school is exceedingly difficult to identify, and 'the purpose of the ministerial exception is to allow religious employers the freedom to hire and fire those with the ability to shape the practice of their faith.'" *Id.* at 16-17 (citation omitted).

The historical analysis in *Our Lady of Guadalupe* introducing the Court's discussion of the ministerial exception, which Plaintiff reduces to a mishandled phrase (Supp. Opp. at 3), aptly frames the non-interference principle we urge here as a specific immunity, which requires no balancing to apply:

> The independence of religious institutions in matters of "faith and doctrine" is closely linked to independence in what we have termed "'matters of church government.'" *Hosanna-Tabor*, 565 U.S. at 186, 132 S.Ct. 694. This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are

- 5 -

> essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles.

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (emphasis added). Plaintiff similarly shies away from the broader reasoning of established Supreme Court jurisprudence like *Dale*, which is another and independent means by which the First Amendment protects private mission-driven organizations, even secular ones like the Boy Scouts. (*Cf.* Supp. Opp. at 4). Thus, the context of teaching in a religious mission-driven school is paramount to answering the Court's questions here.

Finally, Plaintiff gives short shrift to the foundational First Amendment principles that take form in the seminal law on church property cases, intra-church leadership disputes, and the ministerial exception. (Supp. Opp. at 2-3). While these types of disputes are well-developed examples of ecclesiastical abstention, they are not the sole occupiers of that territory. The First Amendment lives and breathes in various litigation postures and contexts, such as *In re Diocese of Lubbock*, 624 S.W.3d 506 (Tex. 2021), and *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (2d Cir. 2014), which Plaintiff hastily excuses as defamation cases without addressing the abstention principles embraced by the Texas Supreme Court and Second Circuit in their analyses. (*Compare* Supp. Opp. at 3-4 with Supp. Br. at 3-4, 16-17). Cases on this continuum requiring abstention include Title VII cases like *Aparicio v. Christian Union, Inc.*, 18-cv-0592, 2019 WL 1437618 (S.D.N.Y. March 29, 2019), and *Curay-Cramer v. Ursuline Academy*, 450 F.3d 130 (3d Cir. 2006), discussed in Defendants' Supplemental Brief at 12-13 and 16, which Plaintiff ignores. They also include claims against religious authorities for negligent hiring, supervision and retention of clergy. *E.g.*, *Schmidt v. Bishop*, 779 F. Supp. 321, 332 (S.D.N.Y. 1991) (dismissing claims against church authorities arising from alleged sexual contact by pastor during counselling relationship with adult, explaining that "any

inquiry into the policies and practices of the Church Defendants in hiring and supervising their clergy" raises "First Amendment problems of entanglement"). These cases all have a common thread: the resolution of the claims could not occur without a civil court or jury making value judgments about the propriety of religious institutions' conduct in light of their religious beliefs and practices. Hence, the courts abstained from violating the First Amendment in all these various disputes, as the Court should here too.

II.     **The First Amendment Requires Civil Abstention at Summary Judgment Here.**

Contrary to Plaintiff's pretense, Defendants do not argue that the First Amendment licenses universal immunity to religious organizations for any type of "faith-based decision-making even when it violates the law." (Supp. Opp. at 1). Rather, Defendants argue that in the context where a religious institution makes a *prima facie* showing of its principled basis for an adverse employment decision, those protected rights cannot be probed or weighed against other competing secular interests. This protection – the non-interference of government in the ordering of a religious school's workforce where a prospective employee volunteers his plans to violate religious doctrine and questions whether he can serve in a role that requires him to live religious doctrine – is what the First Amendment affords Defendants here. It is not an exception to the law; it *is* the law.

The Academy rescinded Plaintiff's employment contract because Plaintiff professed beliefs concerning religious doctrine to his prospective religious employer that rendered him unsuitable for the role of Academy teacher. While Plaintiff cherry-picks general statements about the First Amendment and its role in Title VII cases to argue that he should be able to proceed to trial, Plaintiff fails to appreciate that submission to a jury of "*all* of the evidence (of whatever kind)" (Supp. Opp. at 14) will violate the Defendants' First Amendment rights here, on this record. This is so because the substance of Plaintiff's September 2, 2015 statements to the Academy, and

the substance of the Academy's September 3, 2015 response to Plaintiff, <u>all explicitly include views concerning religious doctrine</u>. (Supp. Br. at 21). The teaching of the *Redhead* directed verdict, among other cases discussed in Defendants' supplemental brief, is that a jury cannot arrive at a verdict in a Title VII mixed-motive case such as this one without assessing the plausibility and relative importance of the religious doctrine underpinning the Academy's decision, and application of that doctrine to the administration of the Academy's workforce – assessments that are forbidden by the First Amendment. (Supp. Br. at 20-21).

Relying on Judge Posner's commentary from a non-religious Title VII sex discrimination suit about whether a non-religious business reason for the employee's firing was pretextual or the "true reason," *Forrester v. Rauland-Borg Corp.*, 453 F.3d 4126 (7th Cir. 2006), Plaintiff extrapolates that a pretext analysis is no different when a religious employer states a religious basis for the firing (Supp. Opp. at 15-16, 23), relying on *Barber* and *Dayton* (*id.* at 16-17). Not so. As discussed above, neither case supports the weight of Plaintiff's argument. And critically, Plaintiff does not directly address Defendants' argument, supported by *Culvert* and *DeMarco*, that the First Amendment is unavoidably implicated when a religious belief is the stated reason for an employment action challenged as pretextual: as long as the adverse action would have occurred for the stated, sincerely held religious beliefs, it does not matter if there is another or many other possible reasons. (*See* Supp. Br. at 18-19).[4]

When a religious institution makes an adverse employment decision on a principled religious basis following an employee's voluntary admission of an intent to violate Catholic beliefs

---

[4] Similar legal and analytical gaps exist regarding Plaintiff's contention that a mixed motive case can proceed to trial when a religious belief is part and parcel of the adverse action. Plaintiff ignores *Redhead* and instead relies on *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) and *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008), Title VII cases that did not involve any religion at all.

and his prospective employment obligations, the First Amendment has already struck the balance for the courts in favor of the religious actor: the religious institution's determination cannot be probed or weighed against other competing secular interests by a judge or jury. This is so whether the abstention "label" is the First Amendment, *Aparicio*, 2019 WL 1437618 at *7, *10 (discussed in Supp. Br. at 12-13), or Title VII's statutory exemption for religious organizations, *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 233 (S.D.N.Y. 2005) (dismissing lay social workers' religious discrimination Title VII claims where Salvation Army's religious views purported to violate social workers' legal and professional counseling obligations).

### III. Plaintiff's Case Turns on His Profession of Contrary Religious Views.

There is no genuine issue of material fact as to the written contents of Plaintiff's email to the Academy on September 2, 2015, and the Academy's written response on September 3, 2015. (Dkt. No. 57-7, Defs. Exs. 27 and 28). To avoid summary judgment, Plaintiff attempts to conjure factual disputes about the meaning of Plaintiff's emailed words and the contours of Catholic doctrine as it relates to gay marriage and gay sex, suggesting that "[i]f the jury finds that absent an ingredient of homophobia, Mr. Butler would not have been fired," plaintiff will prevail. (Supp. Opp. 19-21). The irreconcilable tension between Plaintiff's view of "homophobia" and Catholic doctrine puts the lie to the constitutional clearance advocated by Plaintiff. Stated differently, Plaintiff's case begs the question "Is it homophobic to oppose gay marriage?" From there, it is impossible for a jury to avoid straying into religious doctrine, from deciding that Catholic doctrine is homophobic and therefore a basis upon which to find in favor of Plaintiff. If such a finding were to occur, it would directly violate Title VII's exemption and the First Amendment.

Noting a pathway for the recovery of attorneys' fees, Plaintiff now offers a "third option" to proceed to trial for declaratory and injunctive relief on a "motivating factor" theory, suggesting it is constitutionally permissible because the Academy could not be held liable for backpay or

reinstatement. (Supp. Opp. at 19). This misses a key point made in *Hosanna-Tabor* and highlighted by Defendants. (*See* Supp. Br. at 19). Such a finding is no less prohibited by the First Amendment than an order awarding backpay and reinstatement because it still means that the Academy can be held civilly liable for making a hiring decision based upon its religious beliefs.

This, of course, is the burden that Plaintiff refuses to acknowledge: that, if the case proceeds to trial, and Plaintiff prevails, it means that religious schools are not free to select a workforce of adherent teachers to carry out the ministry of education, which will unnecessarily constrain the employment practices of religious schools for fear of litigation. It also means that the State can punish a religious organization for taking Plaintiff at his word when he volunteered his plans to violate Defendants' religious doctrine and voiced his discomfort with the idea of living the doctrine consistent with the obligations of an Academy teacher, amounting to a wholesale shrinkage of the protective boundary between religious freedom and coercive litigation.

From the outset, Defendants have stated that the decision to rescind Plaintiff's offer of employment results from Plaintiff's violation of the morals and teachings of the Roman Catholic Faith. (Defs. Answer to Am. Compl., Dkt. No. 23 at ¶¶ 1, 19; Academy Letter dated Sept. 3, 2015, Dkt. No. 57-7, Defs. Ex. 28). Testimony from Academy principal Mrs. Cieloszyck that she understood Mr. Butler's email implied a "breach of contract by intending and expressing intent to break the Catholic morals and values that are incorporated into all of the documents that were signed" is consistent with this position. (*Cf.* Supp. Opp. at 22; Dkt. No. 69-1, Tr. 211:6-10). Indeed, the documents referenced by Mrs. Cieloszyck, cited by the Academy in its Affirmative Defenses, include the Academy contract signed by Plaintiff and accompanying Academy handbook which both state that, as a Catholic School Teacher, Plaintiff was essential to the ministry of conveying the Faith and that he was to teach and convey the Roman Catholic Faith by

being a role model of the Catholic Faith to his students. (Defs. Affirmative Defenses, Dkt. No. 23 at ¶¶ 48-49; Contract, Dkt. No. 57-5 at Ex. 15, Handbook, Dkt. No., 57-6 at Ex. 16 Sec. 1.A). These documents specifically required that Plaintiff "shall not teach, advocate, encourage, or counsel beliefs or practices contrary to the Catholic Faith." (*Id.*)

On its face, Plaintiff's September 2, 2015 email to the Academy opposes Catholic beliefs: it evinces an unqualified intent to enter into a marriage that is undisputedly opposed by the Catholic Faith. (*Cf.* Supp. Opp. at 19). It also contextualizes Plaintiff's view of his fit for the position of Academy teacher, a position that not only requires doctrinal alignment with the Catholic Faith, but exemplification of that doctrine as a role model for students. In that email, Plaintiff told the Academy "*After attending the first day of orientation, I am concerned about my position within the diocese and school. The tones of the speakers were strident at times and I cannot tell if I would be accepted. I am homosexual and plan on marrying my boyfriend eventually, and after being told all day that I have to live church doctrine I feel wounded and unwanted. . . . I put the decision in your hands now rather than some point down the line. Would I still be a welcome member of the St. Stan's community?*" (Dkt. 57-7 at Ex. 27). Plaintiff's litigation-driven attempt to recast his email as meaning that he intended to follow Church doctrine and not marry his boyfriend until the Church changed its beliefs (Supp. Opp. at 20-21) is a bridge too far, and cannot defeat summary judgment in Defendants' favor.

Even more to the point, there is no evidence in the record that the Academy allowed the hiring or retention of a teacher who professed an intent to violate Catholic doctrine or voiced a concern to the Academy as to whether they could meet the obligations to live Catholic doctrine consistent with the obligations for Academy teachers.

Under such circumstances, and on this record, whether the grounds are called the First Amendment, ministerial exception, Title VII's exemptions, or the NYSHRL and NYCHRL's exemptions, the Court should grant summary judgment in favor of Defendants.

## CONCLUSION

Based on the foregoing reasons of fact and law, Defendants ask the Court to grant summary judgment and dismiss Plaintiff's claims.

Respectfully submitted,

*/s/Richard J. Cea*
Richard J. Cea
Wingate, Kearney & Cullen
111 John Street, Suite 1040
New York, New York 10038


*/s/Marissa Parker*
Mark E. Chopko
Marissa Parker
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103

## **CERTIFICATE OF SERVICE**

I, Marissa Parker, hereby certify that on August 18, 2021, I caused a true and correct copy of the foregoing Supplemental Reply in Further Support of Defendants' Motion for Summary Judgment Pursuant to Court Order dated June 9, 2021 to be delivered via the Court's electronic filing system upon the following:

> Kathleen Peratis, Esq.
> Amy Biegelsen, Esq.
> Eliana Theodorou, Esq.
> Outten & Golden LLP
> 685 3rd Avenue, 25th Floor
> New York, NY   10017
> kp@outtengolden.com
> abiegelsen@outtengolden.com
> etheodorou@outtengolden.com
> *Attorneys for Plaintiff*

> */s/ Marissa Parker*
> Marissa Parker

5160084