UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

CODY BUTLER,

                     Plaintiff,               **MEMORANDUM & ORDER**
                                            19-CV-3574(EK)(ST)

          -against-

ST. STANISLAUS KOSTKA CATHOLIC
ACADEMY and THE DIOCESE OF BROOKLYN,

                  Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        This employment dispute arises from the termination of a teacher by a Catholic school — the St. Stanislaus Kostka Catholic Academy in Queens, which Plaintiff and Defendants' employees refer to as "St. Stans."  Plaintiff Cody Butler claims that St. Stans fired him on account of his sexual orientation. He brings suit against the school and the Diocese that oversees it pursuant to Title VII and analogous New York State and City laws, and also seeks unpaid wages under the New York Labor Law. Both parties move for summary judgment: Butler with respect to certain of St. Stans' affirmative defenses, and St. Stans on all of Butler's claims.  For the reasons set out below, I grant St. Stans' motion for summary judgment and deny Butler's motion.

## I.   Background

        The following facts are drawn from the parties' Local Rule 56.1 statements, along with the deposition transcripts and

other documentary materials they submitted.  Because I grant St. Stans' motion for summary judgment (and deny Butler's), I construe the evidence in the light most favorable to Butler, the non-movant in the prevailing motion.

St. Stans' stated mission is to, among other things, provide a "nurturing environment that emphasizes Catholic values" as well as "the beauty of diversity and love of God, others and life-long learning."  Pl.'s Responses to Defs.' Local Rule 56.1 Statement of Undisputed Material Facts in Supp. of Their Mot. for Summ. J. ("Pl.'s Rule 56.1 Responses") ¶ 6, ECF No. 58-1.  The school is managed by a "Board of Members," all of whom are appointed by the Bishop of the Diocese; most of them are religious clergy.  *Id.* ¶¶ 8-9.

In August 2015, Butler applied to teach two subjects at St. Stans: English Language Arts and Social Studies.  Pl.'s Rule 56.1 Responses ¶ 68.  Butler's resume showed fourteen years of Catholic education, including at Catholic elementary and high schools.  Defs.' Mot. for Summ. J. ("Defs.' Mot.") Ex. 24, ECF No. 57-7.  Butler submitted his application under a cover letter stating that the position would be "a way of enacting my faith, to teach in a Catholic setting."  *Id.*; *see also id.* (Butler explains his desire to "teach in a place where I can integrate contemporary pedagogical methods with the universal and eternal values we are raised with in the Catholic faith").  St. Stans

2

treated Butler's experience in the Catholic school system as important in the hiring process.  Pl.'s Rule 56.1 Responses ¶ 75.

St. Stans interviewed Butler that month; the school subsequently offered him the position for the 2015-2016 school year.  *Id.* ¶¶ 77-78.  Butler signed a Contract of Employment requiring him to, among other things, "exemplify by [his] public conduct Catholic Doctrine and Morality," serve as "a role model of the Catholic Faith," and "includ[e] the Church's teachings within" the subject matter of his lessons.  Defs.' Mot. Ex. 15, at 2, ECF No. 57-5.  And he received the Academy Teacher Personnel Handbook (the "Handbook"), sent to all new hires, which stated that teachers must "embrac[e] the ministry" and could be terminated if they violated "the tenets of Catholic morality or teaching contrary to Catholic doctrine."  Defs.' Mot. Ex. 16, at 10, 62, ECF No. 57-6.[1]

Deposition testimony also made clear that St. Stans expected its teachers to fulfill several religious obligations. This testimony primarily came from Dr. Thomas Chadzutko, the Superintendent of Catholic School Support Services at the Brooklyn Diocese, and Christina Cieloszczyk, St. Stans' principal.  Among other things, Superintendent Chadzutko

---

[1] Page numbers in citations to record documents other than deposition transcripts refer to ECF pagination.

testified that teachers may not publicly challenge church
doctrine and must "defend[] [its] values and virtues."  Defs.'
Mot. Ex. 2 ("Chadzutko Dep. Tr."), at 163:14-25, 175:8-13, ECF
No. 57-4.  And Principal Cieloszczyk testified that teachers
were expected to "incorporate" Catholic values into their
classroom lessons, even in non-religious classes (Butler
disputes this statement).  Defs.' Mot. Ex. 1 ("Cieloszczyk Dep.
Tr."), at 26:9-19, 29:18-31:7, ECF No. 69-1.[2]

On September 1, Butler attended a "New Teacher
Orientation Program" at St. Stans along with the other first-
year teachers.  Pl.'s Rule 56.1 Responses ¶ 258.  The
orientation emphasized the importance of the gospel and
catechism, among other things.  *Id.* ¶ 96; Defs.' Mot. Ex. 20, at
120, 122-23, 132, ECF No. 57-6 (slides entitled "What is
Catechesis?", "Who is a Catechist?", "Why Catechesis?", and
"Every Teacher is a Religion Teacher").[3]  Butler does not allege
that any explicit discussion of homosexuality transpired during
the orientation.

_____

[2] Portions of Cieloszczyk's deposition cited in this Order are also
located at ECF No. 60-11.

[3] At his deposition, Butler stated that he could not recall whether he
viewed the presentation, entitled "Teaching our Catholic Faith for New
Teachers," from which these slides are drawn.  *See* Pl.'s Rule 56.1 Responses
¶ 51.

The day after orientation, and just days before the school year was set to begin, Butler sent Principal Cieloszczyk an email expressing reservations about his new role.  Butler wrote:

> After attending the first day of orientation, I am concerned about my position within the diocese and school. The tones of the speakers were strident at times and I cannot tell if I would be accepted.  I am homosexual and plan on marrying my boyfriend eventually, and after being told all day that I have to live church doctrine I feel wounded and unwanted.
>
> I want to teach the kids at St. Stan's [sic] more than anything, but I put the decision in your hands now rather than at some point down the line.  Would I still be a welcome member of the St. Stan's community?

Defs.' Mot. Ex. 27, at 44, ECF No. 57-7.

Principal Cieloszczyk forwarded Butler's email to Dr. Chadzutko and asked for advice.  Pl.'s Rule 56.1 Responses ¶ 106.  She testified later that she escalated the email because Butler's stated intent to marry his boyfriend "does not coincide with our Catholic morals and values."  *Id.* ¶ 107; Defs.' Mot. Ex. 1, at 68:17-23, ECF No. 57-1.  At the time, and to this day, Catholic doctrine held that marriage is only between a man and a woman, and the Church lacks "the power to give the blessing to unions of persons of the same sex."  Pl.'s Rule 56.1 Responses ¶ 108 ("The Catholic Church teaches that marriage is only between a man and a woman."); *see also* Offices of the Congregation for the Doctrine of the Faith, *Responsum* of the

Congregation for the Doctrine of the Faith to a *Dubium* Regarding
the Blessing of the Unions of Persons of the Same Sex (March 15,
2021).[4]

The next day, Principal Cieloszczyk sent Butler a
termination letter (which was returned as undeliverable).  Pl.'s
Rule 56.1 Responses ¶¶ 119-20.  When Butler arrived at the
school on September 8, Principal Cieloszczyk gave Butler a copy
of the letter, which was dated September 3.  *Id.* ¶¶ 124-25.  The
letter stated that "we cannot enter into a contract for
employment with you as a teacher in this Catholic institution
due to the violation of the Catholic faith and morals of our
school."  *Id.* ¶ 119.

Given that the school year was to start shortly
thereafter, St. Stans embarked on a rapid interview process to
replace Butler.  *Id.* ¶ 130; Cieloszczyk Dep. Tr. 32:17-19.  The
school wound up hiring a new teacher, Amanda Puglionisi, who
served for only one year.  Pl.'s Rule 56.1 Responses ¶ 130;
Pl.'s Mot. Ex. N. ("Puglionisi Dep. Tr.") 11:21, ECF No. 60-17.
Butler deposed Ms. Puglionisi in this case and relies heavily on
her testimony that during this period, she did not include
religious material in her classroom teaching.  *See* Mem. of Law
in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot.") 4-8,

---

[4] *Available at* https://press.vatican.va/content/salastampa/en/
bollettino/pubblico/2021/03/15/210315b.html (last accessed June 27, 2022).

11-12, ECF No. 60-1.  As discussed below, however, Ms. Puglionisi did acknowledge that, among other things, she accompanied her students to and from morning prayer every day, attended Mass with them "around the major holidays," and attended confirmation ceremonies.  *See* Pl.'s Rule 56.1 Responses ¶¶ 14-15, 133, 136, 198; *see also* Cieloszczyk Dep. Tr. 27:9-12 (noting that teachers and students "pray together as a school down in the auditorium" each morning and that "[t]eachers are then expected to lead prayer before lunch and lead prayer before the end of the day.").

In April 2016, Butler filed a discrimination claim with the New York City Commission on Human Rights ("NYCCHR"). Verified Complaint to the NYCCHR, ECF No. 60-40.  In its position statement before the NYCCHR, St. Stans took the position (as it does here) that the termination was predicated on Butler's statement of intended conduct, rather than his sexuality itself.  The school asserted that Butler's "choice to marry another man is a clear and obvious violation of Church teachings," and that "[i]f [Butler] was living a celibate life[,] his sexual orientation would be meaningless absent more actions on his part."  Pl.'s Mot. Ex. E ¶¶ 40-41, ECF No. 60-8. Butler commenced this action in June 2019.

## II.  Legal Standards

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[5]

The moving party has the burden of demonstrating the absence of a dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v.*

---

[5] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

*Catrett*, 477 U.S. 317, 322 (1986).  In performing this analysis, the Court must resolve all ambiguities and draw all inferences in favor of the non-moving party.  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

Generally speaking, employment-discrimination claims proceed through the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  At the first step, the plaintiff must present evidence sufficient to prove a *prima facie* case of discrimination based on a protected characteristic — here, Butler's sexual orientation.  *Id.* at 802; *see Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) ("Under *McDonnell Douglas*, plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination." (emphasis added)).  If the plaintiff makes that showing, the burden shifts to the defendant to present a "legitimate, non-discriminatory" explanation for the challenged employment action, *McDonnell*, 411 U.S. at 802; St. Stans proffers, here, its religious tenets and Butler's rejection thereof.  If the defendant meets its burden at the second step, the burden returns to the plaintiff, who must prove by a preponderance of the evidence that the justification put forward by the defendant is pretextual.  *Id.* at 804.

This analysis yields to First Amendment considerations, however, in certain claims against religious employers.  The Free Exercise and Establishment Clauses protect "the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020).  These clauses thus "foreclose certain employment discrimination claims brought against religious organizations." *Id.* at 2061.

### III. Analysis

Title VII prohibits covered employers from firing employees where their sex or sexual orientation is a "motivating factor." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015); *see* 42 U.S.C. § 2000e-2(a)(1) (prohibiting an employer from "discharg[ing] any individual . . . because of such individual's race, color, religion, sex, or national origin"); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (sex discrimination under Title VII includes discrimination based on sexual orientation).  At the same time,

> the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion.  The First Amendment outlaws such intrusion.

*Our Lady of Guadalupe*, 140 S. Ct. at 2060.

St. Stans claims it is exempt from Title VII liability in this case based on these First Amendment principles and also the statutory exemptions in Title VII itself, which permit religious "educational institution[s]" to "employ employees of a particular religion."  42 U.S.C. § 2000e-2(e); *see also id.* § 2000e-1(a).  Because I hold that the First Amendment requires summary judgment in favor of St. Stans (for two separate reasons), I do not reach the statutory question.

St. Stans' First Amendment defense implicates, first, the so-called "ministerial exception" recognized and discussed by the Supreme Court in two relatively recent cases.  This exemption shields religious employers from liability for employment decisions regarding employees who qualify as "ministers," regardless of whether they are terminated for a religious reason, a secular reason or, indeed, with no reason given at all.  In Section III.A, I conclude that Butler was hired into a "ministerial" capacity at St. Stans, and that summary judgment is required on that basis.

The ministerial exception is not, however, the only mechanism limiting secular courts' intrusion into the employment decisions of religious institutions.  The ministerial exception derives from, and is but one manifestation of, a broader (and

well-settled) principle expressed in Supreme Court and Second Circuit jurisprudence — the principle of "church autonomy." This principle is process-oriented: it cabins a court's authority to interfere in a religious organization's "independence in matters of faith and doctrine and in closely linked matters of internal government," *Our Lady of Guadalupe*, 140 S. Ct. at 2061, even outside the discrimination context. St. Stans invokes the principle of church autonomy in addition to the ministerial exception, and I conclude in Section III.B below that it would mandate summary judgment under the *McDonnell Douglas* analysis even if Butler had not been hired into a ministerial role.  This is because St. Stans has pointed to documentary evidence that Butler was terminated for religious reasons, and the principle of church autonomy precludes a jury from questioning the veracity of those reasons (or the weight to be accorded them) under the guise of pretext analysis in this case.

A.   **The Ministerial Exception Requires Dismissal**

        Broadly speaking, the ministerial exception "precludes application of [Title VII] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012).  Every circuit had adopted a version of the ministerial exception before the Supreme Court recognized it

in *Hosanna-Tabor*.  *Id.* at 188 n.2.  And the exception has been applied to a broad range of employees, extending well beyond ordained ministers.  In *Rweyemamu v. Cote*, for example, the Second Circuit noted that the doctrine had been invoked to protect religious institutions in suits by an "organist / music director," a "director of music ministries," a press secretary, and a kosher-kitchen staffer at a Jewish nursing home.  520 F.3d 198, 206-07 (2d Cir. 2008).

The Supreme Court analyzed the ministerial exception twice in the last decade: first in *Hosanna-Tabor*, 565 U.S. 171, and eight years later in *Our Lady of Guadalupe* ("*OLG*"), 140 S. Ct. 2049.  Neither case sets out a definitive rule for when a religious employee qualifies as a "minister," *Hosanna-Tabor*, 565 U.S. at 190; indeed, the cases counsel against any formulaic test or "checklist" approach.  *See id.* (counseling against the adoption of a "rigid formula"); *Our Lady of Guadalupe*, 140 S. Ct. at 2066-67 (criticizing the Court of Appeals for treating the factors identified as relevant in *Hosanna-Tabor* as "checklist items").  The Court did, however, identify a series of relevant factors, and the application of those factors compels the conclusion that the ministerial exception applies here.

In *Hosanna-Tabor*, the Supreme Court considered whether a fourth-grade teacher at a Lutheran school qualified as a

minister.  565 U.S. at 176-78.  The Court concluded —
unanimously — that she did, citing her title ("Minister of
Religion"), her use of that title, the process behind her
hiring, and the "important religious functions" she performed.
*Id.* at 191-92.[6]  The Court noted that the case implicated
important societal interests in enforcing antidiscrimination
statutes as well as ensuring religious freedom.  *Id.* at 196.
Given the plaintiff's ministerial duties, however, the Court
concluded that "the First Amendment has struck the balance
[between those interests] for us."  *Id.*  Accordingly, the
Supreme Court held that the Sixth Circuit had erred in reversing
the district court's grant of summary judgment to the school.
*Id.*  This was true even though the school had invoked no
religious reason for the teacher's termination.  *Id.* at 178
(noting that teacher-plaintiff had become ill with what was
later diagnosed as narcolepsy, and was terminated after school
administrators deemed her "unlikely to be physically capable of
returning to work").

Eight years later, the Supreme Court revisited the
ministerial exception in *Our Lady of Guadalupe*.  Unlike the

---

[6] The plaintiff in *Hosanna-Tabor*, Ms. Perich, "taught math, language
arts, social studies, science, gym, art, and music.  She also taught a
religion class four days a week, led the students in prayer and devotional
exercises each day, and attended a weekly school-wide chapel service.  Perich
led the chapel service herself about twice a year."  *Id.* at 178.

"called" teacher in *Hosanna-Tabor*, 565 U.S. at 177-78, the teacher-plaintiffs in *OLG* were "lay" employees of the Catholic schools at which they taught.  *Our Lady of Guadalupe*, 140 S. Ct. at 2056, 2058.  The two teachers "were not given the title of 'minister' and ha[d] less religious training than" the *Hosanna-Tabor* plaintiff.  *Id.* at 2055.  Indeed, one of the *OLG* plaintiffs apparently attested that she was not even a practicing Catholic.  *Id.* at 2069; *see also id.* at 2056 n.2.  Still, the Supreme Court determined — again by a broad majority — that both teachers qualified for the ministerial exception.  The Court began with the following observation about religious schools, which applies with equal force here:

> The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

*Id.* at 2055.[7]

In analyzing the applicability of the ministerial exception, the Court observed that formal titles are not

---

[7] As in *Hosanna-Tabor*, the religious-school defendants in *Our Lady of Guadalupe* did not argue that they terminated the plaintiffs for religious reasons (at least as far as the opinion makes apparent).  *See id.* at 2058 (school claimed to have terminated one plaintiff based on her "difficulty in administering a new reading and writing program"); *id.* at 2059 (other plaintiff fired, according to school, based on her "failure to observe the planned curriculum and keep an orderly classroom").

controlling.  "What matters, at bottom, is what an employee does."  *Id.* at 2064.  In this regard, however, the Court gave significant deference to the *church's stated expectations* about how a given role was to be performed.  To understand those expectations, the Court looked to, among other things, the plaintiffs' employment agreements and their schools' faculty handbooks.  *Id.* at 2056-59.  In several places in the opinion, the Court invoked the testimony of the school principals.  *E.g.*, *id.* at 2057 & n.5; 2058 & n.7; *see also id.* at 2059 ("The school principal confirmed these expectations [about, among other things, integrating Catholic thought and principles into secular subjects].").  In the *OLG* majority's assessment of what the employees in question did, the following factors were important:

- **The schools' *stated missions*.**  "Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught . . . ."  *Id.* at 2066.

- **The teachers' *employment agreements*,** which were "in pertinent part nearly identical."  *Id.* at 2058.  One plaintiff's agreement informed her, for example, that the school's mission was "to develop and promote a Catholic School Faith Community," that "all her duties and responsibilities as a Teacher were to be performed within this overriding commitment," and that she was expected to

16

"model and promote Catholic faith and morals." *Id.* at 2056; *see also id.* at 2066 (the teachers "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith").

■ ***Faculty handbooks.*** "The St. James handbook define[d] 'religious development' as the school's first goal and provide[d] that teachers must 'model the faith life,' 'exemplify the teachings of Jesus Christ,' 'integrate Catholic thought and principles into secular subjects," and "prepare students to receive the sacraments." *Id.* at 2058-59.

■ ***Religious teaching.*** Both elementary school teachers provided religious instruction, in addition to teaching all other subjects. "Morrissey-Berru provided religious instruction every day using a textbook designed for use in teaching religion to young Catholic students." *Id.* at 2057. "Under the prescribed curriculum, she was expected to teach students, among other things, to learn and express belief that Jesus is the son of God and the Word made flesh; to identify the ways the church carries on the mission of Jesus"; and to "locate, read and understand stories from the Bible." *Id.* The other teacher, Ms. Biel, "was required to teach religion for 200 minutes each week

and administered a test on religion every week." *Id.* at 2059.

- **"Catechist" status.** "Like all teachers in the Archdiocese of Los Angeles, Morrissey-Berru was considered a catechist, *i.e.*, a teacher of religion." *Id.* at 2057. Catechists are "responsible for the faith formation of the students in their charge each day." *Id.* The Supreme Court repeatedly invoked this notion — that all teachers were expected to model religious values for students at all times.

- **Participation in prayer.** One teacher, Morrissey-Berru, was "expected to attend faculty prayer services*," id.* at 2056, and was required to participate in "school liturgical activities, as requested." *Id.* She "occasionally selected and prepared students to read at Mass," *id.* at 2057, and she "was expected to take her students to Mass once a week and on certain feast days." *Id.* "Biel taught her students about Catholic practices like the Eucharist and confession. At monthly Masses, she prayed with her students." *Id.* at 2059.

Consideration of these factors leads to the same conclusion here. In its public job listing, St. Stans said that it was looking only for "a practicing Roman Catholic committed to the mission of Catholic education" — not secular education — to fill the position. Pl.'s Rule 56.1 Responses ¶ 27; *see also*

Pl.'s Mot. Ex. Z, at 3, ECF No. 60-29 (stating in job posting
that the Diocese was seeking "qualified and committed Catholic
educators to advance the mission of Catholic schools").  Butler
invoked his Catholic education explicitly in his job
application.  *See id.* ¶ 70 (in his cover letter, Butler stated
that it was "important for me, as a way of enacting my faith, to
teach in a Catholic setting"); *id.* ¶¶ 72-73 (resume listing
Butler's education in Catholic schools); *see also Fratello*, 863
F.3d at 195 (school principal "applied for the job in a letter
drawing attention to her . . . 'strong Catholic faith'").
Butler does not contest that St. Stans hired him on that basis.
Pl.'s Rule 56.1 Responses ¶¶ 74-75.

    After receiving the job offer, Butler signed a written
Contract of Employment dated August 28, 2015.  *See* Defs.' Mot.
Ex. 15 (countersigned by St. Stans' Principal Cieloszczyk).  In
that contract Butler agreed, among other things, that:

> The TEACHER and the Academy [are] involved in the
> ministry of teaching and conveying the Roman Catholic
> Faith.  The TEACHER is essential to the ministry of
> conveying the Faith.  The TEACHER is to teach and
> convey the Roman Catholic Faith by being a role model
> of the Catholic Faith to [his] students.  The TEACHER
> is to support and exemplify by his/her public conduct
> Catholic Doctrine and Morality.  The TEACHER is to
> include the Church's teachings within the
> content/subject matter of all subjects.  The TEACHER
> is to incorporate objects of Catholic Faith into the
> learning environment and she/he will have religious
> articles displayed in the classroom at all times.  The
> TEACHER shall not teach, advocate, encourage, or

counsel beliefs or practices contrary to the Catholic
Faith.

Pl.'s Rule 56.1 Responses ¶¶ 34-35 (citing Defs.' Mot. Ex. 15).
The Contract of Employment further obligated Butler to "teach
*and act* according to the laws and precepts of the Roman Catholic
Church." *Id.* (emphasis added)*.*  In attempting to diminish the
import of these requirements, Butler relies on district court
cases that predate *OLG* and are meaningfully distinguishable on
their facts.[8]

Butler's contract also incorporated St. Stans'
Personnel Handbook by reference: he agreed to "fulfill the
requirements for Professional Development and Living and Leading
by Faith set forth in the Academy Teacher Personnel Handbook."
Defs.' Mot. Ex. 15.  The Handbook, in turn, "called" on Butler
to "embrac[e] the ministry of the Roman Catholic school,"
"demonstrate an acceptance of Gospel values and the Roman

---

[8] For example, Butler cites *Richardson v. Northwest Christian
University,* 242 F. Supp. 3d 1132 (D. Ore. 2017).  There, the court held that
the ministerial exception did not apply to an "assistant professor of
exercise science" despite the expectation that she would "integrate her
Christianity into her teaching and demonstrate a maturing Christian faith."
*Id.* at 1145.  In addition to predating *OLG*, *Richardson* is distinguishable
because — for example — the professor apparently had literally no religious
duties.  *See id.* (plaintiff "was charged with no religious duties such as
taking students to chapel or leading them in prayer").  Butler, in contrast,
acknowledges that he would have been expected to attend prayer with his
students, among other things.  Pl.'s Rule 56.1 Responses ¶¶ 89, 132-33.
Butler also relies heavily on *Redhead v. Conference of Seventh-Day
Adventists*, No. 03-CV-6187 (E.D.N.Y. July 29, 2008), but as discussed in
Section III.B., *infra*, he has deeply misunderstood the procedural history and
ultimate import of that case.

Catholic tradition," and "encourage" students "to make Roman Catholic value judgments." Defs.' Mot. Ex. 16, at 10-11. It specifically provided for "termination of a teacher's employment" should they violate "the tenets of Catholic morality." *Id.* ¶ 41; *see also, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 192-97 (2d Cir. 2017) (relying on the Archdiocese's "Administrative Manual" for schools and the plaintiff's employment contract in applying the ministerial exception to a school principal's discrimination suit, even pre-*OLG*).[9] St. Stans also sent new teachers a "Welcoming Letter" reiterating that each teacher would "play a vital role in advancing the mission of the Catholic Church," and that they

---

[9] Butler places substantial weight on *Fratello's* footnote 2, where the court wrote:

> Because we give significant weight to the provisions of the Manual, *we first caution that its contents establish very little by themselves*. What is significant is that the Manual undisputedly governed the operation of the School, and that those who operated the School regarded the Manual as authoritative and generally sought to conform to the practices and standards that it espoused.

863 F.3d at 193 n.2 (emphasis added). *Fratello's* precondition for significance, however, is present here too: the record is replete with testimony from the school superintendent, principal, and others that St. Stans' personnel regarded the Personnel Handbook's pronouncements as authoritative and generally sought to conform to them. As set out below, Butler cannot overcome this testimony solely via Ms. Puglionisi's testimony. Perhaps more importantly, the argument for which Butler invokes this footnote is diametrically at odds with two aspects of *OLG* — both (a) the Court's guidance about taking the religious school's "definition and explanation" of teachers' roles seriously, and (b) the Court's reliance on the schools' handbooks in its analysis. *See OLG*, 140 S. Ct. at 2066.

would share "the awesome responsibility of bringing the Gospel message to the students."  Pl.'s Rule 56.1 Responses ¶ 92.[10]

Because he was hired in late summer, Butler missed the first day of orientation on August 26, 2015; but he was in attendance on Day 2.  *Id.* ¶¶ 257-259.  The New Teacher Orientation consisted of fifteen separate presentations or sets of remarks, nine of which explicitly involved prayer or discussed St. Stans' teachers' obligations to impart the Catholic faith to students.  *See* Defs.' Mot. Ex. 26, at 40-42, ECF No. 57-7 (schedule of programming listing "Opening Prayer, Welcome and Introductions"; "Mass – Immaculate Conception Chapel"; "Presentation: Mission and Ministry of Catholic Education"; "Teacher as Catechist~ Living and Leading by Faith"; "Living and Leading by Faith: Methodology"; "Closing Remarks & Prayer"; "Opening Prayer, Welcome"; "How Do We Bring Religion Into Everything We Teach?"; and "Closing Remarks & Prayer").

At the orientation, presenters repeated these sentiments, instructing teachers to "live by" the "word." Defs.' Mot. Ex. 20, at 126.  During a presentation entitled "Teaching our Catholic Faith for New Teachers", the school emphasized that "every teacher is a Religion teacher" at St.

---

[10] Butler claims he never received this letter either.  *Id.*  Regardless, the letter is probative of the role St. Stans' teachers play in inculcating the Catholic faith in students.

Stans.  *Id.* at 133.  At another presentation entitled "New
Teacher Orientation Program," teachers were "called to become
personally involved" in the faith, including by "being a
practicing Roman Catholic," "embracing the ministry of the
Catholic school," and "demonstrating acceptance of Gospel values
and the Christian tradition."  Defs.' Mot. Ex. 14, at 28, ECF
No. 57-5.  The presentation goes on: "[E]ach Catholic school
teacher share[s] in the responsibility for students' Christian
formation."  *Id*. at 30.

Principal Cieloszczyk testified that "religion is
expected to be incorporated into whatever subject the teachers
teach, including prayer with the students in the classroom,"
Cieloszczyk Dep. Tr. 26:13-16, and that this was true "in
English language arts especially."  *Id.* 26:16-17.  And Butler
effectively concedes that part of his job at St. Stans would
have been the obligation to model the faith for his students.
Pl.'s Rule 56.1 Responses ¶ 25 (replying "Undisputed" to
Defendants' assertion that "[t]he academy views its teachers to
be ministers of the Faith"); *id.* ¶ 26 (again "Undisputed" that
St. Stans "considers its teachers essential to the ministry of
conveying the Faith").

The key assessment of "what an employee does" is made
at least somewhat more difficult in this case by the timing of
Butler's email and his ensuing termination, which occurred

before he had taught the first day of school.  Nevertheless,
this extensive evidence leaves no doubt that Butler's job did,
and would have continued to, include important ministerial
duties.  It is true, as Butler argues, that his job description
differed from the *Hosanna-Tabor* and *OLG* teachers in one
prominent way: Butler was not tasked with providing *specified*
religious instruction.  *Cf., e.g., Our Lady of Guadalupe*, 140 S.
Ct. at 2056 ("For many years, Morrissey-Berru was employed at
OLG as a lay fifth or sixth grade teacher.  Like most elementary
school teachers, she taught all subjects, and since OLG is a
Catholic school, the curriculum included religion.  As a result,
she was her students' religion teacher.").  Butler relies
heavily on his subject-matter assignment (English Language Arts
and Social Studies), and he invokes the testimony of the teacher
hurriedly hired to replace him for a single year in support of
the assertion that he was not, in fact, tasked with
communicating religious lessons.  *See* Pl.'s Mot. 11–13, ECF No.
60-1; Pl.'s Rule 56.1 Statement of Undisputed Material Facts
¶ 2, ECF No. 60-2 (Ms. Puglionisi testified that she "didn't do
anything religion-related within the classroom").

        There are several problems with this argument.  First,
it accords no weight to the specific ministerial duties that it
is undisputed Butler would have performed.  The parties agree,
among other things, that Ms. Puglionisi accompanied her students

to morning prayer "each morning," *see* Pl.'s Rule 56.1 Responses ¶ 13 (citing Puglionisi testimony that she "took part" in morning prayer with students, though "I didn't lead that"); Cieloszczyk Dep. Tr. 39:11-16 (testifying to a "specific recollection" that Ms. Puglionisi "participate[d] in prayer" at morning services); that she attended Mass with her students on a number of occasions, Pl.'s Rule 56.1 Responses ¶¶ 89, 132-33; Cieloszczyk Dep. Tr. 39:7-40:6; that she attended their confirmations, Pl.'s Rule 56.1 Responses ¶ 136, and that she was required to complete a catechism program within the first four years of her hiring.  *Id.* ¶ 30.  This despite the fact that St. Stans found Ms. Puglionisi on a moment's notice, that she missed the New Teacher Orientation, and that she remained at St. Stans for just one year before leaving to teach in the public school system.  Puglionisi Dep. Tr. 20:16-22, 23:3-17, 25:21-26:14.

Second, and more importantly, Butler's argument about religious teaching would require the Court to disregard St. Stans' evidence — discussed above at length — that Butler was obligated to live as a catechist and teach the gospel every day by word and deed.[11]  This evidence, when considered holistically,

---

[11] For example, the school's principal testified that St. Stans expected all its teachers, including Butler, to incorporate religion into lesson plans.  Cieloszczyk Dep. Tr. 26:12-19, 27:9-14, 29:18-24, 40:10-12, 45:25-47:5, 170:12-25; *see also* Pl.'s Rule 56.1 Responses ¶ 89.  The numerous presentations at New Teacher Orientation exhorted teachers to play their

is fatal to Butler's claim.  It cannot be overcome by Ms. Puglionisi's testimony that she did not broach religion with her students.  Her testimony could prove, at most, that *she* declined to follow the contractual (and spiritual) obligations imposed on St. Stans' teachers, and that the school did not penalize her for it during the brief period of her employment.[12]

Third, it would violate the Supreme Court's directives in *Hosanna-Tabor* and *OLG* for me to regard specified religious curricular duties as a prerequisite for the ministerial exception's application.  *Hosanna-Tabor* explicitly declined to adopt a "rigid formula," 565 U.S. at 190, and *OLG* disparaged the "checklist" approach applied by the Court of Appeals below.  140 S. Ct. at 2066-67.  Indeed, *OLG* made clear that no single prerequisite controls by holding that the ministerial exception may apply even to employees who are not practicing members of the institution's faith.  *Id.* at 2069.

---

critical parts in exhibiting the Catholic faith.  *See* Defs.' Mot. Ex. 20, at 28 (presentation entitled "Teaching our Catholic Faith for New Teachers"); Defs.' Mot. Ex. 14, at 28 (presentation entitled "New Teacher Orientation Program," explaining that teachers were "called to become personally involved" in the faith, including by "[b]eing a practicing Roman Catholic," "[e]mbracing the ministry of the Catholic school," and "[d]emonstrating acceptance of Gospel values and the Christian tradition").

[12] Presumably Butler's replacement signed an employment contract like his, obligating her, too, to spread the gospel through word and deed and incorporating the Faculty Handbook.  But the record does not reveal Ms. Puglionisi's specific contractual arrangements.  She did testify that St. Stans' principal observed her teaching "[t]wice, I want to say twice." Puglionisi Dep. Tr. 36:8-12.

In the end, *OLG* commands that courts afford meaningful deference to religious school administrators and clergy when they attest that a particular employee had ministerial duties. In holding that both *OLG* plaintiffs were ministers despite lacking the title, the Court noted that both teachers' "schools saw them as playing a vital part in carrying out the mission of the church, *and the schools' definition and explanation of their roles is important*." *Our Lady of Guadalupe*, 140 S. Ct. at 2066 (emphasis added).  The Court offered a reason for this deference: "In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Id.*  This is a point the Court has made on many previous occasions: that secular courts are ill-equipped to wade into any controversy of religious doctrine.  *See, e.g.*, *Serbian E. Orthodox Diocese for the U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976) (observing "the general rule that religious controversies are not the proper subject of civil court inquiry"); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969) (civil courts should not resolve questions that would require them "to engage in the forbidden process of interpreting and weighing church doctrine"); *Kedroff v. St. Nicholas*

*Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116
(1952) (holding that "[f]reedom to select the clergy" has
"constitutional protection"); *Watson v. Jones*, 80 U.S. 679, 727
(1871) (civil court should defer to religious authorities on
"questions of [church] discipline, or of faith, or
ecclesiastical rule, custom, or law.").

Beyond any deference to St. Stans, however, we can
also look to Butler's own statements — made during his brief
employment — for evidence of his ministerial role.  While Butler
contends now that his job was not ministerial in nature, he
acknowledged otherwise in his reaction to the orientation, in a
precise and explicit way.  Indeed, *this case arises* directly out
of Butler's reaction to the ministerial training in his
orientation.  As noted above, Butler described himself as
feeling "wounded" and "unwanted" after that training — in his
words, at "being told all day that I have to live church
doctrine."  Defs.' Mot. Ex. 27, at 44.

In this regard, the religious interests at stake in
this case go beyond the First Amendment interests in *Hosanna* and
*OLG*.  Butler was not only terminated from a ministerial position
at St. Stans — he was terminated from that position after
expressing discomfort with the ministerial aspects of the
position.  He did so by articulating the view that the
requirement to "live church doctrine" was discomfiting to him,

and also by articulating his intent to contravene the Church's prohibition on same-sex marriage.[13]

When Butler took issue with the admonishment to live church doctrine, he was objecting to his own job description — what he was being told that *he had to do* to perform the job successfully.  His legal position is, for this reason, obviously internally contradictory: it defies logic to acknowledge that a teacher in his position is "told all day that [he has] to live church doctrine," on the one hand, and still contend that the job has no religious component, on the other.

For these reasons, St. Stans' motion for summary judgment must be granted.

## B.    Summary Judgment Would be Warranted Even if the Ministerial Exception Did Not Apply

Given that the ministerial exception applies, Butler's claims must be dismissed: employees "properly characterized as 'ministers' are flatly barred from bringing employment-discrimination claims against the religious groups" for whom

---

[13] Butler argues now that he intended to marry his partner "only . . . if and when same-sex marriage was sanctioned by the Church."  Pl.'s Mot. 2; see also Pl.'s Rule 56.1 Responses ¶¶ 262-64.  But he did not include this qualifier in his email, and there is no reason the school should have intuited what he left out.  Moreover, one might legitimately ask whether a church employee's statement that he intends to do what church doctrine forbids when the Church changes its position — even if that was what Butler meant — still constitutes an objection to church doctrine as it currently stands.  *See, e.g.*, Cieloszyck Dep. Tr. 155:16-24 (indicating that questioning Catholic doctrine can itself "undercut somebody's ability to support and exemplify" "Catholic doctrine and teaching on morality").  One problem with sending this case to a jury is that the question I have just posed *is itself* a religious question.

they worked.  *Fratello*, 863 F.3d at 202-03.  This bar applies regardless of whether the challenged decision was "made for a religious reason" or not.  *Hosanna-Tabor*, 565 U.S. at 194.  Even if Butler did not qualify as a ministerial employee, however, summary judgment would be required *on the record of this case*, given the interplay between the *McDonnell Douglas* framework, on the one hand, and the church autonomy principle, on the other. That principle is broader than the ministerial exception, and it has implications for the *McDonnell Douglas* analysis in discrimination cases where (as here) the defendant has proffered a religious reason for termination.

    1.   Church-Autonomy Principle

The Free Exercise and Establishment Clauses assure a right to church autonomy.  *Our Lady of Guadalupe*, 140 S. Ct. at 2061; *see also, e.g.*, *Rweyemamu v. Cote*, 520 F.3d 198, 205 (2d Cir. 2008) (citing cases).  This doctrine includes "a religious institution's right to decide matters of faith, doctrine, and church governance," *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006), and guarantees religious organizations "independence from secular control or manipulation."  *Kedroff*, 344 U.S. at 116.

The church-autonomy principle arises not only from the recognition that secular courts have limited *business* managing religious institutions, but also that courts have limited

*aptitude* for such management.  The Second Circuit noted in
*Fratello* that the "notion of judicial incompetence with respect
to strictly ecclesiastical matters can be traced at least as far
back as James Madison, the leading architect of the religious
clauses of the First Amendment."  863 F.3d at 203; *see also*
*Watson*, 80 U.S. at 729 ("It is not to be supposed that the
judges of civil courts can be as competent in the ecclesiastical
law and religious faith of all these bodies as the ablest men in
each are in reference to their own.").

          The ministerial exception is but one manifestation of
the church-autonomy principle.  *See Our Lady of Guadalupe*, 140
S. Ct. at 2060 (religious institutions' freedom to make hiring
decisions is "a component" of their autonomy).  More broadly,
the Supreme Court held long ago that courts were to avoid
interfering in "matters of church government as well as those of
faith and doctrine," *Kedroff*, 344 U.S. at 116, including those
involving "theological controversy, church discipline,
ecclesiastical government or the conformity of the members of
the church to the standard of morals required of them."  *Watson*,
80 U.S. at 733.  Thus the First Amendment protects more
generally against "wide-ranging intrusion[s] into sensitive
religious matters."  *Rweyemamu*, 520 F.3d at 207; *see also*
*Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (instructing that
"courts should refrain from trolling through a person's or

institution's religious beliefs"); *Milivojevich*, 426 U.S. at 713 (recognizing that court "inquiry into the procedures that canon or ecclesiastical law supposedly requires" is "exactly the inquiry that the First Amendment prohibits"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) ("We agree with the Fifth Circuit that throughout [the Supreme Court's] opinions there exists a spirit of freedom for religious organizations, an independence from secular control or manipulation.") (citing *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972)).[14]

These admonitions make clear that the church-autonomy principle has procedural, as well as substantive, components. It prevents courts from subjecting religious institutions to "protracted legal process pitting church and state as adversaries," *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 949 (9th Cir. 1999), and offers some protection from "the expense and indignity of the civil legal process." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 957 (9th Cir.

---

[14] Reading the deposition testimony of St. Stans' principal, one might reasonably ask whether it is too late to prevent a "trolling" through the school's religious beliefs, as *Mitchell* and these other cases command. Over more than 250 pages, the principal is asked questions like "[h]ow do you determine whether or not an essay topic is on a religious subject?," Cieloszyck Dep. Tr. 30:15–17; "how would a teacher bring up Catholic faith and morals in a class discussion about a novel or historic event?," *id.* at 45:9–11; "how do you remind teachers of their duty to embrace the ministry of the Roman Catholic church and share in its evangelizing mission?," *id.* at 46:18–21; and (with respect to the "Stations of the Cross" service that Mr. Butler's replacement participated in), "[i]s there any ecclesiastical requirement?  Do you have to be baptized to participate in that service?" *Id.* at 54:22–24.

2004); *see also NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) (recognizing that "the very process of inquiry" can implicate the First Amendment). Indeed, in *EEOC v. Catholic University*, the D.C. Circuit held that "the EEOC's two-year investigation of [the plaintiff's] claim, together with the extensive pre-trial inquiries and the trial itself, constituted an impermissible entanglement with judgments that fell within the exclusive province of" the religious institution. 83 F.3d at 467.

With the church-autonomy principle in mind, I proceed to examine the *McDonnell Douglas* framework as Butler seeks to apply it to this case.

### 2. Interplay with *McDonnell Douglas* Factors Here

The plaintiff's burden at step one of the *McDonnell Douglas* framework — to establish a *prima facie* case — is "not onerous," *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and I assume here that Butler has satisfied it.[15] At step two of the framework, it falls to the defendant to articulate a non-discriminatory reason for the termination at

---

[15] Among other things, Butler points to an email from St. Stans' principal. Plaintiff's law firm had emailed the principal a letter. Principal Cieloszczyk forwarded the email to Dr. Chadzutko, the schools superintendent, with a note that it was in regard to the "young man that I had hired in August before I knew he was gay." Defs.' Mot. Ex. 29. This email may be subject to multiple interpretations, as discussed below, but it is likely sufficient to clear the bar at step one of the *McDonnell Douglas* framework.

issue.[16]  Here, St. Stans has pointed to documentary evidence of an asserted religious violation as its non-discriminatory reason, in the form of Butler's email.  At step three, Butler faces a dual burden: "An employer's reason for termination cannot be proven to be a pretext for discrimination unless it is shown to be false *and* that discrimination was the real reason." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514-15 (1993).

In cases against religious employers, these inquiries are constrained, to some degree, by the First Amendment.  Among other things, the principle of church autonomy precludes a jury — and at the summary-judgment stage, the Court — from treating as broadly up-for-debate the Church's assessment that Butler's email violated an important religious tenet.  The Second Circuit said so explicitly in *Rweyemamu*, even before *Hosanna-Tabor* or *OLG* was decided, summarizing the state of its jurisprudence as follows: "we will permit lay employees . . . to bring discrimination suits against their religious employers,"

---

[16] In *DeMarco v. Holy Cross High School*, the Second Circuit recognized that assessing the "plausibility" of a church's stated non-discriminatory reason "could give rise to constitutional problems where . . . a defendant proffers a religious purpose for a challenged employment action."  4 F.3d 166, 171 (2d Cir. 1993).  Still, a plaintiff might properly "be able to put into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise." *Id*.  St. Stans' reason does not fit these categories.

*Rweyemamu*, 520 F.3d at 207, but "even when we permit suits by lay employees, *we will not subject to examination the genuineness of a proffered religious reason for an employment action*." *Id.* (emphasis added); *see also DeMarco*, 4 F.3d at 171 ("ADEA plaintiffs may not challenge the plausibility of putative religious purposes.  A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held."); *Catholic High School Ass'n of the Archdiocese of N.Y. v. Culvert*, 753 F.2d 1161, 1168 (2d Cir. 1985) (where religious school argued that a challenged labor action was motivated by religious purpose, state labor relations board was constitutionally prohibited from inquiring into whether church held a particular belief or whether its claimed doctrinal position was correct).[17]

In sum, Butler cannot carry his burden at step three by instigating a debate over whether the Church really believes

---

[17] Butler disputes that the church-autonomy principle has any application beyond the ministerial exception in a case like this.  *See* Pl.'s Suppl. Br. 13, ECF No. 73 ("Outside the ministerial exception, no First Amendment issues arise when an employer moves for summary judgment on a Title VII claim and points to a religious reason for its adverse actions.").  Put differently, Butler is arguing that for non-ministerial employees, the First Amendment affords church employers no protection at all in employment decisions.  This argument ignores the force of *Rweyemamu*, *DeMarco* and *Culvert*, as well as cases like *NLRB v. Catholic Bishop of Chicago*, where the Supreme Court held that the National Labor Relations Board lacked jurisdiction over religious organizations because the church-autonomy principle prevents "inquir[ies] into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission."  440 U.S. 490, 502 (1979).

its position on marriage, or what the precise contours of that position are, or the extent to which his email statement really was in tension with that position or not.  He has only limited options for showing pretext, as discussed in *DeMarco*: he must "focus[] upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination."  *DeMarco*, 4 F.3d at 171.

Butler has produced virtually no meaningful evidence of those kinds.  His pretext argument is predicated largely on three pieces of evidence:

**The "coded message" at orientation.**  Butler asserts that one speaker at his orientation warned against leading a "double life," and that Butler "understood to be a disparaging reference to homosexuals."  Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summary Judgment ("Pl.'s Opp. Br.") 2–3, ECF No. 58; Pl.'s Rule 56.1 Responses ¶¶ 104–05, 260–61.

But nothing in the orientation materials mentions homosexuality, and Butler concedes that the speaker — a Diocese representative — did not mention it by name.  The term "double life" is regularly deployed in other contexts.  *See, e.g.*, *United States v. Owens*, 917 F.3d 26, 33 (1st Cir. 2019) (having

36

an affair is leading a "double-life"); *Coen v. Am. Certified Special Servs., Inc.*, No. 13-CV-5522, 2014 WL 1237258, at *1 (E.D.N.Y. Mar. 25, 2014) (Mann, M.J.) (referring to a "double life" of "gambling, illegal drugs, and illicit sex"); Doug Stanglin, *Pope Denounces Catholics Who Lead a "Double Life,"* USA Today (Feb. 23, 2017, 3:47 P.M.) (speaking of employers who "boast they are 'very Catholic' yet fail to pay their workers a fair wage")[18]; *see also Lead a Double Life*, Merriam-Webster.com Dictionary (defining the idiom as "to not tell the whole truth about one's life")[19]; *12 People Who Led Double Lives Until They Did — Or Didn't — Come Crashing Down*, Buzzfeed.com (Feb. 21, 2021) (discussing affairs, drug dealing, and secret families).[20] This comment cannot be the basis for a finding of pretext.

**Principal Cieloszczyk's email.** Butler points to an email Principal Cieloszczyk sent Dr. Chadzutko two months after he was terminated. Principal Cieloszczyk had just received an email attaching a letter from Butler's counsel. She forwarded the email and attached letter to the superintendent, noting that they were in regard to the "young man that I had hired in August before I knew he was gay." Defs.' Mot. Ex. 29, ECF No. 57-7.

---

[18] https://www.usatoday.com/story/news/2017/02/23/pope-denounces-catholics-who-lead-double-life/98298868/ (last visited June 27, 2022).

[19] https://www.merriam-webster.com/dictionary/lead a double life.

[20] https://www.buzzfeed.com/mikespohr/double-lives-stories (last visited June 27, 2022).

But this email does not say that St. Stans terminated Butler for being gay.  Principal Cieloszczyk, for her part, says she referred to Butler as she did simply to "refresh" the superintendent's recollection of the original email she had sent him on the subject.  Cieloszczyk Dep. Tr. 43:10-12.[21]

     *Policy violation*.  Butler advances only one argument that implicates *DeMarco's* neutral principles — he claims that St. Stans *violated its own policies* in firing him.  Butler's argument goes as follows: St. Stans' stated policy is to permit homosexuals into the ministry, as long as they do not engage in *conduct* proscribed by the Vatican.  Pl.'s Opp. Br. Ex. J ("Chadzutko Dep. Tr.") 272:14-19 (testifying that a "gay teacher who was celibate" would be "eligible for employment in the Brooklyn diocese," but that the decision to "marry another man . . . is a clear and obvious violation of Church teachings").  Notwithstanding this policy, Butler's argument goes, St. Stans fired Butler because of the statement in his email about his sexual orientation.  This policy violation, according to Butler, constitutes "strong evidence of pretext." Pl.'s Opp. Br. 5; *see* Tr. of Oral Arg. 50:22-52:14, ECF No. 67.

---

[21] Butler argues that St. Stans should have investigated what Butler meant when he said he would "eventually" marry his boyfriend — specifically, what the word "eventually" meant with respect to a change in church doctrine, and whether he intended to remain celibate in the meantime.  But there is nothing about the word "eventually" that should have led the Church to deduce the condition he now attaches to his statement of intent, or to launch the investigation that Butler describes.

But this argument is obviously circular; to conclude that St. Stans violated its policy, one must presume St. Stans fired Butler based on his sexual orientation — the thing Butler is ultimately trying to prove — and not because his email communicated a rejection of Church doctrine in the statement that he "intended" to marry another man.[22]  Butler's argument that a policy violation appears on the face of the neutral evidence is thus illogical.[23]

Given the paucity of neutral, "factual" evidence, the only way for the jury to find pretext would be to question the Church's explanation of religious doctrine, or to question how much that particular religious doctrine really mattered to the Church.[24]  To do so, however, would violate the church-autonomy principle.

This predicament has been dispositive before, even outside the context of the ministerial exception.  In *Curay-*

---

[22] In case not obvious, the circularity works as follows: Butler argues that we know he was fired for his sexuality because St. Stans violated its policy when firing him, and we know that they violated their policy because they fired him for his sexuality.

[23] The neutral evidence of a policy violation hypothesized by *DeMarco* would arise if, for example, an institution said it would give employees ten days to respond to accusations of misconduct, but terminated an employee after only five.  To find a policy violation of that kind would not require a determination of whether the underlying discrimination had occurred or not.

[24] Butler argues in the alternative that he does not need to show pretext in a mixed-motive case.  *See* Pl.'s Opp. Br. 21-23.  To the extent Butler does raise a mixed-motive theory, the principle of church autonomy still applies, and the Court's analysis would remain unchanged.

*Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, for example, the court dismissed a sex-discrimination claim brought by a Catholic school teacher without invoking the ministerial exception.  450 F.3d 130 (3d Cir. 2006).  Ms. Curay-Cramer, who admittedly violated Church doctrine, claimed the school fired her based on her sex (not religion) because male teachers who also violated Church doctrine kept their jobs.  *Id.* at 137–40. The Third Circuit dismissed Curay-Cramer's claim because "measur[ing] the degree of severity of various violations of Church doctrine" would have required an impermissible "inquiry into a religious employer's religious mission or the plausibility of its religious justification."  *Id.* at 142.  The Third Circuit's reasoning had nothing to do with Curay-Cramer's substantive job duties.  The problem was procedural: the finder of fact would need to inquire into whether, and how much, the employer truly believed in its asserted doctrine.

A decision from another judge in this district is equally compelling.  In *Redhead v. Conference of Seventh-Day Adventists*, No. 03-CV-6187 (E.D.N.Y. July 29, 2008), the district judge initially denied a motion for summary judgment on a Title VII sex-discrimination claim, saying that "a jury remains the proper instrument for determining whether it was pregnancy or fornication that caused the Defendant to dismiss the Plaintiff."  *Redhead v. Conf. of Seventh-Day Adventists*, 566

F. Supp. 2d 125, 137 (E.D.N.Y. 2008).  Butler emphasizes this holding, apparently unaware of the case's subsequent procedural history: after the trial evidence was received, but before the jury had a chance to begin deliberations, the district judge reversed herself and issued a directed verdict for the defendant.  She explained that the plaintiff failed to present neutral "factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative nondiscriminatory purpose was stated only after the allegation of discrimination." Pl.'s Mot. Ex. 38 (transcript of oral ruling in *Redhead*), at 236:6-17.  Given the state of the evidence, she held, the jury could "only find for plaintiff by questioning the testimony of [defendant's representatives] and specifically questioning the validity and plausibility of the church doctrine that the defense witnesses claim motived the adverse employment action." *Id.* at 237:4-8.  Based on that, she determined that the case could not be sent to the jury in a manner commensurate with the Constitution.  *Id.* at 237:8–24.  The same is true here.

This is not to say that religious employers may always escape the *McDonnell-Douglas* pretext inquiry simply by asserting a religious justification for terminating a non-ministerial employee.  *See Askew v. Trs. of the Gen. Assembly of the Church*

*of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d
at 419 ("When a church dispute turns on a question devoid of
doctrinal implications, civil courts may employ neutral
principles of law to adjudicate the controversy." (citing *Jones
v. Wolf*, 443 U.S. 595, 602–03 (1979) (states may resolve church
property disputes, provided they do so based on "neutral
principles of law")); *Rayburn v. General Conf. of Seventh-Day
Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (First Amendment
does not prevent "Title VII scrutiny, where the [employment]
decision does not involve the church's spiritual functions.").
As *DeMarco* explained, the pretext inquiry remains, in the usual
case, amenable to neutral review on the basis of "factual"
questions.  *See* 4 F.3d at 171.

      But this is not the "usual" case *DeMarco* envisioned.
Butler affirmatively — and undisputedly — registered his
discomfort with Church doctrine; he told St. Stans that "having
to live Church doctrine all day" made him feel "wounded" and
"unwanted."  And Butler said he had a current intention to marry
his boyfriend — a seeming rejection of the Church's current
position on same-sex marriage, regardless of whether he planned
to wait until the Church changed its stance.

            *          *          *          *          *

      The bottom line is that courts have long recognized
the church-autonomy doctrine, and no binding authority has ever

said that the ministerial exception eclipses this doctrine in employment-discrimination cases.  Given the case law discussed above, I am constrained to conclude that no such limitation exists.  Under controlling case law, the church autonomy doctrine applies in the employment-discrimination context, as it does elsewhere.  And this principle forecloses judicial inquiry into the plausibility of St. Stans' asserted religious justifications in this case.

## C.   State-Law Claims

In addition to his Title VII claims, Butler brings claims under the New York State Human Rights Law, New York City Human Rights Law, and New York Labor Law.  Because I dismiss Butler's Title VII claim — the sole basis for federal jurisdiction in this case — I decline to exercise supplemental jurisdiction over his remaining state-law claims.  *See* 28 U.S.C. § 1367(c); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[O]ur Court has held, as a general proposition, that 'if [all] federal claims are dismissed before trial, . . . the state claims should be dismissed as well.'" (emphasis omitted)).  These claims are therefore dismissed.

## IV.  Conclusion

For the reasons stated above, St. Stans' motion for summary judgment is granted, and Butler's motion for partial

summary judgment is denied.  The Clerk of Court is respectfully

directed to enter judgment and close this case.

        SO ORDERED.


                         /s/ Eric Komitee
                      ERIC KOMITEE
                      United States District Judge

Dated:    June 27, 2022
           Brooklyn, New York